**KING & SPALDING LLP**
ERIC S. PETTIT, (SBN 234657)
*epettit@kslaw.com*
CRAIG H. BESSENGER (SBN 245787)
*cbessenger@kslaw.com*
633 West Fifth Street, Suite 1600
Los Angeles, California 90071
Tel: (213) 443-4355
Fax: (213) 443-4310

Attorneys for Plaintiffs
CENTERLINE HOUSING PARTNERSHIP I, L.P. – SERIES 2
RCHP SLP I L.P. – SERIES 2

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

CENTERLINE HOUSING PARTNERSHIP I, L.P. – SERIES 2, f/k/a RELATED CAPITAL HOUSING PARTNERSHIP I, L.P. – SERIES 2, a Delaware limited partnership; and RCHP SLP I L.P. – SERIES 2, a Delaware limited partnership,

Plaintiffs,

v.

PALM COMMUNITIES, f/k/a PALM DESERT DEVELOPMENT COMPANY, a California corporation; and HOUSING CORPORATION OF AMERICA, a Utah non-profit corporation,

Defendants.

Case No.

**COMPLAINT**

**COMPLAINT**

Plaintiffs Centerline Housing Partnership I, L.P. – Series 2, f/k/a Related Capital Housing Partnership I, L.P. – Series 2 (“Centerline”) and RCHP SLP I L.P. – Series 2 (“RCHP” and, collectively with Centerline, “Plaintiffs”) by and through their undersigned counsel, bring this action against Defendants Palm Communities, f/k/a Palm Desert Development Company (“PDDC”) and Housing Corporation of America (“HCA” and, collectively with PDDC, “Defendants”), as set forth below:

**NATURE OF CASE**

1. Plaintiffs Centerline and RCHP are, respectively, the Investor Limited Partner and Special Limited Partner of Frederick and 52 II Limited Partnership, a California limited partnership (the “Partnership”) that owns a 72-unit apartment complex located in Coachella, California (the “Apartment Complex” or the “Property”). Plaintiffs contributed virtually all the capital used to develop the Apartment Complex, totaling more than $7.5 million dollars, and hold a 99.99% ownership stake in the Partnership.

2. Defendant PDDC is a California for-profit corporation, and Defendant HCA is a Utah non-profit corporation. PDDC and HCA are, respectively, the Administrative General Partner and Managing General Partner of the Partnership. Defendants did not contribute significant capital to the Partnership, but have received substantial fees and other economic benefits in exchange for developing and operating the Apartment Complex, and owe fiduciary duties to Plaintiffs and the Partnership.

3. The Partnership and the rights and obligations of Plaintiffs and Defendants in their respective capacities as Investor Limited Partner, Special Limited Partner, Administrative General Partner, and Managing General Partner are governed by an Amended and Restated Agreement of Limited Partnership, as amended (the “Partnership Agreement”).

4. The Apartment Complex owned by the Partnership is a “qualified low-

income housing project" eligible for federal income tax credits and other tax benefits under the Low Income Housing Tax Credit ("LIHTC") provisions of the Internal Revenue Code, 26 U.S.C. § 42 ("Section 42"). Those tax credits are earned over a fifteen-year period commonly referred to as the "Compliance Period."

5. Section 42 provides that certain "qualified nonprofit organization[s]" can hold a "right of 1st refusal" ("ROFR") to purchase a LIHTC project for a statutorily defined price following the end of the Compliance Period in the event that the owner elects to accept a bona fide third party offer to purchase the project. 26 U.S.C. § 42(i)(7) ("Section 42(i)(7)"). The Section 42(i)(7) price is equal to the principal amount of all outstanding indebtedness secured by the property plus all federal, state, and local taxes attributable to such sale, and is typically—though not always—less than the fair market value of the LIHTC project.

6. PDDC, HCA, and the Partnership are parties to an "Option Agreement and Right of First Refusal" (the "Option and ROFR Agreement"). The Option and ROFR Agreement grants PDDC a unilateral option to purchase the Property for the *greater of* fair market value or the Section 42(i)(7) price following the end of the Compliance Period.

7. In addition, the Option and ROFR Agreement grants HCA a ROFR to purchase the Apartment Complex at the Section 42(i)(7) price, but only if the owner—i.e., the Partnership—"shall desire to accept a bona fide offer from an unrelated third party to purchase the Property" from the Partnership.

8. Under the Partnership Agreement, any sale of the Apartment Complex or refinancing of the Partnership's debt requires the Consent of the Special Limited Partner, which the Partnership Agreement defines as "the prior written consent or approval of the Special Limited Partner, which may be granted or withheld in its sole discretion, unless otherwise specified herein to the contrary."

9. On December 16, 2020, in response to a request by PDDC for

approval to refinance the Partnership's debt, Plaintiffs sent a letter to the Partnership's Administrative General Partner—i.e., Defendant PDDC—stating that, "[d]ue to a variety of circumstances in the markets, including the capital markets, the Limited Partners do not currently anticipate that they will desire a Sale or Refinancing Transaction in 2021."

10. Notwithstanding (a) PDDC's recent stated desire to refinance the Partnership's debt (rather than sell the Apartment Complex), and (b) Plaintiffs' statement that they do not wish to sell the Apartment Complex, on January 11, 2021 PDDC sent a letter purporting to provide Defendant HCA with notice that the Partnership "has received, and desires to accept, a bona fide offer from an unrelated third party to purchase the Property" from the Partnership.

11. PDDC's January 11, 2021 letter attached a copy of the putative offer, which was likewise dated January 11, 2021. The letter then claimed that, pursuant to Paragraph 5 of the Option and ROFR Agreement, "HCA has the right, to be exercised within forty-five (45) days after receipt of the proposed offer from [the Partnership], to respond in writing to [the Partnership] indicating that HCA desires to purchase the property for a price equal to the amount set forth in Paragraph 4(a)(i)" of the Option and ROFR Agreement—i.e., the Section 42(i)(7) price.

12. The Section 42(i)(7) price is millions of dollars less than the Apartment Complex's fair market value.

13. Plaintiffs accordingly bring this action for declaratory relief in order to confirm that HCA's Section 42(i)(7) ROFR under the Option and ROFR Agreement has *not* been triggered and may not be exercised unless and until Plaintiff RCHP consents to a sale of the Apartment Complex.

14. The outcome of this dispute will have no impact on the continued operation of the Apartment Complex as affordable housing. Instead, Plaintiffs bring this action to enforce their undisputed contractual right to prevent Defendants from forcing the Partnership to sell the Apartment Complex to Defendant HCA for

a price that is substantially less than its fair market value.

15. Plaintiffs also seek a judicial declaration that Defendants cannot refinance the Partnership's debt without RCHP's prior written consent.

## THE PARTIES

16. Plaintiff Centerline is a Delaware limited partnership. Centerline amended its partnership agreement to change its name from "Related Capital Housing Partnership I, L.P. – Series 2" to "Centerline Housing Partnership I, L.P. – Series 2" on April 2, 2007. Centerline's limited partner and 99.99% owner is Omena, LLC, a Nevada limited liability company ("Omena"). Omena's sole member is Alden Torch Financial LLC ("Alden Torch"), a Delaware limited liability company whose members are citizens of Colorado. Centerline's general partner and .01% owner is RCHP General I L.L.C. – Series 2, a Delaware limited liability company. RCHP General I L.L.C. – Series 2 has five members, all of whom are citizens of New York, as well as a non-member manager, Centerline Manager LLC, a Delaware limited liability company ("Centerline Manager"). Centerline Manager is wholly-owned through a series of sole membership Delaware limited liability companies by Centerline Holding Company, a Delaware statutory trust, and Centerline Holding Company is wholly-owned by Otsego Holdings LLC, a Delaware limited liability company whose sole member is Alden Torch. Centerline accordingly is a citizen of Colorado and New York (and no other state).

17. Plaintiff RCHP is also a Delaware limited partnership. RCHP's limited partner and 99.99% owner is RelCap Holding Company LLC, a New York limited liability company whose members are all citizens of New York. RCHP's general partner and .01% owner is RCHP General I L.L.C. – Series 2, a Delaware limited liability company. RCHP General I L.L.C. – Series 2 has five members, all of whom are citizens of New York, as well as a non-member manager, Centerline Manager. Centerline Manager is wholly-owned through a series of sole

membership Delaware limited liability companies by Centerline Holding Company, a Delaware statutory trust, and Centerline Holding Company is wholly-owned by Otsego Holdings LLC, a Delaware limited liability company whose sole member is Alden Torch. RCHP accordingly is a citizen of Colorado and New York (and no other state).

18. Defendant PDDC is a for-profit corporation organized and existing under the laws of the State of California, with its principal place of business in Irvine, California. PDDC amended its articles of incorporation on September 27, 2011 to change its name from "Palm Desert Development Company" to "Palm Communities." In its capacity as the Partnership's Administrative General Partner, PDDC shares responsibility with Defendant HCA to manage the Apartment Complex, which is located at 84500 Avenue 52 in Coachella, California.

19. Defendant HCA is a non-profit corporation organized and existing under the laws of the State of Utah, with its principal place of business in Salt Lake City, Utah. In its capacity as the Partnership's Managing General Partner, HCA shares responsibility with Defendant PDDC to manage the Apartment Complex, which is located at 84500 Avenue 52 in Coachella, California.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiffs are citizens of Colorado and New York, while Defendants are citizens of California and Utah.

21. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers jurisdiction over federal questions, and 28 U.S.C. § 1340, which confers jurisdiction over "any civil action arising under any Act of Congress providing for internal revenue." 28 U.S.C. §§ 1331 and 1340 provide independent bases for federal subject matter jurisdiction over this

action because the contractual right in dispute was granted pursuant to, and must be interpreted in accordance with, Section 42(i)(7) of the Internal Revenue Code. *See Riseboro Cmty. P'ship v. SunAmerica Hous. Fund No. 682*, 401 F. Supp. 3d 367, 372-77 (E.D.N.Y. 2020) (holding plaintiff raised a federal question under 26 U.S.C. § 42 in a contractual dispute involving the interpretation and purported exercise of a Section 42(i)(7) ROFR); *see also New York ex rel. Jacobsen v. Wells Fargo Nat'l Bank, N.A.*, 824 F. 3d 308, 317-18 (2d Cir. 2016) (interpretation of federal law according favorable tax treatment to mortgage-backed securities "fully 'justif[ies] resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues'") (quoting *Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005)).

22. Plaintiffs seek declaratory relief pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202, which grant this Court authority to declare the rights and other legal relations surrounding questions of actual controversy that exist between Plaintiffs and Defendants.

23. Venue is proper in the United States District Court for the Central District of California under 28 U.S.C. § 1391 because the Apartment Complex and the principal office of the Partnership are both located in this District, and because the events giving rise to this partnership dispute relate to the Apartment Complex and the Partnership.

## FACTUAL ALLEGATIONS

### *A. The LIHTC Program*

24. Congress passed the LIHTC provisions in Section 42 of the Internal Revenue Code in order to promote private investment in the development of affordable housing. Section 42 permits investors who commit capital to developing and operating affordable housing projects to earn tax credits generated by those projects, as well as tax deductions arising out of reductions in the investor's capital account and other benefits attendant to their ownership interests.

25. LIHTC investments are typically structured as a limited partnership between an investor limited partner, who provides the necessary capital, and one or more general partners, who are responsible for developing and operating the project. As is the case here, the investor partner typically acts through a special limited partner, and a general partner may (or may not) be a qualified nonprofit organization focused on affordable housing, which receive certain favorable treatment under Section 42.

26. For a LIHTC investment to be treated as a partnership for tax purposes, the tax credits generated by the LIHTC project must be allocated proportionately in accordance with the partners' respective ownership interests in the partnership that owns the project—i.e., the partnership must have "economic substance." As a result, investor limited partners and special limited partners such as Plaintiffs typically hold a 99% or greater ownership interest in the LIHTC partnerships in which they invest. While the tax credits and other tax advantages are a primary benefit of the investment, LIHTC partnerships must have a tax-independent expectation of profit, and the rights of investor limited partners and special limited partners such as Plantiffs to share in any such profit are determined by the express terms of the applicable partnership agreements.

27. LIHTC partnerships are subject to a statutory fifteen-year "Compliance Period" under Section 42 during which the LIHTC is earned and/or can be recaptured. LIHTC partnerships accordingly often grant their partners various disposition rights at or near the end of the Compliance Period. These provisions can include options, forced sale rights, and rights of first refusal, and can be set forth either in the partnership agreement itself or in a separate agreement.

28. In order to qualify for the tax credits, LIHTC partnerships must agree to record restrictive covenants on their properties to ensure that those properties will comply with affordability and other regulatory restrictions for at least fifteen

years—and in California, at least *forty* years—beyond the end of the Compliance Period, regardless of who owns the property.

29. As noted above, qualified nonprofit organizations that focus on affordable housing receive certain favorable treatment under Section 42. One example of this favorable treatment is Section 42(i)(7)(A), which states: "No Federal income tax benefit shall fail to be allowable to the taxpayer with respect to any qualified low-income building merely by reason of a right of 1st refusal held by the tenants (in cooperative form or otherwise) or resident management corporation of such building or by a qualified nonprofit organization (as defined in subsection (h)(5)(c)) or government agency to purchase the property after the close of the compliance period for a price which is not less than the minimum purchase price determined under subparagraph (B)."

30. The minimum purchase set by Section 42(i)(7)(B) is equal to the outstanding debt on the property plus the exit taxes resulting from the transfer, an amount that is often, though not always, less than the fair market value of the property. As a result, at the time of Section 42(i)(7)'s enactment, "there was congressional concern that the grant of a below-market *option* (as proposed by the Low-Income Housing Tax Credit Act of 1989) was a substantial enough relinquishment of one of the benefits of ownership that true ownership was at issue" under tax principles that permit the allocation of Section 42 tax credits to investors. Tracy A. Kaye, Sheltering Social Policy in the Tax Code: The Low-Income Housing Credit, 38 VILLANOVA L.R. 871, 893 (1993) (emphasis added).

31. To address this concern, Congress enacted a version of Section 42(i)(7) that permitted the grant of a below-market *right of first refusal*, which—unlike an option— "does not give the holder the power to compel an unwilling owner to sell." *Id.* at 897. By structuring Section 42(i)(7) in this way, Congress ensured that "non-profit groups [do not have] . . . the power to compel an unwilling owner to sell." *Id.*; *see also* 136 Cong. Rec. 30528 (Oct. 18, 1990 Senate Report)

(describing Section 42(i)(7) ROFR as applying "should the owner decide to sell").

32. The distinction Congress drew between options and rights of first refusal when crafting Section 42(i)(7) is not simply a legislative creation, but instead has a long history in common law, including in California. *See, e.g.,* Restatement (First) of Property, § 413 cmt. b (2017) (stating that rights of first refusal "are contingent upon the desire of the owner to sell"); *see also Rollins v. Stokes*, 123 Cal. App. 3d 701, 710 (Ct. App. 1981) ("'An owner of land may receive 50 offers to buy it every single day, but if he does not care to sell the land, those 50 offers are not legally operative to give the holder of the right of first refusal the power to buy'") (quoting 1A Corbin, Contracts (1980 Pocket Supp.) s 261, p. 171); *Mercer v. Lemmens*, 230 Cal.App.2d 167, 171 (1964) ("The distinction between an option and a preemptive right is well recognized in the law. A preemptive right does not give the preemptioner the power to compel and unwilling owner to sell; it merely requires the owner, when and if he decides to sell, to offer the property first to the person entitled to the preemptive right at the stipulated price and is valid.").

***B. The Partnership and the Apartment Complex***

33. The Partnership was formed in August 2001 in order to generate low-income housing tax credits pursuant to Section 42 while at the same time creating new affordable housing in Coachella, California.

34. PDDC is the Partnership's Administrative General Partner.

35. The Partnership amended its Partnership Agreement on March 1, 2002 in connection with the admission of non-profit HCA as Managing General Partner, Centerline's affiliate and predecessor-in-interest RCC Credit Facility, L.L.C. as Investor Limited Partner, and RCHP's affiliate and predecessor-in-interest Related Direct SLP LLC as Special Limited Partner. Three months later, on May 30, 2002, the Partnership further amended its Partnership Agreement in connection with the transfer of the Investor Limited Partner interest to Centerline and the Special

Limited Partner interest to RCHP.

36. Centerline contributed more than $7.5 million in capital to the Partnership in exchange for its Partnership interest, and Plaintiffs collectively hold a 99.99% ownership stake in the Partnership. Defendants, by contrast, have never made any significant capital contributions to the Partnership, and collectively hold only a .01% ownership interest in the Partnership.

37. The Partnership used Centerline's capital to fund the development and operation of the Apartment Complex, which is a 72-unit affordable housing development located at 84500 Avenue 52 in Coachella, California. The Apartment Complex is the second phase of a two-phase development that, while owned separately from the first phase, shares various amenities and common areas developed as part of the first phase.

38. Notwithstanding their minimal ownership interest, PDDC and HCA exert significant control over the management and operations of the Apartment Complex, and have earned substantial fees and other economic benefits in exchange for their services.

39. Based on the Apartment Complex's "placed in service" date under Section 42, the Compliance Period for the Partnership ended on December 31, 2017.

40. The Apartment Complex is subject to extended use restrictions that run with the land and ensure that the Apartment Complex will remain affordable housing for several more decades even if it is sold to a new owner.

***C. The Partnership Agreement***

41. The Partnership and the respective rights and obligations of Plaintiffs and Defendants in their capacities as the Partnership's partners are governed by the Partnership Agreement, a true and correct copy of which is attached hereto as Exhibit "A."

42. The Partnership Agreement confirms that Defendants—in their

capacities as Administrative General Partner and Managing General Partner—owe fiduciary duties to Plaintiffs and the Partnership. Section 5.2A of the Partnership Agreement, for example, states that Defendants "shall at all times exercise their responsibilities as General Partners in a fiduciary manner."

43. Section 5.6 of the Partnership Agreement likewise confirms that Defendants have "fiduciary obligations with respect to the management, financing and disposition of the Apartment Complex," and Section 5.8A prohibits the Investor Limited Partner from "contract[ing] away the fiduciary duty owed to it by the General Partners or their Affiliates under common law."

44. Finally, Section 5.3D states that, "[s]o long as a General Partner is the Tax Matters Partner, in discharging its duties and responsibilities, it shall act as a fiduciary to the Limited Partner and shall obtain the consent of the Special Limited Partner in connection with all material decisions and determinations to be made by the Partnership with respect to income tax matters. . . ." PDDC is, and at all relevant times has been, the Tax Matters Partner for the Partnership.

45. Sections 5.4A and 5.5B(iv) of the Partnership Agreement provide that neither PDDC nor HCA may refinance the Partnership's debt or sell the Apartment Complex without the Consent of the Special Limited Partner, which the Partnership Agreement defines as "the prior written consent or approval of the Special Limited Partner, which may be granted or withheld in its sole discretion, unless otherwise specified herein to the contrary."

***D. The ROFR and Option Agreement***

46. At the same time that HCA and Plaintiffs were admitted as partners, the Partnership entered into the Option and ROFR Agreement with PDDC and HCA. A true and correct copy of the Option and ROFR Agreement is attached hereto as Exhibit "B."

47. As alleged above, the Option and ROFR Agreement grants PDDC a unilateral option to purchase the Property following the end of the Compliance

Period. Paragraph 3 of the Option and ROFR Agreement states that PDDC "may exercise the Option by delivering to Owner [i.e. the Partnership], at any time during the Option Term, written notice of such exercise[,]" and Paragraph 4 states that "[t]he purchase price for the Property pursuant to the Option shall be the greater of" fair market value or the Section 42(i)(7) price.

48. In addition, the Option and ROFR Agreement grants HCA a ROFR to purchase the Apartment Complex at the Section 42(i)(7) price—even if that price is far lower than fair market value—following the end of the Compliance Period, but only if the Partnership "shall desire to accept a bona fide offer from an unrelated third party to purchase the Property" from the Partnership.

49. The Option and ROFR Agreement requires the Partnership to deliver to HCA a copy of any proposed offer that it desires to accept, and gives HCA "the right, to be exercised by written notice to Owner within forty-five (45) days after receipt of a copy of the proposed offer from Owner, to respond in writing to Owner indicating that HCA desires to purchase the property for a price equal to the amount set forth in Paragraph 4(a)(1) above"—i.e., the Section 42(i)(7) price.

50. The Option and ROFR Agreement accordingly provides non-profit HCA with a defensive right to ensure that Plaintiffs and/or PDDC do not sell the Apartment Complex to a third party and thereby terminate HCA's involvement with the Apartment Complex, because such a sale would trigger HCA's right to purchase the Apartment Complex at the below-market Section 47(i)(7) price.

### *E. Despite Plaintiffs' Objections, PDDC Purports to Trigger HCA's ROFR and Threatens to Refinance the Partnership's Debt*

51. On December 16, 2020, Plaintiffs sent a letter to PDDC following up on a conversation between representatives of Plaintiffs and PDDC regarding the August 2021 maturity of the Partnership's mortgage on the Apartment Complex (the "Permanent Loan").

52. Plaintiffs stated in their letter that, "[d]ue to a variety of circumstances

in the markets, including the capital markets, the Limited Partners do not currently anticipate that they will desire a Sale or Refinancing Transaction in 2021." Plaintiffs accordingly offered either "to provide a 6-month bridge loan at an interest rate equal to 1% per annum (over 500 bps less than the current interest rate) and with no requirement for third party reports or other closing costs[,]" or "to purchase the Permanent Loan and provide a forbearance agreement for 6-months after maturity, provided that the interest accrues at the default rate of interest for all periods after maturity."

53. PDDC waited almost a full month before responding to Plaintiffs' December 16, 2020 letter. Moreover, prior to responding Plaintiffs' offers regarding the Permanent Loan, PDDC sent a letter to HCA dated January 11, 2021—which PDDC forwarded to Plaintiffs on January 12, 2021—purporting to provide HCA with notice that the Partnership "has received, and desires to accept, a bona fide offer from an unrelated third party to purchase the Property" (the "Notice Letter").

54. PDDC's Notice Letter attached a copy of the putative offer, which was likewise dated January 11, 2021. The Notice Letter stated that, pursuant to Paragraph 5 of the Option and ROFR Agreement, "HCA has the right, to be exercised within forty-five (45) days after receipt of the proposed offer from [the Partnership], to respond in writing to [the Partnership] indicating that HCA desires to purchase the property for a price equal to the amount set forth in Paragraph 4(a)(i)" of the Option and ROFR Agreement—i.e., the Section 42(i)(7) price.

55. Several aspects of the putative offer attached to the Notice Letter suggest that it is not "a bona fide offer from an unrelated third party" as required under the Option and ROFR Agreement.

56. First, as alleged above, the putative offer is dated the same day as the Notice Letter, suggesting that PDDC anticipated and coordinated its submission.

57. Second, the putative offer provided an incomplete and incorrect street

address for the Apartment Complex.

58.     Third, the putative offer only contemplates the purchase of the Apartment Complex even though the Apartment Complex shares facilities with an earlier phase of the same development, such that it would not be commercially reasonable to make an offer to purchase only the Apartment Complex without the first phase of the development.  Indeed, PDDC's website describes the Apartment Complex and the first phase of the development as a single 154-unit property and lists all of the common amenities—including the pool, which was an amenity of the earlier phase that residents of the Apartment Complex can access—as if it were a single development.

59.     Fourth, on information and belief, the individual who submitted the putative offer has direct or indirect business connections with PDDC.  *Cf. Senior Hous. Assistance Group v. AMTAX Holdings 260, LLC, et al.*, No. C17-115 RSM, 2019 WL 1417299, *12 (W.D. Wash. Mar. 29, 2019) (finding that defendant had "engaged in inequitable, bad faith, and unjust conduct when it secretly colluded with [a business associate] to procure sham offers from straw buyers" in order to improperly attempt to trigger a Section 42(i)(7) ROFR).

60.     PDDC's Notice Letter, moreover, is ineffective because it failed to comply with the notice requirements set forth in Paragraph 8 of the Option and ROFR Agreement.

61.     In any event, PDDC's claims in the Notice Letter that the Partnership "desires to accept" the putative offer and that HCA's Section 42(i)(7) ROFR accordingly has been triggered are incorrect.  As alleged above, the Partnership cannot sell the Apartment Complex—and thus cannot form a desire to accept an offer to buy the Apartment Complex—without Plaintiffs' prior written consent, and Plaintiffs confirmed just prior to PDDC's transmittal of the Notice Letter that they did not anticipate "desir[ing] a Sale or Refinancing Transaction in 2021."

62.     On January 15, 2021—i.e., three days after forwarding the Notice

Letter to Plaintiffs—PDDC finally sent a response to Plaintiffs' December 16, 2020 letter regarding the Permanent Loan.

63. PDDC did not mention the Notice Letter in its January 15, 2021 letter to Plaintiffs. Instead, PDDC's January 15, 2021 letter rejected the two options Plaintiffs had offered to address the impending maturity of the Permanent Loan, and stated that, notwithstanding PDDC's failure to obtain Plaintiffs' consent, the Partnership "intend[s] to proceed with a refinancing transaction at the best rates and terms possible today."

64. PDDC's stated intention to move forward with a refinance of the Partnership's debt a mere three days after forwarding the Notice Letter to Plaintiffs demonstrates that PDDC does not genuinely desire to sell the Apartment Complex, and instead is using the purported triggering of HCA's below-market ROFR to force Plaintiffs to accede to PDDC's demands regarding the proposed refinance of the Partnership's debt.

## CAUSES OF ACTION

### Count One (Declaratory Judgment: Section 42(i)(7) ROFR)

65. Plaintiffs repeat and reallege the allegations contained in each and every preceding paragraph of this Complaint as if set forth herein in full.

66. The Partnership is the owner of the Apartment Complex.

67. Plaintiffs and Defendants are parties to the Partnership Agreement, which governs their rights and obligations to each other and to the Partnership in their respective capacities as the Partnership's Investor Limited Partner, Special Limited Partner, Administrative General Partner, and Managing General Partner.

68. The Partnership Agreement is a valid, binding, and enforceable contract.

69. Plaintiffs have performed all their obligations under the Partnership Agreement, including the contribution of more than $7.5 million in capital to the Partnership.

70. The Partnership Agreement does not permit Defendants to sell the Apartment Complex without Plaintiff RCHP's prior written consent.

71. RCHP has not consented to a sale of the Apartment Complex.

72. Defendant PDDC has nonetheless indicated that the Partnership "has received, and desires to accept, a bona fide offer from an unrelated third party to purchase the Property" from the Partnership.

73. In addition, PDDC contends that, in light of the Partnership's purported desire to accept an allegedly bona fide offer from a supposedly unrelated third party, Defendant HCA's right under a separate Option and ROFR Agreement to purchase the Apartment Complex at the Section 42(i)(7) price has been triggered and may be exercised within forty-five days of January 11, 2021.

74. An actual controversy accordingly has arisen and now exists between Plaintiffs, on one hand, and Defendants, on the other, as alleged herein.

75. Plaintiffs are entitled to a declaratory judgment pursuant to Rule 57 of the Federal Rules of Civil Procedure that HCA's Section 42(i)(7) ROFR has not been triggered and may not be exercised unless and until RCHP consents to a sale of the Apartment Complex.

**Count Two (Declaratory Judgment:  Refinance)**

76. Plaintiffs repeat and reallege the allegations contained in each and every preceding paragraph of this Complaint as if set forth herein in full.

77. The Partnership is the owner of the Apartment Complex.

78. Plaintiffs and Defendants are parties to the Partnership Agreement, which governs their rights and obligations to each other and to the Partnership in their respective capacities as the Partnership's Investor Limited Partner, Special Limited Partner, Administrative General Partner, and Managing General Partner.

79. The Partnership Agreement is a valid, binding, and enforceable contract.

80. Plaintiffs have performed all their obligations under the Partnership

Agreement, including the contribution of more than $7.5 million in capital to the Partnership.

81. The Partnership Agreement does not permit Defendants to refinance the Partnership's debt without Plaintiff RCHP's prior written consent.

82. RCHP has not consented to a refinancing of the Partnership's debt.

83. Defendant PDDC has nonetheless indicated that it "intend[s] to proceed with a refinancing transaction at the best rates and terms possible today."

84. An actual controversy accordingly has arisen and now exists between Plaintiffs, on one hand, and Defendants, on the other, as alleged herein.

85. Plaintiffs are entitled to a declaratory judgment pursuant to Rule 57 of the Federal Rules of Civil Procedure that Defendants cannot refinance the Partnership's debt without RCHP's prior written consent.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for the following relief:

a. A judicial declaration pursuant to Rule 57 of the Federal Rules of Civil Procedure that HCA's Section 42(i)(7) ROFR has not been triggered and may not be exercised unless and until RCHP consents to a sale of the Apartment Complex;

b. A judicial declaration pursuant to Rule 57 of the Federal Rules of Civil Procedure that Defendants cannot refinance the Partnership's debt without RCHP's prior written consent;

c. A speedy hearing pursuant to Rule 57 of the Federal Rules of Civil Procedure;

d. An award of all costs, expenses, and attorneys' fees to the extent permitted by statute, contract, or equitable principles; and

e. Such other and further relief as the Court may deem just and proper.

/ /

/ /

DATED: January 19, 2021

KING & SPALDING LLP
ERIC S. PETTIT
CRAIG H. BESSENGER

By: /s/*Eric S. Pettit*
ERIC S. PETTIT
Attorneys for Plaintiffs
CENTERLINE HOUSING PARTNERSHIP I, L.P. – SERIES 2
RCHP SLP I L.P. – SERIES 2