**JACKSON TIDUS**
EDWARD A. GALLOWAY (SBN 128962)
  *egalloway@jacksontidus.law*
2030 Main Street, 12th Floor
Irvine, CA 92614
Tel: (949) 752-8585
Fax: (949) 752-0597

*Attorney for Defendants / Counterclaimants*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTERLINE HOUSING PARTNERSHIP I, L.P. – SERIES 2, f/k/a RELATED CAPITAL HOUSING PARTNERSHIP I, L.P. – SERIES 2, a Delaware limited partnership; and RCHP SLP I L.P. – SERIES 2, a Delaware limited partnership, <br><br>            Plaintiffs/Counter-Defendants, <br><br>        v. <br><br> PALM COMMUNITIES, f/k/a PALM DESERT DEVELOPMENT COMPANY, a California corporation; and HOUSING CORPORATION OF AMERICA, a Utah non-profit corporation, <br><br>            Defendants/Counterclaimants, <br><br>        v. <br><br> ALDEN TORCH FINANCIAL, LLC, a Delaware limited liability company, <br><br>            Counter-Defendant. | Case No. 8:21-cv-00107 <br><br> The Honorable James V. Selna <br><br> **ANSWER AND COUNTERCLAIMS** |

# ANSWER

Defendants Palm Communities, f/k/a Palm Desert Development Company ("Palm") and Housing Corporation of America ("HCA" and together with Palm, "Defendants"), by and through their undersigned counsel, respond to the Complaint by Plaintiffs Centerline Housing Partnership I, L.P. – Series 2, f/k/a Related Capital Housing Partnership I, L.P. – Series 2 ("Centerline") and RCHP SLP I L.P. – Series 2 ("RCHP" and together with Centerline, "Plaintiffs"), as set forth below:

# NATURE OF CASE

1.      Admit the first sentence of Paragraph 1.  Deny the second sentence of Paragraph 1.

2.      Admit the first and second sentences of Paragraph 2.  Deny the remainder of Paragraph 2.

3.      Admit.

4.      Admit, and Defendants respectfully refer the Court to the express provisions of 26 U.S.C. § 42 for a complete and accurate description of its content.

5.      Admit, and Defendants respectfully refer the Court to the express provisions of 26 U.S.C. § 42(i)(7) for a complete and accurate description of its content.

6.      Admit, and Defendants respectfully refer the Court to the express provisions of the Option and ROFR Agreement[1] for a complete and accurate description of its content.

7.      Admit, and Defendants respectfully refer the Court to the express provisions of the Option and ROFR Agreement for a complete and accurate description of its content.

_____

[1] Unless provided otherwise, all defined terms have the same meaning as in the Complaint.

ANSWER AND COUNTERCLAIMS

8.      Deny to the extent the Partnership does not need the Consent of the Special Limited Partner to express a desire to accept an offer to purchase the Apartment Complex, nor can the Special Limited Partner unreasonably withhold or delay its consent to a refinance of the Partnership's debt.  Defendants respectfully refer the Court to the Partnership Agreement for a complete and accurate description of its content.

9.      Admit to the extent that the December 16, 2020 letter was sent to follow up on a phone call during which Erik Halter and Tony Petropolus, on behalf of Defendants, asked Chris Blake, on behalf of Alden Torch Financial LLC ("Alden Torch") and the Limited Partners, "what the Limited Partners would like to do in light of the August 2021 maturity of the Permanent Loan."

10.     Admit that on January 11, 2021, Palm sent HCA a letter providing notice that the Partnership had received and desired to accept a bona fide offer from an unrelated third party to purchase the Apartment Complex.  Deny the remainder of Paragraph 10.

11.     Admit, and Defendants respectfully refer the Court to the January 11, 2021 letter for a complete and accurate description of its content.

12.     Admit, and Defendants respectfully refer the Court to the Option and ROFR Agreement and 26 U.S.C. § 42(i)(7).

13.     Deny that Plaintiffs are entitled to the relief they seek.

14.     Deny.

15.     Deny that Plaintiffs are entitled to the relief they seek.

## THE PARTIES

16.     Defendants do not have sufficient information to admit or deny Paragraph 16.

17.     Defendants do not have sufficient information to admit or deny Paragraph 17.

ANSWER AND COUNTERCLAIMS

18.     Admit, and Defendants respectfully refer the Court to the Partnership Agreement for a complete and accurate description of its content.

19.     Admit, and Defendants respectfully refer the Court to the Partnership Agreement for a complete and accurate description of its content.

## JURISDICTION AND VENUE

20.     Admit.

21.     Deny.  *See Tenants' Dev. Corp. v. AMTAX Holdings 227, LLC*, No. 20-cv-10902-LTS, 2020 WL 7646934 (D. Mass. Dec. 23, 2020) (holding federal question subject matter jurisdiction does not exist over a nearly identical issue involving Alden Torch and another Section 42 ROFR).

22.     Admit.

23.     Admit.

## FACTUAL ALLEGATIONS

24.     Paragraph 24 contains a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny that Paragraph 24 provides a complete and accurate description of Congressional intent or the LIHTC program.

25.     Deny the first sentence of Paragraph 25 to the extent Plaintiffs' imply the investor limited partner provided all "necessary capital."  Admit the second sentence of Paragraph 25.

26.     Admit that (i) an investor limited partner typically holds a 99% or greater ownership interest in the LIHTC partnership to provide for the allocation to the investor limited partner of 99% or more of the tax credits allocated to the Partnership under the LIHTC program, (ii) the investor limited partner's primary, bargained-for benefit in exchange for its capital contribution are the tax credits allocated under the LIHTC program and other tax benefits, and (iii) the rights and

obligations of the respective partners are governed by the applicable partnership agreements and related contracts.  Deny the remainder of Paragraph 26.

27.    Admit.

28.    Admit.

29.    Admit, and Defendants respectfully refer the Court to 26 U.S.C. § 42(i)(7) for a complete and accurate description of its content.

30.    Admit the first sentence of Paragraph 30.  The second sentence of Paragraph 30 consists of an opinion as to Congressional intent to which no response is required.  To the extent a response is required, Defendants deny the remainder of Paragraph 30.

31.    Paragraph 31 consists of an opinion as to Congressional intent to which no response is required.  To the extent a response is required, Defendants deny Paragraph 31.

32.    Paragraph 32 consists of opinions and legal conclusions to which no response is required.  To the extent a response is required, Defendants deny Paragraph 32.

33.    Admit to the extent the full purpose of the Partnership is described under Section 2.5 of the Partnership Agreement.

34.    Admit.

35.    Admit.

36.    Admit that the Investor Limited Partner contributed approximately $7.5 million to be admitted into the Partnership and, along with the Special Limited Partner, has a 99.99% ownership stake in the Partnership, which entitled the Investor Limited Partner to be allocated 99.99% of the nearly $9.5 million in tax credits allocated to the Partnership under the LIHTC Program.  Defendants deny the remainder of Paragraph 36.

/ / /

37.   Admit that the Investor Limited Partner's capital contribution was combined with other sources of capital secured by Defendants to develop and operate the Apartment Complex.  Admit that the Apartment Complex shares certain amenities with other another, separately owned apartment complex. Defendants deny the remainder of Paragraph 37.

38.   Admit that Defendants have exclusive control over the operation and management of the Partnership and the Apartment Complex and earn fees and other benefits for those efforts.  Defendants deny the remainder of Paragraph 38, and respectfully refer the Court to the Partnership Agreement for a complete and accurate description of its content.

39.   Admit.

40.   Admit that the Apartment Complex is subject to extended use restrictions that run with the land.

41.   Admit, and Exhibit A appears to be a copy of the Partnership Agreement, excluding the exhibits.

42.   Admit, and Defendants respectfully refer the Court to the Partnership Agreement for a complete and accurate description of its content.

43.   Admit, and Defendants respectfully refer the Court to the Partnership Agreement for a complete and accurate description of its content.

44.   Admit, and Defendants respectfully refer the Court to the Partnership Agreement for a complete and accurate description of its content.

45.   Deny to the extent that Defendants have exclusive control over the management and operation of the Partnership, and the Partnership does not need the Consent of the Special Limited Partner to express a desire to accept an offer to purchase the Apartment Complex, nor can the Special Limited Partner unreasonably withhold or delay its consent to a refinance of the Partnership's debt.

Defendants respectfully refer the Court to the Partnership Agreement for a complete and accurate description of its content.

46.     Admit.

47.     Admit, and Defendants respectfully refer the Court to the Option and ROFR Agreement for a complete and accurate description of its content.

48.     Admit, and Defendants respectfully refer the Court to the Option and ROFR Agreement for a complete and accurate description of its content.

49.     Admit, and Defendants respectfully refer the Court to the Option and ROFR Agreement for a complete and accurate description of its content.

50.     Paragraph 50 contains an opinion to which no response is required. To the extent a response is required, Defendants admit only that the Option and ROFR Agreement provides HCA with a ROFR pursuant to which the Partnership must offer the Apartment Complex to HCA for the Section 42(i)(7) price if, during the option term, the Partnership desires to accept a bona fide offer from an unrelated third party to purchase the Apartment Complex.  Defendants deny the remainder of Paragraph 50.

51.     Admit, but Defendants aver that the maturity date is September 1, 2021.

52.     Admit, and Defendants respectfully refer the Court to the December 16, 2020 letter for a complete and accurate description of its content.

53.     Admit that Palm sent a letter to HCA dated January 11, 2021, providing notice that the Partnership received and desired to accept a bona fide offer from an unrelated third party to purchase the Apartment Complex, and Palm forwarded that letter to Plaintiffs on January 12, 2021.  Defendants deny the remainder of Paragraph 53.

54.     Admit, and Defendants respectfully refer the Court to the January 12, 2021 letter for a complete and accurate description of its content.

ANSWER AND COUNTERCLAIMS

55.   Deny.

56.   Deny.

57.   Deny.

58.   Deny.

59.   Deny.

60.   Deny.

61.   Deny.

62.   Admit that on January 15, 2021, Palm sent a letter to Defendants regarding the Permanent Loan.  Defendants respectfully refer the Court to the January 15, 2021 letter for a complete and accurate description of its content.

63.   Admit, and Defendants respectfully refer the Court to the January 15, 2021 letter for a complete and accurate description of its content.

64.   Deny.

## CAUSES OF ACTION

### Count One

65.   Defendants repeat and reallege the answers contained in the above paragraphs by reference as if fully stated herein.

66.   Admit.

67.   Admit.

68.   Admit.

69.   Deny.

70.   Deny to the extent that Defendants have exclusive control over the management and operation of the Partnership, and the Partnership does not need the Consent of the Special Limited Partner to express a desire to accept an offer to purchase the Apartment Complex.

71.   Deny to the extent that Defendants have exclusive control over the management and operation of the Partnership, and the Partnership does not need

ANSWER AND COUNTERCLAIMS

the Consent of the Special Limited Partner to express a desire to accept an offer to purchase the Apartment Complex.

72.     Admit.

73.     Admit that HCA's ROFR has been triggered.

74.     Admit.

75.     Deny that Plaintiffs are entitled to the relief they seek.

## Count Two

76.     Defendants repeat and reallege the answers contained in the above paragraphs by reference as if fully stated herein.

77.     Admit.

78.     Admit.

79.     Admit.

80.     Deny.

81.     Deny to the extent that RCHP cannot unreasonably withhold or delay its consent to a refinance of the Partnership's long-term debt.

82.     Admit, and Defendants further aver that RCHP has unreasonably withheld and delayed its consent to a refinance of the Partnership's long-term debt.

83.     Admit.

84.     Admit.

85.     Deny that Plaintiffs are entitled to the relief they seek.

## PRAYER FOR RELIEF

Defendants deny that Plaintiffs are entitled to any of the relief sought.

## AFFIRMATIVE DEFENSES

First Affirmative Defense:  Plaintiffs are not entitled to relief because they fail to state a claim upon which relief can be granted.

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

<u>Second Affirmative Defense</u>:  Plaintiffs are not entitled to relief because they are in breach of the Partnership Agreement.

<u>Third Affirmative Defense</u>:  Plaintiffs are not entitled to relief under the unclean hands doctrine.

ANSWER AND COUNTERCLAIMS

## **COUNTERCLAIMS**

Defendants/Counterclaimants Palm Communities, f/k/a Palm Desert Development Company ("Palm" or the "Administrative GP"), and Housing Corporation of America ("HCA" or the "Managing GP," and together with Palm, the "General Partners"), by and through their undersigned counsel, bring the following Counterclaims against Plaintiffs/Counter-Defendants Centerline Housing Partnership I, L.P. – Series 2, f/k/a Related Capital Housing Partnership I, L.P. – Series 2 ("Centerline" or the "Investor LP") and RCHP SLP I L.P. – Series 2 ("RCHP" or the "Special LP," and together with Centerline, the "Limited Partners"), as well as Counter-Defendant Alden Torch Financial LLC ("Alden Torch," and together with the Limited Partners, the "Counter-Defendants"), in support of the following causes of action, as set forth below:

## **INTRODUCTION**

1.     In 2002, Frederick and 52 II Limited Partnership, f/k/a Frederick and 52 II L.P. (the "Partnership"), was formed for the purpose of investing in real property and providing low-income housing through the construction, renovation, rehabilitation, operation and leasing of a 72-unit affordable housing development commonly known as the Orchard Villas II Apartments, located at 84500 Avenue 52, Coachella, California 92236 (the "Apartment Complex").

2.     The Apartment Complex provides housing for low-income households in accordance with the Low-Income Housing Tax Credit ("LIHTC") program, codified under 26 U.S.C. § 42 *et seq.* ("Section 42").

3.     Pursuant to the Partnership's Amended and Restated Agreement of Limited Partnership, dated March 1, 2002 (the "Partnership Agreement"), Palm is the Administrative General Partner and HCA is the Managing General Partner of the Partnership, while RCC Credit Facility, L.L.C. was admitted as the Limited Partner and Related Direct SLP LLC was admitted as the Special Limited Partner.

4.      The Partnership Agreement governs the rights and obligations of each of the partners.

5.      On May 30, 2002, the Partnership Agreement was amended to withdraw RCC Credit Facility, L.L.C. as the Limited Partner and Related Direct SLP LLC as the Special Limited Partner, and to admit Centerline's predecessor-in-interest, Related Capital Housing Partnership I L.P. – Series 2, as the Investor Limited Partner and RCHP SLP I L.P. – Series 2 as the Special Limited Partner.

6.      Related Capital Housing Partnership I L.P. – Series 2 changed its name to "Centerline Housing Partnership I, L.P. – Series 2" in 2007.

7.      Centerline is owned, controlled, and managed by Alden Torch.

8.      RCHP is owned, controlled, and managed by Alden Torch.

9.      Alden Torch is known in the LIHTC industry as an "Aggregator" – an entity that acquires interests in affordable housing partnerships after those partnerships are formed and operated in accordance with the LIHTC program, and then, upon the expiration of the 15-year compliance period required under Section 42 (the "Compliance Period"), challenges the contractual transfer rights associated with those partnerships and attempts to extract value out of the interests that was not intended by the original parties to the partnership.

10.     If an Aggregator can force a cash return to the investor limited partner that was not intended by the original parties to the LIHTC deal, that cash return will primarily benefit the Aggregator.

11.     Aggregators, like Alden Torch, use a variety of methods to achieve their goal of extracting unintended value, such as forcing protracted litigation and leveraging economies of scale to, and in hopes of, overwhelming their counterparts.

12.     Alden Torch is relying upon the "Aggregator's playbook" here to rewrite the Partnership Agreement and to allow Alden Torch to extract a windfall

ANSWER AND COUNTERCLAIMS

from the Partnership to the detriment of the Apartment Complex, the low-income residents, and the General Partners.

13.     Specifically, Alden Torch, purportedly on behalf of the Special LP, has unreasonably withheld and delayed consent to the Partnership refinancing its long-term debt, which is scheduled to mature and come due on September 1, 2021. Alden Torch instead proposed two alternatives that forced the Partnership to forego taking advantage of a historically low interest rate environment in exchange for unfavorable terms that benefit Alden Torch to the detriment of the Partnership.

14.     Alden Torch's conduct, on behalf of the Special LP, breaches the Special LP's obligation under the Partnership Agreement to not unreasonably withhold or delay consent to refinance the Partnership's debt.

15.     This common Aggregator tactic is often used to threaten LIHTC partnerships with imminent defaults on long-term debt as a means of leveraging the general partners into submitting to the Aggregator's demand for a king's ransom upon the limited partners exit from the partnership, and is often, like here, contrary to the express terms of the applicable partnership agreement and the intent of the original parties.

16.     Furthermore, concurrent with the Partnership Agreement, the Partnership entered into an Option Agreement and Right of First Refusal with the General Partners (the "ROFR Agreement").

17.     Under the ROFR Agreement, HCA is entitled to purchase the Apartment Complex for a contractual price established by Section 42(i)(7)(B) if, at any time during the option term, "[the Partnership] shall desire to accept a bona fide offer from an unrelated third party to purchase the [Apartment Complex]" (the "ROFR").

18.     The option term is defined to begin on the first day following the close of the Compliance Period and to expire after 4 years (the "Option Term"). In

ANSWER AND COUNTERCLAIMS

other words, the Option Term begins on January 1, 2018, and expires on December 31, 2021.

19.   During the Option Term, on January 11, 2021, following an unsolicited offer that resulted in a series of negotiations and increasing offers, the Partnership received a bona fide offer from an unrelated third party to purchase the Apartment Complex (the "Purchase Offer").

20.   The Purchase Offer includes all material terms and set out standard due diligence requirements that must be completed upon the acceptance of the offer, after which the closing of the sale transaction would become binding on the parties.

21.   In accordance with Section 5.4.A of the Partnership Agreement, the Administrative GP, on behalf of the Partnership, determined the Purchase Offer was a good offer and desired to accept it.

22.   Section 5.4.A of the Partnership Agreement explicitly authorizes the Administrative GP "to sell, lease, exchange, refinance or otherwise transfer, convey or encumber all or substantially all of the assets of the Partnership, provided, however, that the terms of any such sale, exchange, refinancing or other transfer, conveyance or encumbrance must receive the Consent of the Special Limited Partner before such transaction ***shall be binding*** on the Partnership." [Bold and italics added.]

23.   The Apartment Complex makes up substantially all of the Partnership's assets.

24.   As a result of the Partnership's desire to accept the Purchase Offer, HCA's ROFR was triggered under the terms of the ROFR Agreement.

25.   Therefore, on January 11, 2021, the Administrative GP, on behalf of the Partnership, sent HCA a Notice of Proposed Offer (the "ROFR Notice") (i) declaring that the Partnership received and desires to accept a bona fide offer from

an unrelated third party to purchase the Apartment Complex, (ii) attaching a copy of the Purchase Offer, and (iii) providing HCA with 45 days, in accordance with the terms of the ROFR Agreement, to respond in writing indicating that HCA is exercising its ROFR.   A true and correct copy of the ROFR Notice, with attachment, is attached hereto as **Exhibit 1**.

26.   On January 12, 2021, the Administrative GP, on behalf of the Partnership, forwarded a copy of the ROFR Notice to Alden Torch.  A true and correct copy of the January 12, 2021 letter, excluding attachments, is attached hereto as **Exhibit 2**.

27.   On January 19, 2021, Alden Torch responded to the January 12, 2021 letter, baselessly asserting in conclusory fashion (as is done in the Complaint) that it believes the Purchase Offer was not bona fide.  Alden Torch further argued that that the ROFR is not triggered by the Partnership's desire to accept the Purchase Offer, but requires the Special LP's consent to bind the Partnership to the terms of the Purchase Offer.  A true and correct copy of the January 19, 2021 letter, excluding exhibits, is attached hereto as **Exhibit 3**.

28.   Requiring the Partnership first be bound by the Purchase Offer before the ROFR is triggered contradicts the express terms of the ROFR Agreement, which provides that the ROFR ripens once the Partnership expresses *a desire* to accept a bona fide offer; a determination belonging exclusively to the Administrative GP under the terms of the Partnership Agreement.

29.   Although the General Partners' adhered to the express terms of the ROFR Agreement, Alden Torch has accused the General Partners of breaching the Partnership Agreement and filed the Complaint to prevent HCA from being able to close on its ROFR.

30.   HCA's ROFR has not expired and it intends to exercise it.

/ / /

31.     The General Partners therefore pray for a declaration that, among other things, (a) the ROFR has been triggered under the terms of the ROFR Agreement, and (b) HCA is entitled to exercise its ROFR.

32.     The General Partners also bring counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, and specific performance against the Limited Partners based upon the Limited Partners (a) preventing HCA from being able to close on its ROFR, and (b) unreasonably withholding and delaying consent to refinance the Partnership's long-term debt.

33.     The General Partners bring an additional counterclaim against Alden Torch for tortious interference with contract based upon its ownership, management, and/or control of the Limited Partners, which it has used to force the Limited Partners to interfere with and breach the Partnership Agreement by (a) preventing HCA from being able to close on its ROFR, and (b) unreasonably withholding consent to refinance the Partnership's long-term debt.

34.     The General Partners seek a declaratory judgment, specific performance, damages, and any other relief that the Court deems just and proper.

## THE PARTIES

35.     Counterclaimant Palm is a California corporation with its principal place of business in California and is the Partnership's Administrative General Partner.

36.     Counterclaimant HCA is a Utah non-profit corporation with its principal place of business in Utah and is the Partnership's Managing General Partner.

37.     Counter-Defendant Centerline is a Delaware limited partnership whose partnership interests are ultimately owned by citizens of Colorado and New York only.  Alden Torch is, indirectly, the 99.99% owner of Centerline.

ANSWER AND COUNTERCLAIMS

38.     Counter-Defendant RCHP is a Delaware limited partnership whose partnership interests are ultimately owned by citizens of Colorado and New York only.  Alden Torch indirectly owns the non-member manager of RCHP's general partner.

39.     Counter-Defendant Alden Torch is a Delaware limited liability company with its principal place of business in Denver, Colorado, and whose members are all citizens of Colorado.

## JURISDICTION AND VENUE

40.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1332(a) and 2201(a).

41.     The matter in controversy exceeds the sum of $75,000 exclusive of interests and costs, and is between citizens of different States; thus, there is complete diversity in this action between the real parties to the controversy.

42.     This Court has personal jurisdiction over Alden Torch because, among other reasons, Alden Torch has regularly communicated with Palm and the Partnership in California, owns, controls, and/or manages the Limited Partner's interests in the Partnership and the Apartment Complex (which are both located in California), has knowingly caused harm to a California corporation as a direct result of its conduct, and otherwise routinely transacts business in and/or affecting California.

43.     Alden Torch has intentionally and tortiously interfered with the Partnership Agreement by preventing the Partnership's ability to refinance its long-term debt and by preventing HCA's ability to close on its ROFR.  Specifically, Alden Torch is causing the Limited Partners to breach the Partnership Agreement because Alden Torch, as the owner, controller, and/or manager of the Limited Partners, is unreasonably withholding and delaying consent to a refinance of the Partnership's long-term debt, notwithstanding the historically low interest rate

-16-

ANSWER AND COUNTERCLAIMS

environment available to the Partnership, and is further attempting eviscerate HCA's ROFR under the ROFR Agreement.

44.     In so doing, Alden Torch is acting in its own economic self-interest to maximize its cash return and secure benefits not provided for, or contemplated by, the Partnership Agreement or ROFR Agreement.

45.     Alden Torch knew or should have anticipated that by interfering with the Partnership Agreement and ROFR Agreement it would be subjecting itself to the jurisdiction of this Court.

46.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(1).

## FACTUAL ALLEGATIONS

**I.     The LIHTC Program**

47.     The LIHTC program is a Federal subsidy program that promotes the construction and rehabilitation of rental housing to be affordable to low- and moderate-income households.

48.     The LIHTC program is one of the most important sources of financing for affordable housing across the nation.  Since 1987, the LIHTC program has helped finance almost 3 million affordable rental units nationwide.

49.     Without the incentive of the LIHTC Program, affordable rental housing projects would not generate sufficient profit to warrant investment by for-profit developers.

50.     In addition to Section 42, the LIHTC Program is governed by certain Treasury Regulations, guidance from the United States Department of Treasury and the Internal Revenue Service, and state-specific procedures contained in various documents adopted by designated housing authorities in each state (collectively, the "Tax Credit Rules").

/ / /

51.     To qualify for the LIHTC Program, the Tax Credit Rules require that a project satisfy a number of conditions, including, without limitation, an agreement by the property owner to only rent certain units to households with incomes below certain qualified limits at rents that do not exceed certain maximums for a period of at least 15 years after the property is placed in service (*i.e.*, the Compliance Period), plus an additional period of no less than 15 years, for a total affordability period of at least 30 years (and in the case of California, more than 30 years).

52.     In exchange for their participation, the owner of a low-income housing project selected to take part in the LIHTC program is entitled to the receipt of certain Section 42 tax credits (the "Tax Credits").

53.     The Tax Credits are allotted to each state based on population.  Each state then has the discretion, within certain guidelines, to allocate the Tax Credits to qualified low-income housing projects as deemed appropriate.  *See* 26 U.S.C. § 42(g), (h)(3).  Section 42, however, requires each State set aside at least 10% of its allocable Tax Credits for projects developed and operated by qualified non-profit organizations, such as HCA.  26 U.S.C. § 42(h)(5).

54.     Commonly, a low-income housing project owner is organized as a limited partnership, in which a developer acts as the general partner of the owner entity, controlling the day-to-day management and operations of the project.

55.     Because low-income housing projects typically do not generate enough tax liability to take advantage of the full value of the Tax Credits available, and because many of the developers involved in low-income housing projects are nonprofit, tax-exempt organizations, the Tax Credits are of little value to the developer itself.

56.     As a result, investors with large, predictable annual tax liability are frequently admitted to the project owner as a limited partner, agreeing to contribute

capital to the low-income housing project in exchange for an allocation of substantially all Tax Credits available to the project owner along with certain other expected tax benefits.

57.   In addition to the investor limited partner, in many instances the project owner also admits a special limited partner whose role is to monitor the investor limited partner's receipt of its anticipated tax benefits.

58.   The Tax Credits provide the investor limited partner with a return in the form of a dollar-for-dollar reduction on income taxes.

59.   The project owner frequently collects its Tax Credits over a ten-year period but remains obligated to maintain the low-income rent restrictions and adhere to the other Tax Credit Rules for the remainder of the 15-year Compliance Period, or it will subject the Tax Credits to recapture.

60.   Upon the expiration of the Compliance Period, the project owner will have collected all available Tax Credits, which will no longer hold any recapture risk, in addition to other tax benefits (such as allocable losses), thereby providing the investor limited partner with full realization of the economic benefits it bargained for and expected when negotiating admission to the project owner.

61.   It is therefore routine for the agreements relating to the formation and existence of the project owner to provide the investor limited partner with an easy exit from the project owner at or near the close of the Compliance Period.  This is commonly achieved through (i) a right of first refusal or buyout option belonging to the general partner, (ii) a right of first refusal at the Section 42 statutory price where the general partner is or includes a non-profit organization, or (iii) a forced sale right belonging to the limited partner in case the right of first refusal or buyout option is not exercised.

///

///

ANSWER AND COUNTERCLAIMS

62.     Indeed, a buyout option—or, in the case of a non-profit general partner, a Section 42 right of first refusal—is often one of the primary economic incentives for the general partner to participate in a low-income housing project.

63.     While the investor limited partner receives a substantial yearly return on its investment during the Compliance Period in the form of Tax Credits and other economic benefits (here, the Tax Credits alone were equal to nearly $9.5 million, as compared to the investor limited partners approximately $7.5 million contribution), the general partner provides development and management services to the project for modest fees, which are traditionally required to be deferred and paid out from project cash flows.  Where a non-profit is involved, it is common for the non-profit organization to provide development services and, in some instances, property management services.

64.     The general partner(s) also commonly guarantee the flow of Tax Credits, any negative adjustors, operating losses, project loans, and certain rental requirements, so the general partner(s) assume significant risk in the LIHTC project.

65.     Commonly, and as is the case here, the investor limited partner does not expect, nor project, any cash payment at the end of the Compliance Period that includes, or even considers, the return of its capital contribution to the Partnership or related capital account balances.

66.     The general partner(s) undertake their investment of time, resources, and money, as well as their duties and obligations, with the expectation that they will have the option and right to acquire either the investor limited partner's interest in the project owner as a going-concern, or the real estate project itself at a formulaic price at the end of the Compliance Period.  Relevant here, Section 42 prescribes a formulaic price for a right of first refusal that applies only where a non-profit (such as HCA) is the holder of that right.

ANSWER AND COUNTERCLAIMS

67.     In this case, the General Partners have invested in and took on considerable risk from the Partnership and have dutifully performed their obligations in accordance with these understandings and expectations described above.

68.     Without the rights afforded to the General Partners through the Partnership Agreement and the ROFR Agreement, the General Partners would have had much less incentive to participate in, and otherwise would not have participated in, the development of the Apartment Complex, and would be deprived of economic rights that the parties had originally negotiated and agreed upon at the inception of the governing agreements.

**II.     Alden Torch is an Aggregator**

69.     Alden Torch is what is known throughout the LIHTC industry as an "Aggregator."

70.     For example, a report published in September 2019 found:

> Recently, however, a number of private firms have been challenging LIHTC project transfer rights across the country as a way of obtaining additional profit from these deals at the back end [i.e., after the 15-year compliance period closes].  These firms appear to be aggregating investor interests in LIHTC partnerships; asserting myriad claims and arguments against project transfers, including transfers to nonprofits; and extracting value from the project or nonprofit in the shadow of protracted litigation.  As noted, some in the LIHTC industry have dubbed these firms "aggregators."

*Nonprofit Transfer Disputes in the Low Income Housing Tax Credit Program: An Emerging Threat to Affordable Housing*, Washington State Housing Finance

-21-

ANSWER AND COUNTERCLAIMS

Commission, p. 5 (September 2019), http://www.wshfc.org/admin/Reporton15YearTransferDisputes.pdf (last visited January 30, 2021) (observing that firms like Alden Torch often use burdensome tactics, like litigation, to take advantage of resource disparities in order to leverage economies of scale in hopes of overwhelming their counterparts and preventing rights like the ROFR); *see also* Brandon Duong, *Losing Nonprofit Control of Tax Credit Housing?*, SHELTERFORCE, Oct. 16, 2020, https://shelterforce.org/2020/10/16/refusing-the-right-to-refuse/.

71.     As a Florida Court recently found in a case involving Alden Torch's predecessor—Hunt Capital Partners, LLC ("Hunt")—the "Aggregators' playbook" involves "acquiring limited partner interests in LIHTC partnerships" and then "attempt[ing] to extract value out of such interests that were not intended by the original parties to the partnerships." *CED Capital Holdings 200 EB, L.L.C. v. CTCW Berkshire Club, L.L.C.*, No. 23018-CA-013886-O, 2020 WL 6537072, *5, ¶¶33 (Fla. Cir. Ct. Nov. 3, 2020).

72.     Alden Torch spun off from Hunt in 2015, acquiring a portion of Hunt's affordable housing platform in the process.

73.     Alden Torch has claimed to be the largest affordable housing asset management platform in the multifamily affordable housing industry, with approximately $13 billion worth of assets under management.

74.     As such, Alden Torch's role as an Aggregator, known for conduct such as that giving rise to the dispute here, highlights a concerning trend in the affordable housing industry, where ownership and/or management and control of the investor limited partner interests changes hands during the Compliance Period, with the new limited partner or manager of those interests seeking to undermine the post-Compliance Period transfer rights the original parties agreed to at or near the start of the Compliance Period, in order to extract additional profits to the

ANSWER AND COUNTERCLAIMS

detriment of the general partner(s) and underlying residents in the affordable housing communities.  *See*, *e.g.*, *CED Capital Holdings 200 EB, LLC*, 2020 WL 6537072, at *7, ¶3.

75.    Alden Torch has made no capital investment in the Partnership or the Apartment Complex.

**III.    The Partnership Agreement and ROFR Agreement**

76.    The Partnership Agreement governs the rights and obligations of the General Partners and the Limited Partners.

77.    Article IV of the of the Partnership Agreement addresses, among other things, the Partnership's long-term debt.

78.    Section 4.3.C expressly empowers the General Partners to modify, refinance, or repay the Partnership's mortgage debt provided that "the terms of any such modification, refinancing or repayment must receive the Consent of the Special Limited Partner (***which consent shall not be unreasonably withheld or delayed***) before such transaction shall be binding on the Partnership."  [Emphasis added.]

79.    Article V of the Partnership Agreement provides, among other things, the rights, powers, and obligations of the General Partners.

80.    Section 5.4 expressly governs a conveyance of the Partnership's assets, including the Apartment Complex.

81.    Pursuant to Section 5.4.A, the Administrative GP (Palm) is expressly "authorized to sell, lease, exchange, refinance or otherwise transfer, convey or encumber all or substantially all of the assets of the Partnership."  This power of the Administrative GP is, however, limited to the extent that "the terms of any such sale, exchange, refinancing or other transfer, conveyance or encumbrance must receive the Consent of the Special Limited Partner before such transaction ***shall be binding*** on the Partnership."  [Emphasis added.]

-23-

82.    Thus, the Special LP's consent is not required for the Partnership to express a desire to accept an offer to sell the Apartment Complex, but only for the terms of such offer to become binding on the Partnership.

83.    Section 5.4.B of the Partnership Agreement expressly incorporates the ROFR Agreement, notwithstanding any other provision of the Partnership Agreement.

84.    The ROFR Agreement governs the rights and obligations of the Partnership and HCA as it relates to, among other things, HCA's ROFR.

85.    Section 5 of the ROFR Agreement provides HCA with the right to purchase the Apartment Complex at the Section 42(i)(7) price if the Partnership, during the Option Term, "shall **desire to accept** a bona fide offer from an unrelated third party to purchase the [Apartment Complex]."  [Emphasis added.]

86.    Pursuant to Section 5 of the ROFR Agreement, HCA has 45 days to provide written notice that it is exercising its ROFR following receipt of a copy of the proposed offer from the Partnership.

87.    Section 5 of the ROFR Agreement does not require (nor allow for) the Partnership to actually accept an offer or to enter into a binding purchase and sale agreement for the Apartment Complex before offering the Apartment Complex to HCA pursuant to the terms of the ROFR.

88.    Upon exercise of its ROFR, Section 6 of the ROFR Agreement requires closing a sale of the Apartment Complex to HCA at the Section 42(i)(7) price no later than 180 days after the Partnership receives notice of HCA's exercise.

**IV.    The Current Dispute**

89.    The Compliance Period ended December 31, 2017.

90.    The Option Term runs from January 1, 2018, through December 31, 2021.

ANSWER AND COUNTERCLAIMS

91.     In December 2020, given the historically low interest rate environment available to the Partnership, Palm discussed with Alden Torch, on behalf of the Special LP, refinancing the Partnership's long-term debt that was coming due on September 1, 2021.

92.     On December 16, 2020, Alden Torch sent Palm a letter informing Palm that Alden Torch did not anticipate that the Special LP would "desire a Sale or Refinancing Transaction *in 2021*."  [Emphasis added.]

93.     Alden Torch acknowledged its understanding that the Partnership's long-term debt would come due in 2021, but nonetheless refused, on behalf of the Special LP, to consent to a refinance thereof.  Alden Torch instead offered two options for addressing the pending maturity, neither of which benefit the Partnership when compared to the Partnership's ability to refinance in a historically low interest-rate environment.  Instead, Alden Torch's offers were structured to directly benefit Alden Torch at the expense of the Partnership.

94.     On January 11, 2021, Palm received the Purchase Offer as the result of an unsolicited offer from an unrelated third party that led to negotiations back and forth and a series of increasing offers.

95.     The Purchase Offer is a bona fide offer from an unrelated third party.

96.     The Purchase Offer includes all material terms and, following the acceptance of the offer, establishes a timeline during which standard due diligence requirements must be completed.  Upon satisfactory completion, the sale transaction would become binding on the parties pursuant to the terms of the Purchase Offer.

97.     Palm, on behalf of the Partnership and in accordance with its contractual powers as the Partnership's Administrative General Partner, determined that the Purchase Offer was attractive and therefore, acting on behalf of the Partnership, desired to accept it.

ANSWER AND COUNTERCLAIMS

98.     As a result of the Purchase Offer being a bona fide offer from an unrelated third party to purchase the Apartment Complex and the Partnership's *desire* to accept the Purchase Offer, HCA's ROFR was triggered under the terms of the ROFR Agreement.

99.     On January 11, 2021, Palm, on behalf of the Partnership, sent HCA the ROFR Notice.

100.    Attached to the ROFR Notice was a copy of the Purchase Offer.

101.    On January 12, 2021, Palm, on behalf of the Partnership, forwarded to Alden Torch, on behalf of the Limited Partners, a copy of the ROFR Notice and Purchase Offer.

102.    On January 19, 2021, Alden Torch sent Palm and HCA a letter reiterating its intention, on behalf of the Limited Partners, to unreasonably prevent and delay the Partnership from refinancing its long-term debt, otherwise scheduled to mature on September 1, 2021.

103.    Alden Torch, in its January 19th letter, also incorrectly states that the ROFR may not be exercised without the Special LP's consent.

104.    Relying upon an incorrect interpretation of the Partnership Agreement and ROFR Agreement, Alden Torch wrongfully accuses Palm and HCA of materially breaching the Partnership Agreement.

105.    Among numerous baseless accusations as to the General Partner's intent, the January 19th letter ultimately demands that (i) the General Partners agree with Alden Torch's incorrect assertion that the ROFR was not triggered by the Partnership's desire to sell the Apartment Complex pursuant to the Purchase Offer, and (ii) the Partnership not entertain *any* third party offers to purchase the Apartment Complex.

///
///

ANSWER AND COUNTERCLAIMS

**CAUSES OF ACTION**

**Count I**

**Declaratory Judgment**

**(Against the Limited Partners)**

106.   The General Partners incorporate the above paragraphs by reference as if fully stated herein.

107.   The Partnership Agreement is a valid and binding contract between the Limited Partners and the General Partners.

108.   The ROFR Agreement is a valid and binding contract between the Partnership and the General Partners for which sufficient consideration was provided.

109.   The Partnership Agreement expressly incorporates the ROFR Agreement.

110.   An actual controversy exists as to the parties' respective rights and obligations under the Partnership Agreement and ROFR Agreement.

111.   First, the Special LP cannot prevent the General Partners from refinancing the Partnership's maturing long-term debt by unreasonably withholding or delaying consent thereto.

112.   The Limited Partners, as owned, managed, and controlled by Alden Torch, have breached the Partnership Agreement by unreasonably refusing and delaying consent to refinance the Partnership's debt during all of 2021, notwithstanding the historically low interest rate environment available to the Partnership and the imminent maturity of the Partnership's debt during 2021.

113.   Second, the Administrative GP has the power under the Partnership Agreement to express, on behalf of the Partnership, a desire to sell the Apartment Complex.   The Special LP's consent is only necessary for a sale transaction to become binding on the Partnership.

ANSWER AND COUNTERCLAIMS

114.   Under the ROFR Agreement, HCA's ROFR is triggered during the Option Term if the Partnership desires to accept a bona fide offer from an unrelated third party to purchase the Apartment Complex.

115.   The Purchase Offer was made during the Option Term.

116.   The Purchase Offer is a bona fide offer from an unrelated third party to purchase the Apartment Complex.

117.   The Administrative GP determined, on behalf of the Partnership, that the Purchase Offer is a good offer and desires to accept it, thereby triggering HCA's ROFR.

118.   HCA has 45 days from the date it was notified of the Purchase Offer to exercise its ROFR, which it intends to do.

119.   The Limited Partners, as owned, managed, and controlled by Alden Torch, have breached the Partnership Agreement by filing the Complaint and obstructing HCA's ability to close on its ROFR.

120.   Based upon the foregoing facts, the General Partners are entitled to the following declarations:

      a.   The Partnership Agreement prohibits the Special LP from unreasonably withholding or delaying consent to refinance the Partnership's long-term debt;

      b.   The Special LP is unreasonably withholding and delaying consent to refinance the Partnership's maturing, long-term debt;

      c.   The Administrative GP has the power under the Partnership Agreement to express, on behalf of the Partnership, a desire to sell the Apartment Complex, whereby the Special LP's consent is only necessary for a sale transaction to become binding on the Partnership;

ANSWER AND COUNTERCLAIMS

d.  The Administrative GP, on behalf of the Partnership, received and desired to accept the Purchase Offer;

e.  The Purchase Offer is a bona fide offer from an unrelated third party to purchase the Apartment Complex; and

f.  The Purchase Offer triggered HCA's ROFR, entitling HCA to exercise its ROFR pursuant to the terms of the ROFR Agreement.

## Count II

**Breach of Contract; Breach of the Implied Covenant of Good Faith and Fair Dealing; and Specific Performance**

**(Against the Limited Partners)**

121.  The General Partners incorporate the above paragraphs by reference as if fully stated herein.

122.  The Partnership Agreement is a valid and binding contract between the Limited Partners and the General Partners.

123.  The Partnership Agreement prohibits the Special LP from unreasonably withholding or delaying consent to refinance the Partnership's debt.

124.  The Special LP has unreasonably refused and delayed its consent to any refinance of the Partnership's debt that takes advantage of the historically low interest rate environment, instead forcing the Partnership to choose between defaulting on the debt or accepting terms from Alden Torch intended to benefit Alden Torch to the detriment of the Partnership.

125.  The Special LP has therefore breached the Partnership Agreement and the implied covenant of good faith and fair dealing.

126.  Moreover, the ROFR Agreement is a valid and binding contract between the Partnership and the General Partners for which sufficient consideration was provided.

///

-29-

ANSWER AND COUNTERCLAIMS

127.    The Partnership Agreement expressly incorporates the ROFR Agreement.

128.    The Administrative GP has the power under the Partnership Agreement to express, on behalf of the Partnership, a desire to sell the Apartment Complex.   The Special LP's consent is only necessary for a sale transaction to become binding on the Partnership.

129.    Pursuant to its powers under the Partnership Agreement, the Administrative GP, on behalf of the Partnership, received and desired to accept the Purchase Offer.

130.    The Purchase Offer is a bona fide offer from an unrelated third party to purchase the Apartment Complex.

131.    As a result, HCA's ROFR was triggered under the terms of the ROFR Agreement.

132.    In accordance with the requirements of the ROFR Agreement, the Administrative GP, on behalf of the Partnership, notified HCA of the Purchase Offer and that its ROFR has been triggered.

133.    HCA has 45 days from the date it was notified of the Purchase Offer to exercise its ROFR, which it intends to do.

134.    The Limited Partners immediately filed the Complaint to cloud title to the Apartment Complex, thereby preventing HCA's ability to close on its ROFR.

135.    As a result, the Limited Partners have breached the Partnership Agreement and its implied covenant of good faith and fair dealing by, among other things, demanding rights to which it is not entitled under the Partnership Agreement and interfering with the Administrative GP's powers thereunder.

136.    Due to the Limited Partners' breaches of their obligations under the Partnership Agreement, the General Partners have been and continue to be injured.

///

137.   The General Partners are entitled to specific performance ordering (i) the Special Limited Partner to cease unreasonably withholding and delaying consent to any refinance of the Partnership's long-term debt, and (ii) the Limited Partners to cooperate with the Partnership's obligation to sell the Apartment Complex to HCA pursuant to the terms of the ROFR Agreement.

138.   The General Partners are also entitled to a damages award against the Limited Partners in an amount exceeding $75,000, the precise amount of which will be determined at trial.

## Count III

### Tortious Interference with Contract

### (Against Alden Torch)

139.   The General Partners incorporate the above paragraphs by reference as if fully stated herein.

140.   The Partnership Agreement is a valid and binding contract between the Limited Partners and the General Partners.

141.   The ROFR Agreement is a valid and binding contract between the Partnership and the General Partners for which sufficient consideration was provided.

142.   The Partnership Agreement expressly incorporates the ROFR Agreement.

143.   Prior to taking the actions described herein, Alden Torch was aware of the ROFR Agreement and Partnership Agreement, as well as the Limited Partners' duties and obligations thereunder.

144.   Alden Torch, as owner and/or manager of the Limited Partners, has a material conflict of interest as it relates to any sale of the Apartment Complex during the Option Term because Alden Torch stands to collect significantly more money if HCA's ROFR is forced to expire on December 31, 2021, whereby the

ANSWER AND COUNTERCLAIMS

Special LP may then force a sale of the Apartment Complex pursuant to the Partnership Agreement without the risk of triggering HCA's ROFR.

145.   Alden Torch is therefore acting in its own economic self-interest to interfere with and obstruct the partners' respective rights and obligations under the Partnership Agreement, despite such actions being contrary to the best interests of the Limited Partners and the Partnership.

146.   Through its ownership of and control over the Limited Partners, Alden Torch has intentionally and unjustifiably caused the Limited Partners to breach their contractual obligations under the Partnership Agreement by, among other things, unreasonably refusing and delaying consent to refinance the Partnership's maturing, long-term debt, and by obstructing HCA's ability to close on its ripened ROFR pursuant to the terms of the ROFR Agreement.

147.   As a result of Alden Torch's tortious interference with the Partnership Agreement and ROFR Agreement, as well as the Limited Partners' performance thereunder, the General Partners have been and continue to be injured.

148.   The General Partners are entitled to a damages award against Alden Torch in an amount exceeding $75,000, the precise amount of which will be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, the General Partners pray for relief as follows:

1.   That the Court find and declare that:

   a. The Partnership Agreement prohibits the Special LP from unreasonably withholding or delaying consent to refinance the Partnership's long-term debt;

   b. The Special LP is unreasonably withholding and delaying consent to refinance the Partnership's maturing, long-term debt;

/ / /

    c.  The Administrative GP has the power under the Partnership Agreement to express, on behalf of the Partnership, a desire to sell the Apartment Complex, whereby the Special LP's consent is only necessary for a sale transaction to become binding on the Partnership;

    d.  The Administrative GP, on behalf of the Partnership, received and desired to accept the Purchase Offer;

    e.  The Purchase Offer is a bona fide offer from an unrelated third party to purchase the Apartment Complex; and

    f.  The Purchase Offer triggered HCA's ROFR, entitling HCA to exercise its ROFR pursuant to the terms of the ROFR Agreement.

2.    That the Court find that the Limited Partners breached their contractual obligations, including the implied covenant of good faith and fair dealing, under the Partnership Agreement;

3.    That the Court order specific performance requiring the Limited Partners cease unreasonably withholding and delaying consent to refinancing the Partnership's maturing, long-term debt and cease obstructing HCA's ability to close on its ROFR;

4.    That the Court find that Alden Torch ortuously interfered with the Partnership Agreement and the Limited Partners' obligations thereunder, including by intentionally causing the Limited Partners to breach the Partnership Agreement;

5.    That the Court award damages to the General Partners in an amount to exceed $75,000, the precise amount to be determined at trial; and

6.    That the Court order such other and further relief, including, without limitation, monetary relief and attorneys' fees and costs, which the Court may deem just, equitable and appropriate under the circumstances presented.

**[SIGNATURE CONTAINED ON FOLLOWING PAGE]**

-33-

ANSWER AND COUNTERCLAIMS

DATED:  February 16, 2021                    JACKSON TIDUS

                                    By:    /s/ *Edward A. Galloway*
                                           EDWARD A. GALLOWAY
                                           Attorney for
                                           Defendants/Counterclaimants
                                           PALM COMMUNITIES, F/K/A
                                           PALM DESERT DEVELOPMENT
                                           COMPANY
                                           HOUSING CORPORATION OF
                                           AMERICA

                                           -and -

                                           BC DAVENPORT LLC
                                           DAVID A. DAVENPORT
                                           (*pro hac* application forthcoming)
                                           801 S. Marquette Ave., Suite 200
                                           Minneapolis, MN 55402
                                           Tel:  (612) 445-8010
                                           Fax: (612) 445-8011
                                           david@bcdavenport.com

ANSWER AND COUNTERCLAIMS

EXHIBIT 1

# FREDERICK AND 52 II LIMITED PARTNERSHIP

January 11, 2021

<u>VIA EMAIL AND FEDERAL EXPRESS</u>

Housing Corporation of America
Attn: Carol Cromar
2022 South 2100 East, Suite 101
Salt Lake City, UT 84108

**RE:      Orchard Villas II Apartments ("Property") – Notice of Proposed Offer**

Dear Carol:

Pursuant to Section 5 of the Option Agreement and Right of First Refusal, dated March 1, 2002, among Frederick and 52 II Limited Partnership ("Owner"), Palm Communities ("Palm"), formerly known as Palm Desert Development Company, and Housing Corporation of America ("HCA"), (the "Agreement"), this letter is to provide notice that Owner has received, and desires to accept, a bona fide offer from an unrelated third party to purchase the Property from Owner.

Attached hereto is a copy of the proposed offer. Pursuant to Section 5 of the Agreement, HCA has the right, to be exercised within forty-five (45) days after receipt of a copy of the proposed offer from Owner, to respond in writing to Owner indicating that HCA desires to purchase the property for a price equal to the amount set forth in Paragraph 4(a)(i) of the Agreement.

Should you have any questions please contact me at (949) 625-6419.

Regards,

FREDERICK AND 52 II LIMITED PARTNERSHIP**,** a California limited partnership

By:     PALM COMMUNITIES, a California Corporation
        Its Administrative General Partner

        By: _____
            Danavon L. Horn, President

cc:      Via Email: Alden Torch Financial LLC, Attn: Chris Blake (chris.blake@aldentorch.com)

100 Pacifica, Suite 203
Irvine, CA  92618
tel 949.878.9399 fax 949.878.9399



**COMMERCIAL PROPERTY PURCHASE AGREEMENT
AND JOINT ESCROW INSTRUCTIONS**
(NON-RESIDENTIAL)
(C.A.R. Form CPA, Revised 12/18)

**Date Prepared:** _01/11/2021_

1. **OFFER:**
   A. **THIS IS AN OFFER FROM** _AFFORDABLE HOUSING FOR CALIFORNIA COMMUNITIES OR ITS ASSIGNEE_ ("Buyer").
      ☐ Individual(s), ☒ A Corporation, ☐ A Partnership, ☐ An LLC, ☐ An LLP, or ☐ Other _____
   B. **THE REAL PROPERTY** to be acquired is _84500 Avenue, ORCHARD VILLAS II_ , situated in
      _Coachella_ (City), _____ (County), California, _92236_ (Zip Code), Assessor's Parcel No. _768-330-002_ ("Property").
   C. **THE PURCHASE PRICE** offered is _Five Million, One Hundred Thousand_
      _____ Dollars $_5,100,000.00_ .
   D. **CLOSE OF ESCROW** shall occur on _____ (date) (or ☐ _____ **Days** After Acceptance).
   E. Buyer and Seller are referred to herein as the "Parties." Brokers are not Parties to this Agreement.

2. **AGENCY:**
   A. **DISCLOSURE:** The Parties each acknowledge receipt of a ☒ "Disclosure Regarding Real Estate Agency Relationships" (C.A.R. Form AD)
   B. **CONFIRMATION:** The following agency relationships are confirmed for this transaction:
      **Seller's Brokerage Firm** _NONE_ License Number _____
      Is the broker of (check one): ☐ the seller; or ☐ both the buyer and seller. (dual agent)
      Seller's Agent _____ License Number _____
      Is (check one): ☐ the Seller's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)

      **Buyer's Brokerage Firm** _NONE_ License Number _____
      Is the broker of (check one): ☐ the buyer; or ☐ both the buyer and seller. (dual agent)
      Buyer's Agent _____ License Number _____
      Is (check one): ☐ the Buyer's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)
   C. **POTENTIALLY COMPETING BUYERS AND SELLERS:** The Parties each acknowledge receipt of a ☒ "Possible Representation of More than One Buyer or Seller - Disclosure and Consent" (C.A.R. Form PRBS).

3. **FINANCE TERMS:** Buyer represents that funds will be good when deposited with Escrow Holder.
   A. **INITIAL DEPOSIT:** Deposit shall be in the amount of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _200,000.00_
      (1) **Buyer Direct Deposit:** Buyer shall deliver deposit directly to Escrow Holder by electronic funds
      transfer, ☐ cashier's check, ☐ personal check, ☐ other _____ within 3 business days
      after Acceptance (or _____ );
      OR (2) ☐ **Buyer Deposit with Agent:** Buyer has given the deposit by personal check (or _____ )
      to the agent submitting the offer (or to _____ ), made payable to
      _____ . The deposit shall be held uncashed until Acceptance and then deposited
      with Escrow Holder within 3 business days after Acceptance (or _____ ).
      Deposit checks given to agent shall be an original signed check and not a copy.
      (Note: Initial and increased deposit checks received by agent shall be recorded in Broker's trust fund log.)
   B. **INCREASED DEPOSIT:** Buyer shall deposit with Escrow Holder an increased deposit in the amount of. . . $ _____
      within _____ **Days** After Acceptance (or _____ ).
      If the Parties agree to liquidated damages in this Agreement, they also agree to incorporate the increased
      deposit into the liquidated damages amount in a separate liquidated damages clause (C.A.R. Form
      RID) at the time the increased deposit is delivered to Escrow Holder.
   C. ☐ **ALL CASH OFFER:** No loan is needed to purchase the Property. This offer is NOT contingent on
      Buyer obtaining a loan. Written verification of sufficient funds to close this transaction IS ATTACHED to
      this offer or ☐ Buyer shall, within **3 (or _____ ) Days** After Acceptance, Deliver to Seller such verification.
   D. **LOAN(S):**
      (1) **FIRST LOAN:** In the amount of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____
      This loan will be conventional financing **OR** ☐ Seller financing (C.A.R. Form SFA), ☐ assumed
      financing (C.A.R. Form AFA), ☐ subject to financing, ☐ Other _____ . This
      loan shall be at a fixed rate not to exceed _____% or, ☐ an adjustable rate loan with initial rate not
      to exceed _____%. Regardless of the type of loan, Buyer shall pay points not to exceed _____% of
      the loan amount.
      (2) ☐ **SECOND LOAN** in the amount of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____
      This loan will be conventional financing **OR** ☐ Seller financing (C.A.R. Form SFA), ☐ assumed
      financing (C.A.R. Form AFA), ☐ subject to financing, ☐ Other _____ . This loan shall be at a
      fixed rate not to exceed _____% or, ☐ an adjustable rate loan with initial rate not to exceed _____%.
      Regardless of the type of loan, Buyer shall pay points not to exceed _____% of the loan amount.
   E. **ADDITIONAL FINANCING TERMS:** _Buyers will obtain a loan. AS-IS PURCHASE_
      _____

   F. **BALANCE OF DOWN PAYMENT OR PURCHASE PRICE** in the amount of . . . . . . . . . . . . . . . . . . . $ _4,900,000.00_
      to be deposited with Escrow Holder pursuant to Escrow Holder instructions.
   G. **PURCHASE PRICE (TOTAL):** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _5,100,000.00_

Buyer's Initials ( _ul_ ) ( _____ )     Seller's Initials ( _____ ) ( _____ )

© 2018, California Association of REALTORS®, Inc.
CPA REVISED 12/18 (PAGE 1 OF 11)
**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 1 OF 11)**

Property Address: _84500 Avenue, ORCHARD VILLAS II, Coachella, CA  92236_ _____ Date: _January 11, 2021_ _____

**H.  VERIFICATION OF DOWN PAYMENT AND CLOSING COSTS:** Buyer (or Buyer's lender or loan broker pursuant to paragraph 3J(1)) shall, within 3 (or ___ ) **Days** After Acceptance, Deliver to Seller written verification of Buyer's down payment and closing costs. ( ☐ Verification attached.)

**I.  APPRAISAL CONTINGENCY AND REMOVAL:** This Agreement is (or ☐ is NOT) contingent upon a written appraisal of the Property by a licensed or certified appraiser at no less than the purchase price. Buyer shall, as specified in **paragraph 18B(3),** in writing, remove the appraisal contingency or cancel this Agreement within **17 (or ___ ) Days** After Acceptance.

**J.  LOAN TERMS:**
    **(1)  LOAN APPLICATIONS:** Within **3 (or ___ ) Days** After Acceptance, Buyer shall Deliver to Seller a letter from Buyer's lender or loan broker stating that, based on a review of Buyer's written application and credit report, Buyer is prequalified or preapproved for any NEW loan specified in paragraph 3D. If any loan specified in paragraph 3D is an adjustable rate loan, the prequalification or preapproval letter shall be based on the qualifying rate, not the initial loan rate. ( ☐ Letter attached.)
    **(2)  LOAN CONTINGENCY:** Buyer shall act diligently and in good faith to obtain the designated loan(s). Buyer's qualification for the loan(s) specified above **is a contingency** of this Agreement unless otherwise agreed in writing. If there is no appraisal contingency or the appraisal contingency has been waived or removed, then failure of the Property to appraise at the purchase price does not entitle Buyer to exercise the cancellation right pursuant to the loan contingency if Buyer is otherwise qualified for the specified loan. Buyer's contractual obligations regarding deposit, balance of down payment and closing costs **are not contingencies** of this Agreement.
    **(3)  LOAN CONTINGENCY REMOVAL:**
Within **21 (or ___ ) Days** After Acceptance, Buyer shall, as specified in paragraph 18, in writing, remove the loan contingency or cancel this Agreement. If there is an appraisal contingency, removal of the loan contingency shall not be deemed removal of the appraisal contingency.
    **(4)  ☐ NO LOAN CONTINGENCY:** Obtaining any loan specified above is NOT a contingency of this Agreement. If Buyer does not obtain the loan and as a result Buyer does not purchase the Property, Seller may be entitled to Buyer's deposit or other legal remedies.
    **(5)  LENDER LIMITS ON BUYER CREDITS:** Any credit to Buyer, from any source, for closing or other costs that is agreed to by the Parties ("Contractual Credit") shall be disclosed to Buyer's lender. If the total credit allowed by Buyer's lender ("Lender Allowable Credit") is less than the Contractual Credit, then (i) the Contractual Credit shall be reduced to the Lender Allowable Credit, and (ii) in the absence of a separate written agreement between the Parties, there shall be no automatic adjustment to the purchase price to make up for the difference between the Contractual Credit and the Lender Allowable Credit.

**K.  BUYER STATED FINANCING:** Seller is relying on Buyer's representation of the type of financing specified (including but not limited to, as applicable, all cash, amount of down payment, or contingent or non-contingent loan). Seller has agreed to a specific closing date, purchase price and to sell to Buyer in reliance on Buyer's covenant concerning financing. Buyer shall pursue the financing specified in this Agreement. Seller has no obligation to cooperate with Buyer's efforts to obtain any financing other than that specified in the Agreement and the availability of any such alternate financing does not excuse Buyer from the obligation to purchase the Property and close escrow as specified in this Agreement.

**4.  SALE OF BUYER'S PROPERTY:**
    **A.**  This Agreement and Buyer's ability to obtain financing are NOT contingent upon the sale of any property owned by Buyer.
    **OR B.**  ☐ This Agreement and Buyer's ability to obtain financing are contingent upon the sale of property owned by Buyer as specified in the attached addendum (C.A.R. Form COP).

**5.  ADDENDA AND ADVISORIES:**
    **A.  ADDENDA:** ☐ Addendum #_____ (C.A.R. Form ADM)
        ☐ Back Up Offer Addendum (C.A.R. Form BUO)    ☐ Court Confirmation Addendum (C.A.R. Form CCA)
        ☐ Septic, Well and Property Monument Addendum (C.A.R.  Form SWPI)
        ☐ Short Sale Addendum (C.A.R. Form SSA)    ☐ Other _____

    **B.  BUYER AND SELLER ADVISORIES:**    ☒ Buyer's Inspection Advisory (C.A.R. Form BIA)
        ☐ Probate Advisory (C.A.R. Form PA)    ☐ Statewide Buyer and Seller Advisory (C.A.R. Form SBSA)
        ☐ Trust Advisory (C.A.R. Form TA)    ☐ REO Advisory (C.A.R. Form REO)
        ☐ Short Sale Information and Advisory (C.A.R. Form SSIA)    ☐ Other _____

**6.  OTHER TERMS:** _____
_____
_____

**7.  ALLOCATION OF COSTS**
    **A.  INSPECTIONS, REPORTS AND CERTIFICATES:** Unless otherwise agreed, in writing, this paragraph only determines who is to pay for the inspection, test, certificate or service ("Report") mentioned; it **does not determine who is to pay for any work recommended or identified in the Report.**
        **(1)** ☐ Buyer ☐ Seller shall pay for a natural hazard zone disclosure report, including tax ☐ environmental ☐ Other: _____
            _____ prepared by _____ .
        **(2)** ☐ Buyer ☐ Seller shall pay for the following Report _____
            prepared by _____ .
        **(3)** ☐ Buyer ☐ Seller shall pay for the following Report _____
            prepared by _____

Buyer's Initials   ul   ( _____ ) ( _____ )            Seller's Initials   ( _____ ) ( _____ )

**CPA REVISED 12/18 (PAGE 2 OF 11)**

**COMMERCIAL PROPERTY PURCHASE AGREEMENT  (CPA PAGE 2 OF 11)**
Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5    www.lwolf.com    **ORCHARD**

Property Address: _84500 Avenue, ORCHARD VILLAS II, Coachella, CA  92236_____ Date: _January 11, 2021___

**B. GOVERNMENT REQUIREMENTS AND RETROFIT:**
(1) ☐ Buyer ☐ Seller shall pay for smoke alarm and carbon monoxide device installation and water heater bracing, if required by Law. Prior to Close Of Escrow ("COE"), Seller shall provide Buyer written statement(s) of compliance in accordance with state and local Law, unless Seller is exempt.
(2) (i) ☐ Buyer ☐ Seller shall pay the cost of compliance with any other minimum mandatory government inspections and reports if required as a condition of closing escrow under any Law.
(ii) ☐ Buyer ☐ Seller shall pay the cost of compliance with any other minimum mandatory government retrofit standards required as a condition of closing escrow under any Law, whether the work is required to be completed before or after COE.
(iii) Buyer shall be provided, within the time specified in paragraph 18A, a copy of any required government conducted or point-of-sale inspection report prepared pursuant to this Agreement or in anticipation of this sale of the Property.

**C. ESCROW AND TITLE:**
(1) (a) ☒ Buyer ☒ Seller shall pay escrow fee _BUYERS TO PAY THEIR OWN FEE AND SELLERS TO PAY THEIR OWN FEE_ .
(b) Escrow Holder shall be _FIRST AMERICAN TITLE COMPANY_____
(c) The Parties shall, within **5 (or ___ ) Days** After receipt, sign and return Escrow Holder's general provisions.
(2) (a) ☐ Buyer ☒ Seller shall pay for **owner's** title insurance policy specified in paragraph 17E _____
(b) Owner's title policy to be issued by _FIST AMERICAN TITLE COMPANY_____ .
(Buyer shall pay for any title insurance policy insuring Buyer's **lender**, unless otherwise agreed in writing.)

**D. OTHER COSTS:**
(1) ☐ Buyer ☒ Seller shall pay County transfer tax or fee _____ .
(2) ☐ Buyer ☒ Seller shall pay City transfer tax or fee _____ .
(3) ☐ Buyer ☐ Seller shall pay Owners' Association ("OA") transfer fee _____ .
(4) Seller shall pay OA fees for preparing all documents required to be delivered by Civil Code §4525.
(5) ☐ Buyer ☐ Seller shall pay OA fees for preparing all documents other than those required by Civil Code §4525.
(6) Buyer to pay for any HOA certification fee.
(7) ☐ Buyer ☐ Seller shall pay for any private transfer fee _____ .
(8) ☐ Buyer ☐ Seller shall pay for _____ .
(9) ☐ Buyer ☐ Seller shall pay for _____ .

**8. ITEMS INCLUDED IN AND EXCLUDED FROM SALE:**
**A. NOTE TO BUYER AND SELLER:** Items listed as included or excluded in the MLS, flyers or marketing materials are **not** included in the purchase price or excluded from the sale unless specified in paragraph 8 B, C or D.

**B. ITEMS INCLUDED IN SALE:**
(1) All EXISTING fixtures and fittings that are attached to the Property;
(2) EXISTING electrical, mechanical, lighting, plumbing and heating fixtures, ceiling fans, fireplace inserts, gas logs and grates, solar power systems, built-in appliances, window and door screens, awnings, shutters, window coverings, attached floor coverings, television antennas, satellite dishes, air coolers/conditioners, pool/spa equipment, garage door openers/remote controls, mailbox, in-ground landscaping, trees/shrubs, water features and fountains, water softeners, water purifiers, security systems/alarms.
(3) A complete inventory of all personal property of Seller currently used in the operation of the Property and included in the purchase price shall be delivered to Buyer within the time specified in paragraph 18A.
(4) Seller represents that all items included in the purchase price are, unless otherwise specified or identified pursuant to 8B(7), owned by Seller. Within the time specified in paragraph 18A, Seller shall give Buyer a list of fixtures not owned by Seller.
(5) Seller shall deliver title to the personal property by Bill of Sale, free and clear of all liens and encumbrances, and without seller warranty of condition regardless of value.
(6) As additional security for any note in favor of Seller for any part of the purchase price, Buyer shall execute a UCC-1 Financing Statement to be filed with the Secretary of State, covering the personal property included in the purchase, replacement thereof, and insurance proceeds.
(7) **LEASED OR LIENED ITEMS AND SYSTEMS:** Seller shall, within the time specified in paragraph 18A, (i) disclose to Buyer if any item or system specified in paragraph 8B are otherwise included in the sale is leased, or not owned by Seller, or specifically subject to a lien or other encumbrance, and (ii) Deliver to Buyer all written materials (such as lease, warranty, etc.) concerning any such item. Buyer's ability to assume any such lease, or willingness to accept the Property subject to any such lien or encumbrance, is a contingency in favor of Buyer and Seller as specified in paragraph 18B and C.

**C. ITEMS EXCLUDED FROM SALE:** Unless otherwise specified, the following items are excluded from sale: _____
_____
_____

**D. OTHER ITEMS:**
(1) Existing integrated phone and automation systems, including necessary components such as intranet and Internet-connected hardware or devices, control units (other than non-dedicated mobile devices, electronics and computers) and applicable software, permissions, passwords, codes and access information, are (☐ are NOT) included in the sale.

**9. CLOSING AND POSSESSION:**
**A. Seller-occupied or vacant property:** Possession shall be delivered to Buyer: (i) ☐ at 6 PM or (_____ ☐ AM/☐ PM) on the date of Close Of Escrow; (ii) ☐ no later than ___ calendar days After Close Of Escrow; or (iii) ☐ at ___ ☐ AM/☐ PM on _____ .
**B. Seller Remaining in Possession After Close Of Escrow:** If Seller has the right to remain in possession after Close Of Escrow, (i) the Parties are advised to sign a separate occupancy agreement such as ☐ C.A.R. Form CL; and (ii) the Parties are advised to consult with their insurance and legal advisors for information about liability and damage or injury to persons and personal and real property; and (iii) Buyer is advised to consult with Buyer's lender about the impact of Seller's occupancy on Buyer's loan.
**C. Tenant Occupied Units:** Possession and occupancy, subject to the rights of tenants under existing leases, shall be delivered to Buyer on Close Of Escrow.

Buyer's Initials ( _ul_ ) ( _____ )                                           Seller's Initials ( _____ ) ( _____ )

**CPA REVISED 12/18 (PAGE 3 OF 11)**

**COMMERCIAL PROPERTY PURCHASE AGREEMENT  (CPA PAGE 3 OF 11)**

Property Address: <u>84500 Avenue, ORCHARD VILLAS II, Coachella, CA  92236</u>          Date: <u>January 11, 2021</u>

D. **At Close Of Escrow: (i)** Seller assigns to Buyer any assignable warranty rights for items included in the sale; and **(ii)** Seller shall Deliver to Buyer available Copies of any such warranties. Brokers cannot and will not determine the assignability of any warranties.

E. At Close Of Escrow, unless otherwise agreed in writing, Seller shall provide keys, passwords, codes and/or means to operate all locks, mailboxes, security systems, alarms, home automation systems and intranet and Internet-connected devices included in the purchase price, and garage door openers. If the Property is a condominium or located in a common interest subdivision, Buyer may be required to pay a deposit to the Owners' Association ("OA") to obtain keys to accessible OA facilities.

10. **SECURITY DEPOSITS:** Security deposits, if any, to the extent they have not been applied by Seller in accordance with any rental agreement and current Law, shall be transferred to Buyer on Close Of Escrow. Seller shall notify each tenant, in compliance with the Civil Code.

11. **SELLER DISCLOSURES:**

A. **NATURAL AND ENVIRONMENTAL DISCLOSURES:** Seller shall, within the time specified in paragraph 18, if required by Law: **(i)** Deliver to Buyer earthquake guides (and questionnaire) and environmental hazards booklet; **(ii)** even if exempt from the obligation to provide an NHD, disclose if the Property is located in a Special Flood Hazard Area; Potential Flooding (Inundation) Area; Very High Fire Hazard Zone; State Fire Responsibility Area; Earthquake Fault Zone; Seismic Hazard Zone; and **(iii)** disclose any other zone as required by Law and provide any other information required for those zones.

B. **ADDITIONAL DISCLOSURES:** Within the time specified in paragraph 18, Seller shall Deliver to Buyer, in writing, the following disclosures, documentation and information:

(1) **RENTAL SERVICE AGREEMENTS: (i)** All current leases, rental agreements, service contracts, and other agreements pertaining to the operation of the Property; and **(ii)** a rental statement including names of tenants, rental rates, period of rental, date of last rent increase, security deposits, rental concessions, rebates, or other benefits, if any, and a list of delinquent rents and their duration. Seller represents that no tenant is entitled to any concession, rebate, or other benefit, except as set forth in these documents.

(2) **INCOME AND EXPENSE STATEMENTS:** The books and records, including a statement of income and expense for the 12 months preceding Acceptance. Seller represents that the books and records are those maintained in the ordinary and normal course of business, and used by Seller in the computation of federal and state income tax returns.

(3) ☐ **TENANT ESTOPPEL CERTIFICATES:** (If checked) Tenant estoppel certificates (C.A.R. Form TEC) completed by Seller or Seller's agent, and signed by tenants, acknowledging: **(i)** that tenants' rental or lease agreements are unmodified and in full force and effect (or if modified, stating all such modifications); **(ii)** that no lessor defaults exist; and **(iii)** stating the amount of any prepaid rent or security deposit.

(4) **SURVEYS, PLANS AND ENGINEERING DOCUMENTS:** Copies of surveys, plans, specifications and engineering documents, if any, in Seller's possession or control.

(5) **PERMITS:** If in Seller's possession, Copies of all permits and approvals concerning the Property, obtained from any governmental entity, including, but not limited to, certificates of occupancy, conditional use permits, development plans, and licenses and permits pertaining to the operation of the Property.

(6) **STRUCTURAL MODIFICATIONS:** Any known structural additions or alterations to, or the installation, alteration, repair or replacement of, significant components of the structure(s)upon the Property.

(7) **GOVERNMENTAL COMPLIANCE:** Any improvements, additions, alterations or repairs made by Seller, or known to Seller to have been made, without required governmental permits, final inspections, and approvals.

(8) **VIOLATION NOTICES:** Any notice of violations of any Law filed or issued against the Property and actually known to Seller.

(9) **WATER CONSERVING PLUMBING DEVICES:** Section 1101.5 of the Civil Code, requires that by January 1, 2019, all multi-family residential and commercial real property be equipped with water-conserving plumbing devices. Seller shall disclose in writing whether the property includes any noncompliant plumbing fixtures. Seller may use C.A.R. Form SPQ or ESD. See C.A.R. Form WCMD for further information.

(10) **MISCELLANEOUS ITEMS:** Any of the following, if actually known to Seller: **(i)** any current pending lawsuit(s), investigation(s), inquiry(ies), action(s), or other proceeding(s) affecting the Property, or the right to use and occupy it; **(ii)** any unsatisfied mechanic's or materialman's lien(s) affecting the Property; and **(iii)** that any tenant of the Property is the subject of a bankruptcy.

C. **WITHHOLDING TAXES:** Within the time specified in paragraph 18A, to avoid required withholding Seller shall Deliver to Buyer or qualified substitute, an affidavit sufficient to comply with federal (FIRPTA) and California withholding Law, (C.A.R. Form AS or QS).

D. **NOTICE REGARDING GAS AND HAZARDOUS LIQUID TRANSMISSION PIPELINES:** This notice is being provided simply to inform you that information about the general location of gas and hazardous liquid transmission pipelines is available to the public via the National Pipeline Mapping System (NPMS) Internet Web site maintained by the United States Department of Transportation at http://www.npms.phmsa.dot.gov/. To seek further information about possible transmission pipelines near the Property, you may contact your local gas utility or other pipeline operators in the area. Contact information for pipeline operators is searchable by ZIP Code and county on the NPMS Internet Web site.

E. **CONDOMINIUM/PLANNED DEVELOPMENT DISCLOSURES:**

(1) **SELLER HAS: 7 (or ____ ) Days** After Acceptance to disclose to Buyer whether the Property is a condominium, or is located in a planned development or other common interest subdivision.

(2) If the Property is a condominium or is located in a planned development or other common interest subdivision, Seller has **3 (or ____ ) Days** After Acceptance to request from the OA (C.A.R. Form HOA1): **(i)** Copies of any documents required by Law; **(ii)** disclosure of any pending or anticipated claim or litigation by or against the OA; **(iii)** a statement containing the location and number of designated parking and storage spaces; **(iv)** Copies of the most recent 12 months of OA minutes for regular and special meetings; and **(v)** the names and contact information of all OAs governing the Property (collectively, "CI Disclosures"). Seller shall itemize and Deliver to Buyer all CI Disclosures received from the OA and any CI Disclosures in Seller's possession. Buyer's approval of CI Disclosures is a contingency of this Agreement as specified in paragraph 18B(3). The Party specified in paragraph 7, as directed by escrow, shall deposit funds into escrow or direct to OA or management company to pay for any of the above.

Buyer's Initials ( <u>ul</u> ) (_____)          Seller's Initials (_____) (_____)

**CPA REVISED 12/18 (PAGE 4 OF 11)**

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 4 OF 11)**

Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5   www.lwolf.com          **ORCHARD**

Property Address: <u>84500 Avenue, ORCHARD VILLAS II, Coachella, CA  92236</u>          Date: <u>January 11, 2021</u>

12. ☐ **ENVIRONMENTAL SURVEY** (If checked): Within _____ Days After Acceptance, Buyer shall be provided a phase one environmental survey report paid for and obtained by ☐ Buyer ☐ Seller. Buyer shall then, as specified in paragraph 18, remove this contingency or cancel this Agreement.

13. **SUBSEQUENT DISCLOSURES:** In the event Seller, prior to Close Of Escrow, becomes aware of adverse conditions materially affecting the Property, or any material inaccuracy in disclosures, information or representations previously provided to Buyer of which Buyer is otherwise unaware, Seller shall promptly Deliver a subsequent or amended disclosure or notice in writing, covering those items. **However, a subsequent or amended disclosure shall not be required for conditions and material inaccuracies disclosed in reports ordered and paid for by Buyer.**

14. **CHANGES DURING ESCROW:**
   A. Prior to Close Of Escrow, Seller may only engage in the following acts, ("Proposed Changes"), subject to Buyer's rights in paragraph 14B: **(i)** rent or lease any vacant unit or other part of the premises; **(ii)** alter, modify, or extend any existing rental or lease agreement; **(iii)** enter into, alter, modify or extend any service contract(s); or **(iv)** change the status of the condition of the Property.
   B. **(1)** 7 (or ☐ _____ ) Days prior to any Proposed Changes, Seller shall Deliver written notice to Buyer of any Proposed Changes.
   **(2)** Within 5 (or ___ ) Days After receipt of such notice, Buyer, in writing, may give Seller notice of Buyer's objection to the Proposed Changes in which case Seller shall not make the Proposed Changes.

15. **CONDITION OF PROPERTY:** Unless otherwise agreed in writing: **(i)** the Property is sold **(a)** "AS-IS" in its PRESENT physical condition as of the date of Acceptance and **(b)** subject to Buyer's Investigation rights; **(ii)** the Property, including pool, spa, landscaping and grounds, is to be maintained in substantially the same condition as on the date of Acceptance; and **(iii)** all debris and personal property not included in the sale shall be removed by Close Of Escrow.
   A. Seller shall, within the time specified in paragraph 18A, DISCLOSE KNOWN MATERIAL FACTS AND DEFECTS affecting the Property, including known insurance claims within the past five years, and make any and all other disclosures required by law.
   B. Buyer has the right to conduct Buyer Investigations of the property and, as specified in paragraph 18B, based upon information discovered in those investigations: **(i)** cancel this Agreement; or **(ii)** request that Seller make Repairs or take other action.
   C. **Buyer is strongly advised to conduct investigations of the entire Property in order to determine its present condition. Seller may not be aware of all defects affecting the Property or other factors that Buyer considers important. Property improvements may not be built according to code, in compliance with current Law, or have had permits issued.**

16. **BUYER'S INVESTIGATION OF PROPERTY AND MATTERS AFFECTING PROPERTY:**
   A. Buyer's acceptance of the condition of, and any other matter affecting the Property, is a contingency of this Agreement as specified in this paragraph and paragraph 18B. Within the time specified in paragraph 18B(1), Buyer shall have the right, at Buyer's expense unless otherwise agreed, to conduct inspections, investigations, tests, surveys and other studies ("Buyer Investigations"), including, but not limited to, the right to: **(i)** inspect for lead-based paint and other lead-based paint hazards; **(ii)** inspect for wood destroying pests and organisms. Any inspection for wood destroying pests and organisms shall be prepared by a registered Structural Pest Control company; shall cover the main building and attached structures; may cover detached structures; shall NOT include water tests of shower pans on upper level units unless the owners of property below the shower consent; shall NOT include roof coverings; and, if the Property is a unit in a condominium or other common interest subdivision, the inspection shall include only the separate interest and any exclusive-use areas being transferred, and shall NOT include common areas; and shall include a report ("Pest Control Report") showing the findings of the company which shall be separated into sections for evident infestation or infections (Section 1) and for conditions likely to lead to infestation or infection (Section 2); **(iii)** review the registered sex offender database; **(iv)** confirm the insurability of Buyer and the Property including the availability and cost of flood and fire insurance; **(v)** review and seek approval of leases that may need to be assumed by Buyer; and **(vi)** satisfy Buyer as to any matter specified in the attached Buyer's Inspection Advisory (C.A.R. Form BIA). Without Seller's prior written consent, Buyer shall neither make nor cause to be made: **(i)** invasive or destructive Buyer Investigations except for minimally invasive testing required to prepare a Pest Control Report; or **(ii)** inspections by any governmental building or zoning inspector or government employee, unless required by Law.
   B. Seller shall make the Property available for all Buyer Investigations. Buyer shall **(i)** as specified in paragraph 18B, complete Buyer Investigations and either remove the contingency or cancel this Agreement, and **(ii)** give Seller, at no cost, complete Copies of all such Investigation reports obtained by Buyer, which obligation shall survive the termination of this Agreement.
   C. Seller shall have water, gas, electricity and all operable pilot lights on for Buyer's Investigations and through the date possession is made available to Buyer.
   D. **Buyer indemnity and seller protection for entry upon property:** Buyer shall: **(i)** keep the Property free and clear of liens; **(ii)** repair all damage arising from Buyer Investigations; and **(iii)** indemnify and hold Seller harmless from all resulting liability, claims, demands, damages and costs. Buyer shall carry, or Buyer shall require anyone acting on Buyer's behalf to carry, policies of liability, workers' compensation and other applicable insurance, defending and protecting Seller from liability for any injuries to persons or property occurring during any Buyer Investigations or work done on the Property at Buyer's direction prior to Close Of Escrow. Seller is advised that certain protections may be afforded Seller by recording a "Notice of Non-Responsibility" (C.A.R. Form NNR) for Buyer Investigations and work done on the Property at Buyer's direction. Buyer's obligations under this paragraph shall survive the termination of this Agreement.

17. **TITLE AND VESTING:**
   A. Within the time specified in paragraph 18, Buyer shall be provided a current preliminary title report ("Preliminary Report"). The Preliminary Report is only an offer by the title insurer to issue a policy of title insurance and may not contain every item affecting title. Buyer's review of the Preliminary Report and any other matters which may affect title are a contingency of this Agreement as specified in paragraph 18B. The company providing the Preliminary Report shall, prior to issuing a Preliminary Report, conduct a search of the General Index for all Sellers except banks or other institutional lenders selling properties they acquired through foreclosure (REOs), corporations, and government entities. Seller shall within 7 Days After Acceptance, give Escrow Holder a completed Statement of Information.
   B. Title is taken in its present condition subject to all encumbrances, easements, covenants, conditions, restrictions, rights and other matters, whether of record or not, as of the date of Acceptance except for: **(i)** monetary liens of record (which Seller is obligated to pay off) unless Buyer is assuming those obligations or taking the Property subject to those obligations; and **(ii)** those matters which Seller has agreed to remove in writing.
   C. Within the time specified in paragraph 18A, Seller has a duty to disclose to Buyer all matters known to Seller affecting title, whether of record or not.

Buyer's Initials ( _ul_ ) ( _____ )          Seller's Initials ( _____ ) ( _____ )

Property Address: <u>84500 Avenue, ORCHARD VILLAS II, Coachella, CA  92236</u>                    Date: <u>January 11, 2021</u>

**D.** At Close Of Escrow, Buyer shall receive a grant deed conveying title (or, for stock cooperative or long-term lease, an assignment of stock certificate or of Seller's leasehold interest), including oil, mineral and water rights if currently owned by Seller. Title shall vest as designated in Buyer's supplemental escrow instructions. THE MANNER OF TAKING TITLE MAY HAVE SIGNIFICANT LEGAL AND TAX CONSEQUENCES. CONSULT AN APPROPRIATE PROFESSIONAL.

**E.** Buyer shall receive a standard coverage owners CLTA policy of title insurance. An ALTA policy or the addition of endorsements may provide greater coverage for Buyer. A title company, at Buyer's request, can provide information about the availability, desirability, coverage, and cost of various title insurance coverages and endorsements. If Buyer desires title coverage other than that required by this paragraph, Buyer shall instruct Escrow Holder in writing and shall pay any increase in cost.

**18.** **TIME PERIODS; REMOVAL OF CONTINGENCIES; CANCELLATION RIGHTS: The following time periods may only be extended, altered, modified or changed by mutual written agreement. Any removal of contingencies or cancellation under this paragraph by either Buyer or Seller must be exercised in good faith and in writing (C.A.R. Form CR or CC).**

**A.** **SELLER HAS: 7 (or  <u>45</u>  ) Days** After Acceptance to Deliver to Buyer all Reports, disclosures and information for which Seller is responsible under paragraphs 5A, 6, 7, 8B(7), 11A, B,  C, D and F, 12, 15A and 17A. Buyer after first Delivering to Seller a Notice to Seller to Perform (C.A.R. Form NSP) may cancel this Agreement if Seller has not Delivered the items within the time specified.

**B.** **(1)** **BUYER HAS: 17 (or ___ ) Days** After Acceptance, unless otherwise agreed in writing, to:
   **(i)** complete all Buyer Investigations; review all disclosures, reports, lease documents to be assumed by Buyer pursuant to paragraph 8B(7) and other applicable information, which Buyer receives from Seller; and approve all matters affecting the Property.

**(2)** Within the time specified in paragraph 18B(1), Buyer may request that Seller make repairs or take any other action regarding the Property (C.A.R. Form RR). Seller has no obligation to agree to or respond to (C.A.R. Form RRRR) Buyer's requests.

**(3)** By the end of the time specified in paragraph 18B(1) (or as otherwise specified in this Agreement), Buyer shall Deliver to Seller a removal of the applicable contingency or cancellation (C.A.R. Form CR or CC) of this Agreement. However, if any report, disclosure or information for which Seller is responsible is not Delivered within the time specified in paragraph 18A, then Buyer has **5 (or ___ ) Days** After Delivery of any such items, or the time specified in paragraph 18B(1), whichever is later, to Deliver to Seller a removal of the applicable contingency or cancellation of this Agreement.

**(4)** **Continuation of Contingency:** Even after the end of the time specified in paragraph 18B(1) and before Seller cancels, if at all, pursuant to paragraph 18C, Buyer retains the right, in writing, to either (i) remove remaining contingencies, or (ii) cancel this Agreement based on a remaining contingency. Once Buyer's written removal of all contingencies is Delivered to Seller, Seller may not cancel this Agreement pursuant to paragraph 18C(1).

**C.** **SELLER RIGHT TO CANCEL:**
   **(1)** **Seller right to Cancel; Buyer Contingencies:** If, by the time specified in this Agreement, Buyer does not Deliver to Seller a removal of the applicable contingency or cancellation of this Agreement, then Seller, after first Delivering to Buyer a Notice to Buyer to Perform (C.A.R. Form NBP), may cancel this Agreement. In such event, Seller shall authorize the return of Buyer's deposit, except for fees incurred by Buyer.

**(2)** **Seller right to Cancel; Buyer Contract Obligations:** Seller, after first delivering to Buyer a NBP, may cancel this Agreement if, by the time specified in this Agreement, Buyer does not take the following action(s): **(i)** Deposit funds as required by paragraph 3A or 3B or if the funds deposited pursuant to paragraph 3A or 3B are not good when deposited; **(ii)** Deliver a letter as required by paragraph 3J(1); **(iii)** Deliver verification as required by paragraph 3C or 3H or if Seller reasonably disapproves of the verification provided by paragraph 3C or 3H; or **(iv)** In writing assume or accept leases or liens specified in 8B(7); **(v)** Sign or initial a separate liquidated damages form for an increased deposit as required by paragraphs 3B and 25B; or **(vi)** Provide evidence of authority to sign in a representative capacity as specified in paragraph 23. In such event, Seller shall authorize the return of Buyer's deposit, except for fees incurred by Buyer.

**D.** **NOTICE TO BUYER OR SELLER TO PERFORM:** The NBP or NSP shall: **(i)** be in writing; **(ii)** be signed by the applicable Buyer or Seller; and **(iii)** give the other Party at least **2 (or ___ ) Days** After Delivery (or until the time specified in the applicable paragraph, whichever occurs last) to take the applicable action. A NBP or NSP may not be Delivered any earlier than **2 Days** Prior to the expiration of the applicable time for the other Party to remove a contingency or cancel this Agreement or meet an obligation specified in paragraph 18.

**E.** **EFFECT OF BUYER'S REMOVAL OF CONTINGENCIES:** If Buyer removes, in writing, any contingency or cancellation rights, unless otherwise specified in writing, Buyer shall conclusively be deemed to have: **(i)** completed all Buyer Investigations, and review of reports and other applicable information and disclosures pertaining to that contingency or cancellation right; **(ii)** elected to proceed with the transaction; and **(iii)** assumed all liability, responsibility and expense for Repairs or corrections pertaining to that contingency or cancellation right, or for the inability to obtain financing.

**F.** **CLOSE OF ESCROW:** Before Buyer or Seller may cancel this Agreement for failure of the other Party to close escrow pursuant to this Agreement, Buyer or Seller must first Deliver to the other Party a demand to close escrow (C.A.R. Form DCE). The DCE shall: **(i)** be signed by the applicable Buyer or Seller; and **(ii)** give the other Party at least **3 (or ___ ) Days** After Delivery to close escrow. A DCE may not be Delivered any earlier than **3 Days** Prior to the scheduled close of escrow.

**G.** **EFFECT OF CANCELLATION ON DEPOSITS:** If Buyer or Seller gives written notice of cancellation pursuant to rights duly exercised under the terms of this Agreement, the Parties agree to Sign mutual instructions to cancel the sale and escrow and release deposits, if any, to the party entitled to the funds, less fees and costs incurred by that party. Fees and costs may be payable to service providers and vendors for services and products provided during escrow. Except as specified below, **release of funds will require mutual Signed release Instructions from the Parties, judicial decision or arbitration award.** If either Party fails to execute mutual instructions to cancel escrow, one Party may make a written demand to Escrow Holder for the deposit (C.A.R. Form BDRD or SDRD). Escrow Holder, upon receipt, shall promptly deliver notice of the demand to the other Party. If, within **10 Days** After Escrow Holder's notice, the other Party does not object to the demand, Escrow Holder shall disburse the deposit to the Party making the demand. If Escrow Holder complies with the preceding process, each Party shall be deemed to have released Escrow Holder from any and all claims or liability related to the disbursal of the deposit. Escrow Holder, at its discretion, may nonetheless require mutual cancellation instructions. **A Party may be subject to a civil penalty of up to $1,000 for refusal to sign cancellation instructions if no good faith dispute exists as to who is entitled to the deposited funds** (Civil Code §1057.3).

Buyer's Initials ( <u>ul</u> ) ( _____ )                    Seller's Initials ( _____ ) ( _____ )

**CPA REVISED 12/18 (PAGE 6 OF 11)**

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 6 OF 11)**
Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5    www.lwolf.com          **ORCHARD**

Property Address: <u>84500 Avenue, ORCHARD VILLAS II, Coachella, CA  92236</u>                Date: <u>January 11, 2021</u>

19. **REPAIRS:** Repairs shall be completed prior to final verification of condition unless otherwise agreed in writing. Repairs to be performed at Seller's expense may be performed by Seller or through others, provided that the work complies with applicable Law, including governmental permit, inspection and approval requirements. Repairs shall be performed in a good, skillful manner with materials of quality and appearance comparable to existing materials. It is understood that exact restoration of appearance or cosmetic items following all Repairs may not be possible. Seller shall: (i) obtain invoices and paid receipts for Repairs performed by others; (ii) prepare a written statement indicating the Repairs performed by Seller and the date of such Repairs; and (iii) provide Copies of invoices and paid receipts and statements to Buyer prior to final verification of condition.

20. **FINAL VERIFICATION OF CONDITION:** Buyer shall have the right to make a final verification of the Property within **5 (or ☐  ) Days** Prior to Close Of Escrow, **NOT AS A CONTINGENCY OF THE SALE**, but solely to confirm: (i) the Property is maintained pursuant to paragraph 15; (ii) Repairs have been completed as agreed; and (iii) Seller has complied with Seller's other obligations under this Agreement (C.A.R. Form VP).

21. **PRORATIONS OF PROPERTY TAXES AND OTHER ITEMS:** Unless otherwise agreed in writing, the following items shall be PAID CURRENT and prorated between Buyer and Seller as of Close Of Escrow: real property taxes and assessments, interest, rents, OA regular, special, and emergency dues and assessments imposed prior to Close Of Escrow, premiums on insurance assumed by Buyer, payments on bonds and assessments assumed by Buyer, and payments on Mello-Roos and other Special Assessment District bonds and assessments that are now a lien. The following items shall be assumed by Buyer WITHOUT CREDIT toward the purchase price: prorated payments on Mello-Roos and other Special Assessment District bonds and assessments and HOA special assessments that are now a lien but not yet due. Property will be reassessed upon change of ownership. Any supplemental tax bills shall be paid as follows: (i) for periods after Close Of Escrow, by Buyer; and (ii) for periods prior to Close Of Escrow, by Seller (see C.A.R. Form SPT or SBSA for further information). TAX BILLS ISSUED AFTER CLOSE OF ESCROW SHALL BE HANDLED DIRECTLY BETWEEN BUYER AND SELLER. Prorations shall be made based on a 30-day month.

22. **BROKERS:**
   A. **COMPENSATION:** Seller or Buyer, or both, as applicable, agrees to pay compensation to Broker as specified in a separate written agreement between Broker and that Seller or Buyer.  Compensation is payable upon Close Of Escrow, or if escrow does not close, as otherwise specified in the agreement between Broker and that Seller or Buyer.
   B. **BROKERAGE:** Neither Buyer nor Seller has utilized the services of, or for any other reason owes compensation to, a licensed real estate broker (individual or corporate), agent, finder, or other entity, other than as specified in this Agreement, in connection with any act relating to the Property, including, but not limited to, inquiries, introductions, consultations and negotiations leading to this Agreement. Buyer and Seller each agree to indemnify, defend, and hold the other, the Brokers specified herein and their agents, harmless from and against any costs, expenses or liability for compensation claimed inconsistent with the warranty and representations in this paragraph.
   C. **SCOPE OF DUTY:** Buyer and Seller acknowledge and agree that Broker: (i) Does not decide what price Buyer should pay or Seller should accept; (ii) Does not guarantee the condition of the Property; (iii) Does not guarantee the performance, adequacy or completeness of inspections, services, products or repairs provided or made by Seller or others; (iv) Does not have an obligation to conduct an inspection of common areas or areas off the site of the Property; (v) Shall not  be responsible for identifying defects on the Property, in common areas, or offsite unless such defects are visually observable by an inspection of reasonably accessible areas of the Property or are known to Broker; (vi) Shall not be responsible for inspecting public records or permits concerning the title or use of Property; (vii) Shall not be responsible for identifying the location of boundary lines or other items affecting title; (viii) Shall not be responsible for verifying square footage, representations of others or information contained in Investigation reports, Multiple Listing Service, advertisements, flyers or other promotional material; (ix) Shall not be responsible for determining the fair market value of the Property or any personal property included in the sale; (x) Shall not be responsible for providing legal or tax advice regarding any aspect of a transaction entered into by Buyer or Seller; and (xi) Shall not be responsible for providing other advice or information that exceeds the knowledge, education and experience required to perform real estate licensed activity. Buyer and Seller agree to seek legal, tax, insurance, title and other desired assistance from appropriate professionals.

23. **REPRESENTATIVE CAPACITY:** If one or more Parties is signing the Agreement in a representative capacity and not for him/herself as an individual then that Party shall so indicate in paragraph 40 or 41 and attach a Representative Capacity Signature Disclosure (C.A.R. Form RCSD). Wherever the signature or initials of the representative identified in the RCSD appear on the Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. The Party acting in a representative capacity (i) represents that the entity for which that party is acting already exists and (ii) shall Deliver to the other Party and Escrow Holder, within **3 Days** After Acceptance, evidence of authority to act in that capacity (such as but not limited to: applicable portion of the trust or Certification Of Trust (Probate Code §18100.5), letters testamentary, court order, power of attorney, corporate resolution, or formation documents of the business entity).

24. **JOINT ESCROW INSTRUCTIONS TO ESCROW HOLDER:**
   A. **The following paragraphs, or applicable portions thereof, of this Agreement constitute the joint escrow instructions of Buyer and Seller to Escrow Holder,** which Escrow Holder is to use along with any related counter offers and addenda, and any additional mutual instructions to close the escrow: paragraphs 1, 3, 4B, 5A, 6, 7, 10, 11D, 17, 18G, 21, 22A, 23, 24, 30, 38, 39, 41, 42 and paragraph D of the section titled Real Estate Brokers on page 11. If a Copy of the separate compensation agreement(s) provided for in paragraph 22A, or paragraph D of the section titled Real Estate Brokers on page 11 is deposited with Escrow Holder by Broker, Escrow Holder shall accept such agreement(s) and pay out from Buyer's or Seller's funds, or both, as applicable, the Broker's compensation provided for in such agreement(s). The terms and conditions of this Agreement not set forth in the specified paragraphs are additional matters for the information of Escrow Holder, but about which Escrow Holder need not be concerned. Buyer and Seller will receive Escrow Holder's general provisions, if any, directly from Escrow Holder and will execute such provisions within the time specified in paragraph 7C(1)(c). To the extent the general provisions are inconsistent or conflict with this Agreement, the general provisions will control as to the duties and obligations of Escrow Holder only. Buyer and Seller will execute additional instructions, documents and forms provided by Escrow Holder that are reasonably necessary to close the escrow and, as directed by Escrow Holder, within **3 (or ___ ) Days,** shall pay to Escrow Holder or HOA or HOA management company or others any fee required by paragraphs 7, 11 or elsewhere in this Agreement.

Buyer's Initials   ( ___ ul ___ ) ( _____ )          Seller's Initials   ( _____ ) ( _____ )

Property Address: 84500 Avenue, ORCHARD VILLAS II, Coachella, CA  92236 _____ Date: January 11, 2021 _____

**B.** A Copy of this Agreement including any counter offer(s) and addenda shall be delivered to Escrow Holder within **3 Days** After Acceptance (or _____ ). Buyer and Seller authorize Escrow Holder to accept and rely on Copies and Signatures as defined in this Agreement as originals, to open escrow and for other purposes of escrow. The validity of this Agreement as between Buyer and Seller is not affected by whether or when Escrow Holder Signs this Agreement. Escrow Holder shall provide Seller's Statement of Information to Title company when received from Seller. If Seller delivers an affidavit to Escrow Holder to satisfy Seller's FIRPTA obligation under paragraph 10C, Escrow Holder shall deliver to  Buyer a Qualified Substitute statement that complies with federal Law.

**C.** Brokers are a party to the escrow for the sole purpose of compensation pursuant to paragraph 22A and paragraph D of the section titled Real Estate Brokers on page 11. Buyer and Seller irrevocably assign to Brokers compensation specified in paragraph 22A, and irrevocably instruct Escrow Holder to disburse those funds to Brokers at Close Of Escrow or pursuant to any other mutually executed cancellation agreement. Compensation instructions can be amended or revoked only with the written consent of Brokers.  Buyer and Seller shall release and hold harmless Escrow Holder from any liability resulting from Escrow Holder's payment to Broker(s) of compensation pursuant to this Agreement.

**D.** Upon receipt, Escrow Holder shall provide Seller and Seller's Broker verification of Buyer's deposit of funds pursuant to paragraph 3A and 3B. Once Escrow Holder becomes aware of any of the following, Escrow Holder shall immediately notify all Brokers: **(i)** if Buyer's initial or any additional deposit is not made pursuant to this Agreement, or is not good at time of deposit with Escrow Holder; or **(ii)** if Buyer and Seller instruct Escrow Holder to cancel escrow.

**E.** A Copy of any amendment that affects any paragraph of this Agreement for which Escrow Holder is responsible shall be delivered to Escrow Holder within 3 Days after mutual execution of the amendment.

**25. REMEDIES FOR BUYER'S BREACH OF CONTRACT:**

**A. Any clause added by the Parties specifying a remedy (such as release or forfeiture of deposit or making a deposit non-refundable) for failure of Buyer to complete the purchase in violation of this Agreement shall be deemed invalid unless the clause independently satisfies the statutory liquidated damages requirements set forth in the Civil Code.**

**B. LIQUIDATED DAMAGES: If Buyer fails to complete this purchase because of Buyer's default, Seller shall retain, as liquidated damages, the deposit actually paid. Buyer and Seller agree that this amount is a reasonable sum given that it is impractical or extremely difficult to establish the amount of damages that would actually be suffered by Seller in the event Buyer were to breach this Agreement. Release of funds will require mutual, Signed release instructions from both Buyer and Seller, judicial decision or arbitration award. AT TIME OF ANY INCREASED DEPOSIT BUYER AND SELLER SHALL SIGN A SEPARATE LIQUIDATED DAMAGES PROVISION INCORPORATING THE INCREASED DEPOSIT AS LIQUIDATED DAMAGES (C.A.R.FORM RID).**

Buyer's Initials _____ / _____          Seller's Initials _____ / _____

**26. DISPUTE RESOLUTION:**

**A. MEDIATION:** The Parties agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to arbitration or court action through the C.A.R. Consumer Mediation Center (**www.consumermediation.org**) or through any other mediation provider or service mutually agreed to by the Parties. The Parties also agree to mediate any disputes or claims with Broker(s), who, in writing, agree to such mediation prior to, or within a reasonable time after, the dispute or claim is presented to the Broker. Mediation fees, if any, shall be divided equally among the Parties involved. If, for any dispute or claim to which this paragraph applies, any Party (i) commences an action without first attempting to resolve the matter through mediation, or (ii) before commencement of an action, refuses to mediate after a request has been made, then that Party shall not be entitled to recover attorney fees, even if they would otherwise be available to that Party in any such action. THIS MEDIATION PROVISION APPLIES WHETHER OR NOT THE ARBITRATION PROVISION IS INITIALED. Exclusions from this mediation agreement are specified in paragraph 26C.

**B. ARBITRATION OF DISPUTES:**
**The Parties agree that any dispute or claim in Law or equity arising between them out of this Agreement or any resulting transaction, which is not settled through mediation, shall be decided by neutral, binding arbitration. The Parties also agree to arbitrate any disputes or claims with Broker(s), who, in writing, agree to such arbitration prior to, or within a reasonable time after, the dispute or claim is presented to the Broker. The arbitrator shall be a retired judge or justice, or an attorney with at least 5 years of transactional real estate Law experience, unless the parties mutually agree to a different arbitrator. The Parties shall have the right to discovery in accordance with Code of Civil Procedure §1283.05. In all other respects, the arbitration shall be conducted in accordance with Title 9 of Part 3 of the Code of Civil Procedure. Judgment upon the award of the arbitrator(s) may be entered into any court having jurisdiction. Enforcement of this agreement to arbitrate shall be governed by the Federal Arbitration Act. Exclusions from this arbitration agreement are specified in paragraph 26C.**
          **"NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY."**
          **"WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION."**

Buyer's Initials _____ / _____          Seller's Initials _____ / _____

Buyer's Initials ( ul ) ( _____ )          Seller's Initials ( _____ ) ( _____ )

Property Address: 84500 Avenue, ORCHARD VILLAS II, Coachella, CA  92236     Date: January 11, 2021

C. **ADDITIONAL MEDIATION AND ARBITRATION TERMS:**
(1) **EXCLUSIONS:** The following matters are excluded from mediation and arbitration: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage or installment land sale contract as defined in Civil Code §2985; (ii) an unlawful detainer action; and (iii) any matter that is within the jurisdiction of a probate, small claims or bankruptcy court.
(2) **PRESERVATION OF ACTIONS:** The following shall not constitute a waiver nor violation of the mediation and arbitration provisions: (i) the filing of a court action to preserve a statute of limitations; (ii) the filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies; or (iii) the filing of a mechanic's lien.
(3) **BROKERS:** Brokers shall not be obligated nor compelled to mediate or arbitrate unless they agree to do so in writing. Any Broker(s) participating in mediation or arbitration shall not be deemed a party to the Agreement.

27. **SELECTION OF SERVICE PROVIDERS:** Brokers do not guarantee the performance of any vendors, service or product providers ("Providers"), whether referred by Broker or selected by Buyer, Seller or other person. Buyer and Seller may select ANY Providers of their own choosing.

28. **MULTIPLE LISTING SERVICE/PROPERTY DATA SYSTEM:** If Broker is a participant of a Multiple Listing Service ("MLS") or Property Data System ("PDS"), Broker is authorized to report to the MLS or PDS a pending sale and, upon Close Of Escrow, the terms of this transaction to be published and disseminated to persons and entities authorized to use the information on terms approved by the MLS or PDS.

29. **ATTORNEY FEES:** In any action, proceeding, or arbitration between Buyer and Seller arising out of this Agreement, the prevailing Buyer or Seller shall be entitled to reasonable attorneys fees and costs from the non-prevailing Buyer or Seller, except as provided in paragraph 26A.

30. **ASSIGNMENT:** Buyer shall not assign all or any part of Buyer's interest in this Agreement without first having obtained the written consent of Seller. Such consent shall not be unreasonably withheld unless otherwise agreed in writing. Any total or partial assignment shall not relieve Buyer of Buyer's obligations pursuant to this Agreement unless otherwise agreed in writing by Seller (C.A.R. Form AOAA).

31. **SUCCESSORS AND ASSIGNS:** This Agreement shall be binding upon, and inure to the benefit of, Buyer and Seller and their respective successors and assigns, except as otherwise provided herein.

32. **ENVIRONMENTAL HAZARD CONSULTATION:** Buyer and Seller acknowledge: (i) Federal, state, and local legislation impose liability upon existing and former owners and users of real property, in applicable situations, for certain legislatively defined, environmentally hazardous substances; (ii) Broker(s) has/have made no representation concerning the applicability of any such Law to this transaction or to Buyer or to Seller, except as otherwise indicated in this Agreement; (iii) Broker(s) has/have made no representation concerning the existence, testing, discovery, location and evaluation of/for, and risks posed by, environmentally hazardous substances, if any, located on or potentially affecting the Property; and (iv) Buyer and Seller are each advised to consult with technical and legal experts concerning the existence, testing, discovery, location and evaluation of/for, and risks posed by, environmentally hazardous substances, if any, located on or potentially affecting the Property.

33. **AMERICANS WITH DISABILITIES ACT:** The Americans With Disabilities Act ("ADA") prohibits discrimination against individuals with disabilities. The ADA affects almost all commercial facilities and public accommodations. The ADA can require, among other things, that buildings be made readily accessible to the disabled. Different requirements apply to new construction, alterations to existing buildings, and removal of barriers in existing buildings. Compliance with the ADA may require significant costs. Monetary and injunctive remedies may be incurred if the Property is not in compliance. A real estate broker does not have the technical expertise to determine whether a building is in compliance with ADA requirements, or to advise a principal on those requirements. Buyer and Seller are advised to contact an attorney, contractor, architect, engineer or other qualified professional of Buyer's or Seller's own choosing to determine to what degree, if any, the ADA impacts that principal or this transaction.

34. **COPIES:** Seller and Buyer each represent that Copies of all reports, documents, certificates, approvals and other documents that are furnished to the other are true, correct and unaltered Copies of the original documents, if the originals are in the possession of the furnishing party.

35. **EQUAL HOUSING OPPORTUNITY:** The Property is sold in compliance with federal, state and local anti-discrimination Laws.

36. **GOVERNING LAW:** This Agreement shall be governed by the Laws of the state of California.

37. **TERMS AND CONDITIONS OF OFFER:** This is an offer to purchase the Property on the above terms and conditions. The liquidated damages paragraph or the arbitration of disputes paragraph is incorporated in this Agreement if initialed by all Parties or if incorporated by mutual agreement in a counter offer or addendum. If at least one but not all Parties initial, a counter offer is required until agreement is reached. Seller has the right to continue to offer the Property for sale and to accept any other offer at any time prior to notification of Acceptance. Buyer has read and acknowledges receipt of a Copy of the offer and agrees to the confirmation of agency relationships. If this offer is accepted and Buyer subsequently defaults, Buyer may be responsible for payment of Brokers' compensation. This Agreement and any supplement, addendum or modification, including any Copy, may be Signed in two or more counterparts, all of which shall constitute one and the same writing.

38. **TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the Parties are incorporated in this Agreement. Its terms are intended by the Parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Except as otherwise specified, this Agreement shall be interpreted and disputes shall be resolved in accordance with the Laws of the State of California. **Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed, except in writing Signed by Buyer and Seller.**

39. **DEFINITIONS:** As used in this Agreement:
A. **"Acceptance"** means the time the offer or final counter offer is accepted in writing by a Party and is delivered to and personally received by the other Party or that Party's authorized agent in accordance with the terms of this offer or a final counter offer.
B. **"Agreement"** means this document and any counter offers and any incorporated addenda, collectively forming the binding agreement between the Parties. Addenda are incorporated only when Signed by all Parties.

Buyer's Initials ( ul ) ( )     Seller's Initials ( ) ( )

**CPA REVISED 12/18 (PAGE 9 OF 11)**

**COMMERCIAL PROPERTY PURCHASE AGREEMENT  (CPA PAGE 9 OF 11)**

Property Address: _84500 Avenue, ORCHARD VILLAS II, Coachella, CA  92236_ Date: _January 11, 2021_

   C. **"C.A.R. Form"** means the most current version of the specific form referenced or another comparable form agreed to by the parties.

   D. **"Close Of Escrow"** or **"COE"** means the date the grant deed, or other evidence of transfer of title, is recorded.

   E. **"Copy"** means copy by any means including photocopy, NCR, facsimile and electronic.

   F. **"Days"** means calendar days. However, after Acceptance, the last Day for performance of any act required by this Agreement (including Close Of Escrow) shall not include any Saturday, Sunday, or legal holiday and shall instead be the next Day.

   G. **"Days After"** means the specified number of calendar days after the occurrence of the event specified, not counting the calendar date on which the specified event occurs, and ending at 11:59 PM on the final day.

   H. **"Days Prior"** means the specified number of calendar days before the occurrence of the event specified, not counting the calendar date on which the specified event is scheduled to occur.

   I. **"Deliver"**, **"Delivered"** or **"Delivery"**, unless otherwise specified in writing, means and shall be effective upon: personal receipt by Buyer or Seller or the individual Real Estate Licensee for that principal as specified in the section titled Real Estate Brokers on page 11, regardless of the method used (i.e., messenger, mail, email, fax, other).

   J. **"Electronic Copy"** or **"Electronic Signature"** means, as applicable, an electronic copy or signature complying with California Law. Buyer and Seller agree that electronic means will not be used by either Party to modify or alter the content or integrity of this Agreement without the knowledge and consent of the other Party.

   K. **"Law"** means any law, code, statute, ordinance, regulation, rule or order, which is adopted by a controlling city, county, state or federal legislative, judicial or executive body or agency.

   L. **"Repairs"** means any repairs (including pest control), alterations, replacements, modifications or retrofitting of the Property provided for under this Agreement.

   M. **"Signed"** means either a handwritten or electronic signature on an original document, Copy or any counterpart.

**40. AUTHORITY:** Any person or persons signing this Agreement represent(s) that such person has full power and authority to bind that person's principal, and that the designated Buyer and Seller has full authority to enter into and perform this Agreement. Entering into this Agreement, and the completion of the obligations pursuant to this contract, does not violate any Articles of Incorporation, Articles of Organization, By Laws, Operating Agreement, Partnership Agreement or other document governing the activity of either Buyer or Seller.

**41. EXPIRATION OF OFFER:** This offer shall be deemed revoked and the deposit, if any, shall be returned to Buyer unless the offer is Signed by Seller and a Copy of the Signed offer is personally received by Buyer, or by _____ _JANUARY 15TH, 2021_ _____ , who is authorized to receive it, by 5:00 PM on the third Day after this offer is signed by Buyer (or by ☐ _____ ☐ AM/ ☐ PM, on _____ (date)).

☐ One or more Buyers is signing the Agreement in a representative capacity and not for him/herself as an individual. See attached Representative Capacity Signature Disclosure (C.A.R. Form RCSD-B) for additional terms.

Date _1/11/2021_ BUYER _[signature]_

**(Print name)** _AFFORDABLE HOUSING FOR CALIFORNIA COMMUNITIES OR ITS ASSIGNEE_ _____

Date _____ BUYER _____

**(Print name)** _____

☐ Additional Signature Addendum attached (C.A.R. Form ASA).

**42. ACCEPTANCE OF OFFER:** Seller warrants that Seller is the owner of the Property, or has the authority to execute this Agreement. Seller accepts the above offer and agrees to sell the Property on the above terms and conditions, and agrees to the above confirmation of agency relationships. Seller has read and acknowledges receipt of a Copy of this Agreement, and authorizes Broker to Deliver a Signed Copy to Buyer.

    ☐ (If checked) SELLER'S ACCEPTANCE IS **SUBJECT TO ATTACHED COUNTER OFFER (C.A.R. Form SCO or SMCO) DATED:**
_____

☐ One or more Sellers is signing the Agreement in a representative capacity and not for him/herself as an individual. See attached Representative Capacity Signature Disclosure (C.A.R. Form RCSD-S) for additional terms.

Date _____ SELLER _____

**(Print name)** _FREDERICK 52 II HOUSING CORP OF AMERICA_ _____

Date _____ SELLER _____

**(Print name)** _____

☐ Additional Signature Addendum attached (C.A.R. Form ASA).

( _____ / _____ ) **(Do not initial if making a counter offer.) CONFIRMATION OF ACCEPTANCE:** A Copy of Signed Acceptance was
(Initials)   personally received by Buyer or Buyer's authorized agent on (date) _____ at _____
☐ AM/ ☐ PM. **A binding Agreement is created when a Copy of Signed Acceptance is personally received by Buyer or Buyer's authorized agent whether or not confirmed in this document. Completion of this confirmation is not legally required in order to create a binding Agreement; it is solely intended to evidence the date that Confirmation of Acceptance has occurred.**

**CPA REVISED 12/18 (PAGE 10 OF 11)**

Property Address: _84500 Avenue, ORCHARD VILLAS II, Coachella, CA  92236_____     Date: _January 11, 2021_____

**REAL ESTATE BROKERS:**
**A.   Real Estate Brokers are not parties to the Agreement between Buyer and Seller.**
**B.   Agency relationships are confirmed as stated in paragraph 2.**
C.   If specified in paragraph 3A(2), Agent who submitted the offer for Buyer acknowledges receipt of deposit.
**D.   COOPERATING (BUYER'S) COMPENSATION:** Seller's Broker agrees to pay Buyer's Broker and Buyer's Broker agrees to accept, out of Seller's Broker's proceeds in escrow, the amount specified in the MLS, provided Buyer's Broker is a Participant of the MLS in which the Property is offered for sale or a reciprocal MLS. If Seller's Broker and Buyer's Broker are not both Participants of the MLS, or a reciprocal MLS, in which the Property is offered for sale, then compensation must be specified in a separate written agreement (C.A.R. Form CBC). Declaration of License and Tax (C.A.R. Form DLT) may be used to document that tax reporting will be required or that an exemption exists.
**E.   PRESENTATION OF OFFER:** Pursuant to Standard of Practice 1-7, if Buyer's Broker makes a written request, Seller's Broker shall confirm in writing that this offer has been presented to Seller.

Buyer's Brokerage Firm _NONE_____ DRE Lic. # _____
By _____ DRE Lic. # _____ Date _____
By _____ DRE Lic. # _____ Date _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____
Seller's Brokerage Firm _NONE_____ DRE Lic. # _____
By _____ DRE Lic. # _____ Date _____
By _____ DRE Lic. # _____ Date _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____

**ESCROW HOLDER ACKNOWLEDGMENT:**
Escrow Holder acknowledges receipt of a Copy of this Agreement, (if checked, ☐ a deposit in the amount of $ _____ ),
counter offer numbers _____ ☐ Seller's Statement of Information and _____
_____ , and agrees to act as Escrow Holder subject to paragraph 24 of this Agreement, any
supplemental escrow instructions and the terms of Escrow Holder's general provisions.

Escrow Holder is advised that the date of Confirmation of Acceptance of the Agreement as between Buyer and Seller is _____

Escrow Holder _____ Escrow # _____
By _____ Date _____
Address _____
Phone/Fax/E-mail _____
Escrow Holder has the following license number # _____
☐ Department of Financial Protection and Innovation, ☐ Department of Insurance, ☐ Department of Real Estate.

**PRESENTATION OF OFFER:** (_____) Listing Broker presented this offer to Seller on _____ (date).
<span>Broker or Designee Initials</span>

**REJECTION OF OFFER:** (_____)(_____) No counter offer is being made. This offer was rejected by Seller on _____ (date).
<span>Seller's Initials</span>

Buyer's Initials   ( ul ) ( _____ )                    Seller's Initials  (_____)  (_____)

©2018, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020



CPA REVISED 12/18 (PAGE 11 OF 11)
**COMMERCIAL PROPERTY PURCHASE AGREEMENT  (CPA PAGE 11 OF 11)**
Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5    www.lwolf.com           ORCHARD



CALIFORNIA
ASSOCIATION
OF REALTORS®

**ADDENDUM**

(C.A.R. Form ADM, Revised 12/15)



No. *1* _____

The following terms and conditions are hereby incorporated in and made a part of the: ☐ Purchase Agreement, ☐ Residential Lease or Month-to-Month Rental Agreement, ☐ Transfer Disclosure Statement (Note: An amendment to the TDS may give the Buyer a right to rescind), ☒ Other *COMMERCIAL PROPERTY PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS* ,
dated _____ *January 11, 2021* _____ , on property known as _____ *84500 Avenue, ORCHARD VILLAS II* _____
_____ *Coachella, CA  92236* _____
in which _____ *AFFORDABLE HOUSING FOR CALIFORNIA COMMUNITIES OR ITS ASSIGNEE* _____ is referred to as ("Buyer/Tenant")
and _____ *FREDERICK 52 II HOUSING CORP OF AMERICA* _____ is referred to as ("Seller/Landlord").

*The Seller shall fully cooperate with the Buyers in getting TCAC or other Agency Sale Transfer approval.*

*- Buyer shall have a 30 (thirty) calendar day Feasibility Period/Due Diligence period commencing upon acceptance of offer.*
*- Escrow to close 30 days after Due Diligence period.*
*- Initial Deposit to be $200,000.  $100,000 non-refundable after 30 days from acceptance, and then $100,000 to be non-refundable after 60 days from acceptance.*
*- Buyer to have two(2) 30 days extension for an additional $25,000 per extension and shall be non refundable deposit.*
*- Seller shall make available to Buyer any agreements, audited financials, appraisals, and other reports relevant to the property that Seller may deem useful or if they have in their possession.*

The foregoing terms and conditions are hereby agreed to, and the undersigned acknowledge receipt of a copy of this document.

Date   1/11/2021 _____      Date _____
Buyer/Tenant _____            Seller/Landlord _____
*AFFORDABLE HOUSING FOR CALIFORNIA*                *FREDERICK 52 II HOUSING CORP OF AMERICA*

Buyer/Tenant _____            Seller/Landlord _____

© 1986-2015, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

**ADM REVISED 12/15 (PAGE 1 OF 1)**

**ADDENDUM (ADM PAGE 1 OF 1)**

EXHIBIT 2

# FREDERICK AND 52 II LIMITED PARTNERSHIP

January 12, 2021

<u>VIA EMAIL AND FEDERAL EXPRESS</u>

Alden Torch Financial LLC
1225 17th Street, Suite 1400
Denver, CO 80202
Attn: Chris Blake
( chris.blake@aldentorch.com)

**RE:**   **Orchard Villas II Apartments (Frederick and 52 II Limited Partnership) Notice of Proposed Offer**

Mr. Blake:

Attached please find a copy of the Notice of Proposed Offer sent to Housing Corporation of America.

Should you have any questions please contact me at (949) 625-6419.

Regards,

FREDERICK AND 52 II LIMITED PARTNERSHIP, a California limited partnership

By:   PALM COMMUNITIES, a California Corporation
      Its Administrative General Partner

      By:   _____
            Danavon L. Horn, President

**100 Pacifica, Suite 203**
**Irvine, CA 92618**
tel 949.878.9399 fax 949.878.9399

EXHIBIT 3



January 19, 2021

*__Via Email and Federal Express__*

Palm Desert Development Company
73061 El Paseo, Suite 214
Palm Desert, CA 92261
c/o Palm Communities
100 Pacifica, Suite 203
Irvine, CA 92618
Attn: Danavon Horn
(DHorn@palmcommunities.com)

Housing Corporation of America
2022 South 2100 East, Suite 101
Salt Lake City, UT 84108
Attn: Carol Cromar
(carol@hcahousing.com)

Re:     Frederick and 52 II Limited Partnership (the "<u>Partnership</u>"); Amended and Restated Agreement
of Limited Partnership, dated as of March 1, 2002, as amended (the "<u>Partnership Agreement</u>")
(capitalized terms not otherwise defined herein shall have the meanings set forth in the
Partnership Agreement)

Dear Mr. Horn and Ms. Cromar,

On December 16, 2020, I wrote a letter, on behalf of the Limited Partners of the Partnership, to Mr.
Horn in response to a request about what the Limited Partners would like to do in light of the August
2021 maturity date of the Permanent Loan.  In that letter, I noted that the Limited Partners did not
currently anticipate that they would desire a Sale or Refinancing Transaction in 2021, but that the
Special Limited Partner would be willing to either (a) provide a 6-month bridge loan at an interest rate
equal to 1% per annum (over 500 bps less than the current interest rate) and with no requirement for
third party reports or other closing costs, or (b) purchase the Permanent Loan and provide a forbearance
agreement for 6-months after maturity.  For your convenience, my December 16, 2020 letter is attached
as Exhibit A.

On January 12, 2021, Mr. Horn sent us a letter that was not responsive to my December 16, 2020 letter.
Instead, the January 12, 2021 letter enclosed a letter from Palm Communities, f/k/a Palm Desert
Development Company ("PDDC") to Housing Corporation of America ("HCA") dated January 11,
2021 (the "ROFR Notice Letter").  The ROFR Notice Letter purported to provide HCA with notice
that the Partnership "has received, and desires to accept, a bona fide offer from an unrelated third party
to purchase the Property" from the Partnership, and attached a copy of the putative offer, which was
likewise dated January 11, 2021.  The ROFR Notice Letter then stated that, pursuant to Paragraph 5 of
an Option Agreement and Right of First Refusal dated March 1, 2002 between PDDC, HCA, and the
Partnership (the "Option and ROFR Agreement"), "HCA has the right, to be exercised within forty-
five (45) after receipt of the proposed offer from [the Partnership], to respond in writing to [the
Partnership] indicating that HCA desires to purchase the property for a price equal to the amount set
forth in Paragraph 4(a)(i) of the [Option and ROFR] Agreement"—i.e., the minimum price permitted
under Section 42(i)(7) of the Internal Revenue Code.  Mr. Horn's January 12, 2021 letter to the Limited
Partners—with all accompanying enclosures—is attached as Exhibit B.  In summary, PDDC attempted
to use its role as the Administrative General Partner to trigger HCA's ROFR.

Apart from whether the offer is bona fide (and we believe it will be shown that it is not), the ROFR has not been triggered and may not be exercised unless and until the Special Limited Partner consents to a sale of the Apartment Complex as required under Section 5.4.A and Section 5.5.B(iv) of the Partnership Agreement. The ROFR Notice Letter accordingly constitutes a material breach of the Partnership Agreement and a material violation of PDDC's fiduciary responsibilities to the Partnership and the Limited Partners, and thus qualifies as a "Major Default" subjecting PDDC—and, depending on how it responds, HCA—to potential removal under Section 11.4A of the Partnership Agreement. PDDC's actions also constitute bad faith that, if maintained, would leave both PDDC and HCA with unclean hands. *See Senior Housing Assistance Group v. AMTAX Holdings 260, LLC, et al.*, No. C17-1115-RSM, 2019 WL 1417299, \*12 (W.D. Wash. Mar. 29, 2019) (rejecting purported exercise of below-market right of first refusal granted pursuant to Section 42(i)(7) and finding that nonprofit general partner "engaged in inequitable, bad faith, and unjust conduct when it secretly colluded . . . to procure sham offers from straw buyers").

On January 15, 2021, three days after we received the ROFR Notice Letter, Mr. Horn then purported to respond to my December 16, 2020 letter. This letter (the "Refinance Letter") rejected the two offers the Limited Partners had proposed to address the impending maturity of the Permanent Loan, and stated that PDDC "intends to proceed with a refinancing transaction" notwithstanding the confirmation in my December 16, 2020 letter that the Limited Partners did not desire a refinancing of the Permanent Loan at this time. Mr. Horn's January 15, 2021 letter, attached hereto as Exhibit C, makes no mention of complying with the requirement in the Partnership Agreement to obtain the Consent of the Special Limited Partner in connection with such refinancing. PDDC's affirmative statement that it intends to proceed with a refinancing transaction in the absence of the Special Limited Partner's consent constitutes a further material breach of the Partnership Agreement and further material violation of PDDC's fiduciary responsibilities to the Partnership and the Limited Partners, and qualifies as a separate "Major Default" subjecting PDDC to potential removal under Section 11.4A of the Partnership Agreement.

Due to the materiality and significance of PDDC's actions, and the imminence of potential damages and injury to the Limited Partners, please be advised that the Limited Partners filed a complaint earlier today in the United States District Court for the Central District of California based on both the ROFR Notice Letter and the Refinance Letter (the "Complaint"). The Complaint, which is attached hereto as Exhibit D, seeks a judicial declaration that (1) HCA's Section 42(i)(7) ROFR has not been triggered and may not be exercised unless and until the Special Limited Partner consents to a sale of the Apartment Complex; and (2) the General Partners cannot refinance the Partnership's debt without the Special Limited Partner's prior written consent. The Complaint alleges, moreover, that PDDC's stated intention to move forward with a refinance of the Partnership's debt a mere three days after forwarding the ROFR Notice Letter demonstrates that PDDC does not genuinely desire to sell the Apartment Complex, and instead is improperly using the purported triggering of HCA's below-market ROFR to force the Limited Partners to accede to PDDC's demands regarding the proposed refinance of the Partnership's debt.

The Limited Partners demand that PDDC and HCA confirm in writing within ten days of this letter that HCA's right of first refusal under the Option and ROFR Agreement has not been triggered, and that the General Partners will not refinance the Partnership's debt or entertain any third party offers to purchase the Apartment Complex without first obtaining the Consent of the Special Limited Partner.

This letter is not intended and shall not be deemed to be a waiver, election, or estoppel as to any claim, objection, defense, right, or remedy of the Limited Partners under the Partnership Agreement and related transaction documents or applicable law.

Sincerely,

Alden Torch Financial LLC, on behalf of the Limited Partners

By: _____
      Alison Wadle, EVP and General Counsel

cc (via email):  Chris Blake, Alden Torch Financial

Enclosures

1

## <u>CERTIFICATE OF SERVICE</u>

2

*Centerline Housing Partnership I, L.P. v. Palm Communities, et al.*

3
United States District Court – Central District Case No. 8:21-cv-00107

4

        I hereby certify that I electronically filed the foregoing with the Clerk of the

5
Court for the United States District Court by using the CM/ECF system on
February 16, 2021.

6

7
        Participants in the case who are registered CM/ECF users will be served by
the CM/ECF system.

8

9
        I declare under penalty of perjury under the laws of the United States that the
foregoing is true and correct.

10
        Executed on **February 16, 2021**, at Irvine, California.

11

12
                        */s/ Evelyn Gomez*_____

13
                        Evelyn Gomez

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---