# EXHIBIT A

3

FREDERICK and 52 II LIMITED PARTNERSHIP,
a California limited partnership

AMENDED AND RESTATED AGREEMENT
OF LIMITED PARTNERSHIP

5215/60851-045  LALIB1/508627 v7

## TABLE OF CONTENTS

Page

ARTICLE I   DEFINED TERMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 1 -

ARTICLE II   GENERAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 13 -
2.1  Continuation of the Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . - 13 -
2.2  Principal Office . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 14 -
2.3  Principal Place of Business; Resident Agent . . . . . . . . . . . . . . . . . . . - 14 -
2.4  Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 14 -
2.5  Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 14 -

ARTICLE III  CAPITAL CONTRIBUTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . - 15 -
3.1  General Partners. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 15 -
3.2  Withdrawal of Withdrawing Limited Partner; Admission of
   Managing General Partner and Investor Limited Partners . . . . . . . . . . - 15 -
3.3  Special Limited Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 16 -
3.4  Limited Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 16 -
3.5  Delivery of Capital Note . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 18 -
3.6  Treatment of Other Advances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 18 -
3.7  Capital Accounts; No Interest; Withdrawal . . . . . . . . . . . . . . . . . . . . - 18 -
3.8  Liability of Limited Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 19 -
3.9  Provision of Other Amounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 19 -
3.10  Outside Activities of Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 19 -
3.11  Construction Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 19 -
3.12  Assignment of Capital Contributions . . . . . . . . . . . . . . . . . . . . . . . . - 19 -
3.13  General Partner Pledge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 19 -
3.14  Payment to Construction Lender . . . . . . . . . . . . . . . . . . . . . . . . . . . - 19 -
3.15  Construction Lender's Restrictions on Amendment and Transfer . . . . - 19 -
3.16  Subordination of the Guaranties to the Construction Loan Guaranty . - 19 -

ARTICLE IV  COMPLIANCE WITH AUTHORITY REQUIREMENTS;
   PARTNERSHIP BORROWINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . - 20 -
4.1  Authority Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 20 -
4.2  Authorization to the General Partner . . . . . . . . . . . . . . . . . . . . . . . . - 20 -
4.3  Right to Mortgage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 20 -
4.4  Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 21 -

ARTICLE V  RIGHTS, POWERS AND OBLIGATIONS OF THE GENERAL
   PARTNERS AND LIMITATIONS THEREON; PARTNERS'
   ACTIVITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 21 -
5.1  Exercise of Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 21 -
5.2  Duties and Authority of General Partner . . . . . . . . . . . . . . . . . . . . . . - 22 -
5.3  General Partners' Authority; Tax Matters Partner . . . . . . . . . . . . . . . . - 24 -
5.4  Lease, Conveyance or Refinancing of Assets of the Partnership . . . . . - 26 -
5.5  Restrictions on Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 27 -
5.6  Activities of Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 29 -
5.7  Dealing with Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 29 -
5.8  Indemnification and Liability of the General Partner . . . . . . . . . . . . . . - 29 -
5.9  Representations and Warranties . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 31 -

| 5.10 | Additional Covenants of General Partners . . . . . . . . . . . . . . . . . . . . . . . | - 33 - |
| 5.11 | Obligation to Repair and Rebuild Apartment Complex . . . . . . . . . . . | - 33 - |

| ARTICLE VI | CERTAIN PAYMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 33 - |
| 6.1 | Developer Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 33 - |
| 6.2 | Annual Local Administrative Fee . . . . . . . . . . . . . . . . . . . . . . . . . . | - 34 - |
| 6.3 | MGP Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 34 - |
| 6.4 | Supervisory Management Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 34 - |

| ARTICLE VII | ACCOUNTING, REPORTS, BOOKS, | |
| | BANK ACCOUNTS AND FISCAL YEAR . . . . . . . . . . . . . . . . . . . | - 35 - |
| 7.1 | Bank Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 35 - |
| 7.2 | Books of Account; Fiscal Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 35 - |
| 7.3 | Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 35 - |
| 7.4 | Other Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 36 - |
| 7.5 | Tax Returns and Tax Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 37 - |
| 7.6 | Publicity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 37 - |

| ARTICLE VIII | MANAGEMENT AGENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 37 - |
| 8.1 | Management Agent and Management Fee . . . . . . . . . . . . . . . . . . . . . | - 37 - |

| ARTICLE IX | PROFITS AND LOSSES; DISTRIBUTIONS . . . . . . . . . . . . . . . . . . | - 38 - |
| 9.1 | Allocations of Profits and Losses . . . . . . . . . . . . . . . . . . . . . . . . . . | - 38 - |
| 9.2 | Distribution and Application of Cash Flow and Proceeds From Sale or | |
| | Refinancing Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 41 - |
| 9.3 | Overriding Allocations of Profits and Losses . . . . . . . . . . . . . . . . . | - 43 - |
| 9.4 | Certain Additional Allocations . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 46 - |

| ARTICLE X | TRANSFER OF LIMITED PARTNER INTERESTS . . . . . . . . . . . . . | - 47 - |
| 10.1 | Assignment of Limited Partner Interests . . . . . . . . . . . . . . . . . . . . . | - 47 - |
| 10.2 | Substituted Partners; Admission . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 48 - |
| 10.3 | Assignees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 48 - |

| ARTICLE XI | WITHDRAWAL OF A GENERAL PARTNER; | |
| | NEW GENERAL PARTNER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 49 - |
| 11.1 | Withdrawal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 49 - |
| 11.2 | Effect of Withdrawal; Election to Continue Business . . . . . . . . . . . . | - 50 - |
| 11.3 | Formation of New Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 50 - |
| 11.4 | Special Removal Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 52 - |
| 11.5 | Additional General Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 55 - |
| 11.6 | Amendment of Schedule and Agreement . . . . . . . . . . . . . . . . . . . . . | - 55 - |
| 11.7 | Survival of Liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 55 - |
| 11.8 | Removal and Replacement of Managing General Partner . . . . . . . . . | - 55 - |
| 11.9 | Assignment of HCA's Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 56 - |

| ARTICLE XII | DISSOLUTION AND TERMINATION OF THE PARTNERSHIP . . | - 56 - |
| 12.1 | Events Which Cause a Dissolution . . . . . . . . . . . . . . . . . . . . . . . . . | - 56 - |
| 12.2 | Actions of Liquidating Agent Upon Dissolution . . . . . . . . . . . . . . . | - 56 - |
| 12.3 | Statements on Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 57 - |
| 12.4 | Priority on Liquidation; Distribution of Non-Liquid Assets . . . . . . . . | - 57 - |
| 12.5 | Orderly Liquidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 58 - |
| 12.6 | No Goodwill Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 58 - |

ARTICLE XIII    FOREIGN PARTNERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 58 -
        13.1    Certification of Non-Foreign Status . . . . . . . . . . . . . . . . . . . . . . . . . . - 58 -
        13.2    Withholding of Certain Amounts Attributable to Interests of Foreign
                Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 59 -

ARTICLE XIV    MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 59 -
        14.1    Law Governing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 59 -
        14.2    Power of Attorney . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 59 -
        14.3    Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 59 -
        14.4    Partners Independently Bound . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 59 -
        14.5    Separability of Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 59 -
        14.6    Address and Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 60 -
        14.7    Computation Of Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 60 -
        14.8    Titles and Captions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 60 -
        14.9    Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 60 -
        14.10   Agreement Binding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 60 -
        14.11   Parties in Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 60 -
        14.12   Amendments; Other Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 60 -
        14.13   Survival of Representations, Warranties and Agreements . . . . . . . . . . - 61 -
        14.14   Further Assurances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 61 -
        14.15   Remedies Cumulative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 61 -
        14.16   Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 61 -
        14.17   HCA Obligations Nonrecourse . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 61 -

Exhibits

Exhibit A — Pledge Agreement
Exhibit B — Capital Note
Exhibit C — Form of Budget
Exhibit D — Form of Occupancy Report
Exhibit E — Form of Assignment Documents

FREDERICK and 52 II LIMITED PARTNERSHIP,
a California limited partnership

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP,
dated March 1, 2002, by and among PALM DESERT DEVELOPMENT COMPANY, a
California corporation ("PDDC"), as Administrative General Partner, HOUSING
CORPORATION OF AMERICA, a Utah non-profit corporation ("HCA"), as Managing General
Partner, RELATED DIRECT SLP LLC, a Delaware limited liability company, as Special
Limited Partner, RCC CREDIT FACILITY, L.L.C., a Delaware limited liability company, as
Limited Partner and DANAVON L. HORN, as Withdrawing Limited Partner.

WITNESSETH:

WHEREAS, the Partnership was formed as a limited partnership under the laws
of the State of California pursuant to an Agreement of Limited Partnership dated as of August 6,
2001 (the "Initial Agreement"), by and between PDDC, as general partner and Danavon L. Horn
as original limited partner. The Original Certificate was filed with the Filing Office on August
13, 2001. The Original Certificate is being amended concurrently herewith to evidence the
change of the Partnership's name from "FREDERICK and 52 II L.P." to "FREDERICK and 52 II
LIMITED PARTNERSHIP;"

WHEREAS, the parties hereto desire to enter into this Agreement to provide for,
among other things, (i) the continuation of the Partnership, (ii) the admission of HCA, as
Managing General Partner, RCC Credit Facility, L.L.C. as Limited Partner and Related Direct
SLP LLC as Special Limited Partner, (iii) the payment of Capital Contributions by the Limited
Partner to the Partnership, (iii) the withdrawal of Danavon L. Horn as a limited partner, (iv) the
reallocation of Profits, Losses, Credits and distributions of Cash Flow and other proceeds of the
Partnership among the Partners, (v) the respective rights, obligations and interests of the parties
hereto to each other and to the Partnership and (vi) certain other matters.

NOW, THEREFORE, in consideration of the covenants and agreements
hereinafter set forth, the parties hereto agree that the Initial Agreement, together with all other
agreements by and among the parties, whether oral or in writing, with respect to the rights,
obligations, and interest of the parties as partners of the Partnership, is hereby amended and
restated in its entirety to read as follows:

## ARTICLE I

## DEFINED TERMS

Capitalized terms used in this Agreement shall, unless the context otherwise
requires, have the meanings specified in this Article I. Certain additional defined terms are set
forth elsewhere in this Agreement.

"Accountants" means such firm or firms of independent certified public
accountants as may be engaged by the General Partner with the Consent of the Special Limited
Partner from time to time, and shall initially be Reznick, Fedder & Silverman, having an address
at Glenridge Dr., Suite 500, Atlanta, GA 30342-4998.

"Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of any Fiscal Year of the Partnership, after giving effect to the following adjustments:

(i)   credit to such Capital Account any amounts which such Partner is obligated to restore thereto pursuant to any provision of this Agreement or is deemed to be obligated to restore thereto pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5), of the Regulations; and

(ii)   debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Administrative General Partner" means Palm Desert Development Company, a California corporation.

"Admission Date" means the day on which the Limited Partner acquires its Interest pursuant to the terms of the Contribution Agreement.

"Affiliate" means, when used with reference to a specified Person, any (i) Person that directly or indirectly controls or is controlled by or is under common control with the specified Person, (ii) Person that is an officer, of, partner in or trustee of, or serves in a similar capacity with respect to, the specified Person or of which the specified Person is an officer, partner or trustee, or with respect to which the specified Person serves in a similar capacity and (iii) Person that, directly or indirectly, is the beneficial owner of 10% or more of any class of equity securities of the specified Person or of which the specified Person is directly or indirectly the owner of 10% or more of any class of equity securities. "Affiliate" of the Partnership or a General Partner does not include a Person who is a partner in one or more partnerships or joint ventures with the Partnership or any other Affiliate of the Partnership if such Person is not otherwise an Affiliate of the Partnership or such General Partner.

"Agreement" means this Amended and Restated Agreement of Limited Partnership, as it may be amended from time to time.

"Apartment Complex" means the apartment building to be constructed on certain real property located in Coachella, California, as more fully described in the Title Policy, containing 72 apartments and ancillary and appurtenant facilities being constructed thereon and all furnishings, equipment and personal property used in connection with the operation thereof.

"Architect" means Sinrazon, Inc. and its successors and assigns.

"Assignment" (including the verb form "Assign" and the adjectival form "Assigned") means a valid sale, exchange, transfer or syndication or other disposition of all or any portion of an Interest. "Assignor" means a Partner who makes and Assignment and "Assignee" means a Person who receives an Assignment.

"Authority" means any applicable housing finance authority, which is a public body corporate and politic created by the State, or other agency authorized to issue bonds or other evidence of indebtedness to finance residential housing development. To the extent applicable,

9

Authority shall also mean CTCAC and any government mortgage insurance or co-insurance agency, or any other governmental body or agency having jurisdiction over the operations of the Apartment Complex or that provides assistance to the Partnership, the Apartment Complex and/or its tenants and imposes requirements in connection with such assistance.

"Bankruptcy" or "Bankrupt" means, with respect to any Partner, such Partner making an assignment for the benefit of creditors, becoming a party to any liquidation or dissolution action or proceeding with respect to such Partner or any bankruptcy, reorganization, insolvency or other proceeding for the relief of financially distressed debtors with respect to such Partner, or a receiver, liquidator, custodian or trustee being appointed for such Partner or a substantial part of such Partner's assets and, if any of the same occur involuntarily, the same not being dismissed, stayed or discharged within 90 days; or the entry of an order for relief against such Partner under Title 11 of the United States Code. A Partner shall be deemed Bankrupt if the Bankruptcy of such Partner shall have occurred and be continuing.

"Capital Account" means, with respect to any Partner, the Capital Account maintained for such Partner in accordance with the following provisions:

(i)     to each Partner's Capital Account there shall be credited such Partner's Capital Contributions, such Partner's distributive share of Profits, and any items in the nature of income or gain which are specially allocated pursuant to Article IX hereof, and the amount of any Partnership liabilities assumed by such Partner or which are secured by any property distributed to such Partner;

(ii)    to each Partner's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any property distributed to such Partner pursuant to any provision of this Agreement, such Partner's distributive share of Losses, and any items in the nature of expenses or losses which are specially allocated pursuant to Article IX hereof, and the amount of any liabilities of such Partner assumed by the Partnership or which are secured by any property contributed by such Partner to the Partnership;

(iii)   in the event any Interest is Assigned in accordance with the terms of this Agreement, the Assignee shall succeed to the Capital Account of the Assignor to the extent it relates to the Assigned Interest; and

(iv)    in determining the amount of any liability for purposes of clauses (i) and (ii) above, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and the Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Regulations, and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Administrative General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Partnership or the Partners), are computed in order to comply with such Regulations, the Administrative General Partner may make such modification with the consent of the Special Limited Partner, provided that it is not likely to have a material effect on the amounts distributable to any Partner pursuant to Section 12.4 hereof upon the dissolution of the Partnership. The Administrative General Partner, with the Consent of the Special Limited Partner, also shall (a) make any adjustments that are necessary or appropriate to maintain equality between the aggregate Capital Accounts of the Partners and the aggregate amount of Partnership

capital reflected on the Partnership's balance sheet, as computed for book purposes in accordance with Section 1.701-1(b)(2)(iv)(q) of the Regulations, (b) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Regulations, and (c) make any appropriate modifications to the Capital Accounts of the Partners to reflect revaluations of the Apartment Complex pursuant to Section 1.704-1(b)(2)(iv)(f) of the Regulations.

"Capital Contributions" means, with respect to any Partner, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Partnership with respect to the Interest held by such Partner pursuant to the terms of this Agreement in accordance with Schedule A attached hereto.  The principal amount of a promissory note which is not readily traded on an established securities market and which is contributed to the Partnership by the maker of such note shall not be included in the Capital Contribution of any Person until the Partnership makes a taxable disposition of such note or until (and to the extent) principal payments are made on such note, all in accordance with Section 1.704-1(b)(2)(iv)(d)(2) of the Regulations.  Any reference in this Agreement to the Capital Contribution of a then Partner shall include the contributions to the capital of the Partnership made by any predecessor in interest of such Partner in respect of such Interest of such Partner.  Amounts paid under the Development Deficit Guaranty Agreement or the Recapture Guaranty Agreement or as an Operating Loan, or a Voluntary Loan shall not be deemed Capital Contributions.

"Capital Note" means the promissory note issued by the Limited Partner to the Partnership in the form annexed hereto as Exhibit B pursuant to Section 3.4 hereof.

"Cash Expenditures" means all disbursements of cash during the year (excluding distributions to Partners), including, without limitation, payment of operating expenses, payment of principal and interest on the Partnership's indebtedness (excluding payments of principal and interest on Voluntary Loans, Operating Loans and the payment of the fees set forth in Article VI hereof), cost of repair and restoration of the Apartment Complex, amounts allocated to reserves by the Administrative General Partner.  In addition, the net increase during the year in any escrow account or reserve maintained by or for the Partnership shall be considered a Cash Expenditure during the year.  Cash Expenditures payable to Partners or Affiliates of Partners shall be paid after Cash Expenditures payable to third parties.

"Cash Flow" means the excess of Cash Receipts over Cash Expenditures.  Cash Flow shall be determined separately for each Fiscal Year or portion thereof.

"Cash Receipts" means all cash receipts of the Partnership from whatever source derived other than from a Sale or Refinancing Transaction, including, without limitation, cash from operations, any amounts attributable to construction or development savings, and Capital Contributions.  In addition, the net reduction in any year in the amount of any escrow account or reserve maintained by or for the Partnership shall be considered a Cash Receipt of the Partnership for such year.  Notwithstanding the foregoing, at the election of the Administrative General Partner, Cash Receipts received near the end of a Fiscal Year and intended for use in meeting the Partnership's obligations (including the cost of acquiring assets or paying debts or expenses) in the subsequent Fiscal Year shall not be deemed received until such following year.

"Certificate" means the Original Certificate as amended by any amendments thereto filed in the Filing Office in accordance with the Uniform Act, as amended from time to time.

"<u>Class</u>" means a specific class or grouping of Partners (<u>i.e.</u>, the General Partner or the Limited Partner and the Special Limited Partner).

"<u>Class B Limited Partners</u>" means the Interest received by a General Partner after its withdrawal or removal pursuant to Section 11 hereof or the interest of a Person admitted pursuant to Section 3.4B(i) hereof.  Class B Limited Partners shall not have the rights of Limited Partners hereunder.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended from time to time, or any successor statute.

"<u>Completion</u>" shall have the meaning specified in the Contribution Agreement.

"<u>Compliance Period</u>" shall have the meaning provided in Section 42(i)(1) of the Code.

"<u>Consent of the Special Limited Partner</u>" means the prior written consent or approval of the Special Limited Partner, which may be granted or withheld in its sole discretion, unless otherwise specified herein to the contrary.

"<u>Construction Contract</u>" means the agreement to construct the Apartment Complex between the Partnership and Multi-Family Builders, Inc. as the same may be amended from time to time.

"<u>Construction Loan</u>" means the construction loan provided to the Partnership by FMB.

"<u>Construction Lender</u>" means FMB.

"<u>Contractor</u>" means Multi-Family Builders, Inc. and its successors and assigns.

"<u>Contribution Agreement</u>" means the Contribution Agreement dated as of the date hereof between the General Partner, the Partnership (as constituted immediately prior to the execution of this Agreement) and the Limited Partner.

"<u>Credit</u>" or "<u>Credits</u>" means the Federal Credits.

"<u>Credit Amount</u>" means $867,071 of Credits for 2003; $945,896 of Credits for each of 2004 through 2012, inclusive; and $78,825 of Credits for 2013.

"<u>Credit Conditions</u>" means, for the duration of the Compliance Period, any and all restrictions including, but not limited to, applicable federal, state and local laws, rules and regulations, which must be complied with in order to qualify for the Credits or to avoid an event of recapture in respect of the Credits.

"<u>Credit Period</u>" shall have the meaning specified in Section 42 of the Code with respect to Federal Credits.

"<u>CTCAC</u>" means the California Tax Credit Allocation Committee, or its successor agency.

"<u>Deferred Developer Fee</u>" shall have the meaning provided in Section 6.1 hereof.

12

"Depreciation" means, for each Fiscal Year of the Partnership or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the Federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year or other period bears to such beginning adjusted tax basis; provided, however, that if the Federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Administrative General Partner.

"Developer" shall mean Bighorn Affordable Communities, Inc.

"Developer Fee" has the meaning provided in Section 6.1 hereof and the Contribution Agreement.

"Developer Fee Maturity Date" has the meaning provided in Section 6.1 hereof and in the Contribution Agreement.

"Development Deficit" has the meaning provided in the Development Deficit Guaranty Agreement.

"Development Deficit Guaranty Agreement" means the agreement of the Guarantor to fund "Development Deficits," which shall be substantially in the form of Exhibit E annexed to the Contribution Agreement.

"Development Deficit Guaranty Amount" has the meaning provided in the Development Deficit Guaranty Agreement.

"Eligible Units" means the 72 apartment units in the Apartment Complex, designated as such under Section 3(aa)(i) of the Contribution Agreement.

"Entity" means any general partnership, limited partnership, corporation, joint venture, trust, business trust, limited liability company, limited liability partnership, cooperative or association.

"Escrow Agreement" has the meaning provided in the Contribution Agreement.

"Federal Credits" means the low income tax credits allowable under Section 42 of the Code.

"Filing Office" means the Office of the Secretary of State of the State.

"First Note Payment" has the meaning set forth in Section 3.4.A hereof.

"First Note Payment Conditions " has the meaning set forth in the Contribution Agreement.

"Fiscal Year" means the year maintained by the Partnership for federal income tax purposes.

"FMB" means Farmers and Merchants Bank of Long Beach, in its capacity as Construction Lender and Permanent Lender.

"Foreign Partner" means a Partner who at the time of acquisition of such Partner's interest is not a United States citizen or a resident alien of the United States and whose status subsequently changes to that of a non-resident alien of the United States.

"Foreign Person" means a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate, within the meaning of Sections 897, 1445 and 1446 of the Code.

"Fourth Note Payment" has the meaning set forth in Section 3.4.A hereof.

"Fourth Note Payment Conditions" has the meaning set forth in the Contribution Agreement.

"General Partner" or "General Partners" means PDDC and HCA and their respective successors and assigns, as General Partner pursuant to the provisions of Section 5.3 hereof and any or all Persons who may be designated as General Partners in Schedule A, including, without limitation, the General Partner and any Person or Persons who, at the time of reference thereto, have been admitted as additional or successor General Partners, in each such Person's capacity as a general partner of the Partnership. If there is only one General Partner of the Partnership, the term "General Partners" shall be deemed to refer to such General Partner.

"Governmental Agreements" means all agreements between the Partnership and any Authority with respect to the Apartment Complex and relating to insuring, supplementing, subsidizing, endorsing or otherwise affecting a Mortgage on the Apartment Complex (including, without limitation, any Regulatory Agreement); tax abatements, concessionary financing or grants, or other governmental assistance to the Apartment Complex or its tenants, regardless of its nature, in each case as the same may be amended from time to time.

"Gross Asset Value" means, with respect to any asset owned by the Partnership, the asset's adjusted basis for Federal income tax purposes, except as follows:

(i)     the initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the contributing Partner and the Administrative General Partner with the Consent of the Special Limited Partner;

(ii)     the Gross Asset Value of each asset shall be adjusted to equal its gross fair market value, as determined by the Administrative General Partner with the consent of the Special Limited Partner, as of the following times:  (a) the acquisition of an additional interest by any new or existing Partner in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Partnership to a Partner of more than a de minimis amount of property in respect of its Interest; and (c) the liquidation of the Partnership within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations; provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the Administrative General Partner with the Consent of the Special Limited Partner reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership;

(iii)     the Gross Asset Value of any asset distributed to any Partner shall be the gross fair market value of such asset on the date of distribution; and

14

(iv)   the Gross Asset Value of each asset shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such asset pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent that such adjustment is taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations and Article IX hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (iv) to the extent the Administrative General Partner determines that an adjustment pursuant to clause (ii) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to clause (i), (ii) or (iv) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Gross Effective Income" means the gross income from all sources from the normal operation of the Apartment Complex received on a cash basis (including all public subsidy payments due and payable at such time but not yet received by the Company), but excluding (i) tenant security or other deposits, (ii) Capital Contributions and interest thereon, (iii) interest on reserves not available for distribution, and (iv) the proceeds of insurance payments, except rental interruption insurance.

"Gross Equity" means the Investor Contributions divided by .849972 to include the costs and fees associated with raising the Investor Contributions.

"Guaranties" means, collectively, the Operating Deficit Guaranty Agreement, Development Deficit Guaranty Agreement, Replacement Reserve Guaranty Agreement and Recapture Guaranty Agreement.

"Guarantor" means the Administrative General Partner and Bighorn Affordable Communities, Inc. and, with respect to the Development Deficit Guaranty Agreement only, also Danavon L. Horn.

"Guaranty Period" means the period during which the Guarantor is obligated to fund any Operating Deficit pursuant to the Operating Deficit Guaranty Agreement.

"HCA" means Housing Corporation of America, a Utah nonprofit corporation.

"Hazardous Substances" shall mean any hazardous or toxic substances, materials, wastes, pollutants, or contaminants which are defined, regulated, or listed as "hazardous substances," "hazardous wastes," "hazardous materials," "pollutants," "contaminants," or "toxic substances," under federal or state environmental and health and safety laws and regulations, including without limitation petroleum byproducts, flammable explosives, areas formaldehyde insulation, radioactive materials, asbestos, and lead.  Hazardous Substances do not include substances that are used or consumed in the normal course of developing, operating or occupying a housing project, to the extent and degree that such substances are stored, used, and disposed of in the manner and in amounts that are consistent with normal practice and legal standards.

"Installments" means the First Note Payment, Second Note Payment, Third Note Payment, or Fourth Note Payment.

"Interest" means the entire ownership interest of a Partner in the Partnership at any particular time, including the right of such Partner to any and all benefits to which a Partner

5215/60851-045 LALIB1/508627 v7                    -  8  -

may be entitled as provided in this Agreement, together with the obligations of such Partner to comply with all terms and provisions of this Agreement.

"Investor Contributions" means $7,542,000, plus the amount of any Capital Contributions made by or on behalf of Limited Partner in addition to those provided for in Section 3.4.A hereof less the amount by which the principal of the Capital Note is reduced pursuant to Section 3.4.B hereof.

"Investor Limited Partners" means the Limited Partner and the Special Limited Partner and any Substituted Limited Partner and/or Special Limited Partner.

"Involuntary Withdrawal" means any Withdrawal caused by the Bankruptcy of a General Partner.

"Land" means the real property specified in the definition of Apartment Complex.

"Land Documents" means the Title Policy.

"Lender" means any lender under any mortgage constituting the Mortgage, including FMB.

"Limited Partner" means RCC Credit Facility, L.L.C., a Delaware limited liability company, and any person who becomes a Substituted Limited Partner in respect of any portion of the Limited Partner Interest of the Limited Partner as provided in Article X hereof. The term does not include the Special Limited Partner.

"Liquidation Agent" has the meaning provided in Section 12.2 hereof.

"Management Agent" means the person approved by each Authority the approval of which is required and selected to provide management services to the Apartment Complex from time to time in accordance with Article VIII hereof. Initially, the Management Agent will be The CBM Group, Inc., which initial Management Agent is not an affiliate of either of the General Partners.

"Management Agreement" means the agreement between the Partnership and the Management Agent for the management of the Apartment Complex entered into pursuant to the authority granted by Article VIII hereof.

"Managing General Partner" means HCA, unless and until replaced pursuant to the terms hereof.

"MGP Fee" has the meaning set forth in Section 6.3 hereof.

"Mortgage" means, any mortgage or deed of trust securing an indebtedness of the Partnership and encumbering the Apartment Complex and as such indebtedness may be increased, decreased or refinanced in accordance with this Agreement and the Project Documents. Where the context admits, the term "Mortgage" shall include any mortgage, deed, deed of trust, note, regulatory agreement, security agreement, assumption agreement or other instrument executed in connection with a Mortgage Note which is binding on the Partnership; and in case any Mortgage is replaced or supplemented by any subsequent mortgage or mortgages, the term "Mortgage" shall refer to any such subsequent mortgage or mortgages.

"Mortgage Note" means any promissory note held by a Lender evidencing the indebtedness secured by any Mortgage.

"Net Equity" means with respect to any Partner, the amount of such Partner's Capital Contributions reduced by any distributions to such Partner pursuant to Section 9.2.A(ix).

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

"Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

"Note Payments" has the meaning set forth in Section 3.4.A.

"Note Payment Conditions" has the meaning set forth in the Contribution Agreement.

"Operating Deficit" has the meaning set forth in the Operating Deficit Guaranty Agreement.

"Operating Deficit Guaranty Agreement" means the agreement of the Guarantor to fund Operating Deficits, which shall be in the form of Exhibit F annexed to the Contribution Agreement.

"Operating Loans" means loans made by the Guarantor to the Partnership pursuant to the Operating Deficit Guaranty Agreement to fund Operating Deficits occurring during the Guaranty Period, which loans bear interest at a simple rate of interest of 4% per annum and are repayable only as provided in Article IX hereof.

"Original Certificate" means collectively the Certificate of Limited Partnership Form LP-1 provided for in Section 15621 of the Uniform Act filed in the Filing Office on August 13, 2001.

"Partner" or "Partners" means any or all of the General Partner and the Investor Limited Partners.

"Partner Nonrecourse Debt" has the meaning set forth in Section 1.704-2(b)(4) of the Regulations.

"Partner Nonrecourse Debt Minimum Gain" has the meaning set forth in Section 1.704-2(i)(2) of the Regulations.

"Partner Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(i)(2) of the Regulations.

"Partnership" means the limited partnership governed by this Agreement, as such limited partnership may from time to time be amended or reconstituted.

"Partnership Minimum Gain" has the meaning set forth in Section 1.704-21.704-1(b)(2) of the Regulations.

"Permanent Loan" means that certain permanent loan provided by FMB, or such other lender as may be chosen by the General Partners, as more particularly described in the

Contribution Agreement, as such loan may be refinanced with the Consent of the Special Limited Partner.

"Person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person as the context may require.

"Prime Rate" means the rate of interest publicly announced from time to time by Chase Manhattan Bank, New York, New York, as its prime rate.

"Profits" and "Losses" means, for each Fiscal Year of the Partnership or other period, an amount equal to the Partnership's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(i)     any income of the Partnership that is exempt from Federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(ii)     any expenditures of the Partnership described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2) (iv)(i) of the Regulations and not otherwise taken into account in computing Profits or Losses, shall be subtracted from such taxable income or loss;

(iii)     in the event the Gross Asset Value of any Partnership asset is adjusted pursuant to clause (ii) or (iii) of the definition thereof, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv)     gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v)     in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period; and

(vi)     notwithstanding any other provisions hereof, any items which are specially allocated pursuant to Article IX hereof shall not be taken into account in computing Profits or Losses.

"Project Documents" means this Agreement, the Contribution Agreement, the Construction Contract, the Governmental Agreements, the Land Documents, the Management Agreement, the Mortgage, the Mortgage Note, and any other document related to the financing, development, construction, use or operation of the Apartment Complex, as any such documents may be amended from time to time.

"Purchase Option" means that certain Option Agreement and Right of First Refusal by and between the Partnership and the General Partners in the form of Exhibit J to the Contribution Agreement.

"<u>Recapture Guaranty Agreement</u>" means the agreement of the Guarantor to pay the Investor Limited Partner for losses resulting from Tax Credit Recapture Events (as defined in the Recapture Guaranty Agreement), which shall be in the form of Exhibit I annexed to the Contribution Agreement.

"<u>Regulations</u>" means the Income Tax Regulations promulgated under the Code.

"<u>Regulatory Agreement</u>" has the meaning ascribed to such term in Section 4.1 hereof.

"<u>Rental Achievement</u>" has the meaning ascribed to such term in the Contribution Agreement.

"<u>Replacement Reserve Guaranty Agreement</u>" means the agreement of the Guarantor to fund the Reserve Amount, which shall be in the form of Exhibit H annexed to the Contribution Agreement.

"<u>Reserve Amount</u>" means the amount of $1,500 per month to be deposited in the replacement reserve account for the Apartment Complex; provided that no contribution shall be required to the extent that the balance of the replacement reserve account as of the then current month equals or exceeds $100,800.

"<u>Required Sale Notice</u>" has the meaning ascribed to such term in Section 5.4(B)(ii) hereof.

"<u>Return Amount</u>" has the meaning ascribed to such term in Section 9.2.D hereof.

"<u>Sale or Refinancing Transaction</u>" means any of the following terms or transactions not in the ordinary course of business: a sale, transfer, exchange or other disposition of all or substantially all of the assets of the Partnership, a condemnation of, or a casualty at, the Apartment Complex or any part thereof (to the extent any insurance or condemnation proceeds received by the Partnership in connection therewith are available after the Partnership has utilized such proceeds to repair, rebuild or restore the Apartment Complex pursuant to Section 5.11), a claim against a title insurance company, the refinancing of any Mortgage Note or other indebtedness of the Partnership and any similar item or transaction; <u>provided, however,</u> that neither distributions which are deemed returns of capital for Federal income tax purposes nor the payment of Capital Contributions by the Partners shall be included within the meaning of the term "Sale or Refinancing Transaction."

"<u>Sale or Refinancing Transaction Proceeds</u>" means all cash receipts of the Partnership arising from a Sale or Refinancing Transaction (including principal and interest received on a debt obligation received as consideration, in whole or in part, on a Sale or Refinancing Transaction) less any deductibles or expenses incurred in connection therewith.

"<u>Second Note Payment</u>" has the meaning provided in Section 3.4.A hereof.

"<u>Second Note Payment Conditions</u>" has the meaning provided in the Contribution Agreement.

"<u>Special Limited Partner</u>" means Related Direct SLP LLC, a Delaware limited liability company, and its successors and assigns.

"<u>State</u>" means the state of California.

"Substituted Partner" means any transferee of the Interest of a Partner who is admitted to the Partnership as a successor partner in respect of the Interest of such Partner in accordance with Article X.

"Supervisory Management Fee" has the meaning ascribed to such term in Section 6.4 hereof.

"Tax Matters Partner" means the Partner designated from time to time as the Tax Matters Partner of the Partnership pursuant to Section 5.3.D hereof.

"Third Note Payment" has the meaning provided in Section 3.4.A hereof.

"Third Note Payment Conditions" has the meaning provided in the Contribution Agreement.

"Title Policy" means Policy of Title issued by First AmericanTitle Insurance Company under Order Number 2203189, and all the documents relating thereto.

"Unavoidable Events" means strikes, acts of God, governmental restrictions (other than those contained in the Governmental Agreements), governmental inaction, changes in governmental codes or other requirements after initial approvals were granted, severe and unusual shortages of labor or materials, enemy action, riot, civil commotion, fire, unavoidable casualty or other causes beyond the reasonable control of a party. Lack of funds shall not be deemed a cause beyond the control of a party.

"Uniform Act" means the California Revised Limited Partnership Act, as set forth in Section 15611, et. seq. of the California Corporations Code, as it may be amended from time to time, or any successor statute governing the operation of limited partnerships.

"United States Real Property Interest" means any direct or indirect interest in United States real property as defined in Section 897(c) of the Code and the Regulations promulgated thereunder.

"Voluntary Loan" means a voluntary, unsecured interest-bearing loan of any Partner to the Partnership as described in Section 4.4 hereof.

"Withdrawing" or "Withdrawal" (including the verb form "Withdraw" and the adjectival forms "Withdrawing" and "Withdrawn") means, as to a General Partner, the occurrence of the Bankruptcy, dissolution or liquidation of such Partner, or the withdrawal, removal or retirement from the Partnership of such Partner for any reason, including any Assignment of its Interest and those situations when a General Partner may no longer continue as a General Partner by reason of any law or pursuant to any terms of this Agreement.

"Withdrawing Limited Partner" means Danavon L. Horn, a natural person.

*       *       *

Each definition or pronoun herein shall be deemed to refer to the singular, plural, masculine, feminine or neuter as the context requires. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

ARTICLE II

GENERAL

2.1     Continuation of the Partnership.

A.      The Partnership shall be continued as a limited partnership pursuant to this Agreement. The name of the Partnership shall continue to be "FREDERICK AND 52 II Limited Partnership", a California limited partnership" or such other name selected by the General Partners with the Consent of the Special Limited Partner as may be acceptable to the appropriate recording officials of the State.

B.      As soon after the execution of this Agreement as is practicable, the General Partners shall (if required by the Uniform Act) file this Agreement in accordance with the Uniform Act and/or amend and file the Certificate to reflect the matters set forth herein. The General Partners shall from time to time take all such other actions as may be deemed by them to be necessary or appropriate to (i) effectuate and permit the continuation of the Partnership as a limited partnership under the laws of the State, (ii) enable the Partnership to do business in the state where the Apartment Complex is located and (iii) protect the limited liability of the Investor Limited Partners under the laws of the State, including the preparation and filing of such amendments to this Agreement and any other certificate, document or instrument as may be required under the laws of the State. The Partners shall execute such certificates, documents and instruments and take such other action as may be necessary to enable the General Partners to fulfill their responsibilities under this Section 2.1.B.

2.2     Principal Office. The principal office of the Partnership shall be located at 73061 El Paseo, Suite 214, Palm Desert, California 92261. The Administrative General Partner may maintain such other offices on behalf of the Partnership in the State as they may from time to time deem advisable. The Partnership's books and records will be made available to the Limited Partner or its representatives at its principal office at all times and for any purpose. The principal office of the Partnership may be changed by the Administrative General Partner to another location in California, in which event written notice thereof shall be given by the Administrative General Partner to all the other Partners.

2.3     Principal Place of Business; Resident Agent. The principal place of business of the Partnership shall be at the office of the Administrative General Partner, at 73061 El Paseo, Suite 214, Palm Desert, California 92261. Danavon L. Horn at the aforementioned address, has been appointed the Partnership's resident agent for the service of process in the State.

2.4     Term. The term of the Partnership commenced on August 6, 2001. The Partnership shall continue in full force and effect until the dissolution and termination of the Partnership pursuant to Article XII hereof.

2.5     Purpose.

A.      The specific business and purpose of the Partnership is investment in real property and the provision of low income housing through the construction, renovation, rehabilitation, operation (including conversion to cooperative or condominium form of ownership and the sale of apartment units, if such action would not cause the Credit to be reduced for any year during the Credit Period or Compliance Period or the breach of any restrictive covenant affecting the Property) and leasing of the Apartment Complex and any commercial space located therein, and in connection therewith, subject to and in accordance with

the terms hereof, the permission of each applicable Authority and all Governmental Agreements, to make and perform contracts and other undertakings and to engage in any and all activities and transactions as may be necessary or advisable in connection therewith, including, but not limited to, the purchase, transfer, mortgage, pledge and exercise of all other rights, powers, privileges and other incidences of ownership with respect to the Apartment Complex and to borrow or raise money without limitation as to amount or manner and to carry on any and all activities related to any of the foregoing, subject always to the terms and conditions of this Agreement. The business of the Partnership shall be limited to the construction, ownership, financing, operation and disposition of the Apartment Complex.

    B.    In order to carry out its business and purpose under Section 2.5.A hereof, subject to the terms and conditions hereof, the Partnership is hereby authorized to:

        (i)    acquire and own the Land, and to hold such Land for investment purposes;

        (ii)    construct, renovate, rehabilitate, own, maintain, operate and lease the Apartment Complex;

        (iii)    mortgage, lease, transfer and exchange or otherwise convey and encumber the Apartment Complex (including conversion to cooperative or condominium form of ownership and the sale of apartment units) in furtherance of any and all of the objects of its business in connection with the Apartment Complex;

        (iv)    enter into, perform and carry out contracts of any kind necessary to, or in connection with or incidental to, the construction, renovation, rehabilitation, ownership, financing, maintenance and operation of the Apartment Complex, including, but not by way of limitation, any contracts with any Authority which may be desirable or necessary to comply with the requirements of such Authority, including any agreements relating to regulations or restrictions contained in any mortgages as to rents, sales, charges, capital structure, rate of return and methods of operation;

        (v)    rent dwelling units and commercial space, if any, in the Apartment Complex from time to time in accordance with applicable Federal, state and local regulations, in such a manner so as to qualify for the Credit, collect the rents therefrom, pay the expenses incurred in connection therewith, and distribute the net proceeds to the Partners, subject to any requirements which may be imposed by any Authority; and

        (vi)    purchase, transfer, mortgage, pledge and exercise all other rights, powers, privileges and other incidences of ownership with respect to the Apartment Complex and borrow or raise money without limitation as to amount or manner and carry on any and all activities incidental and appropriate to effectuate the purposes of the Partnership; and

        (vii)    apply for, obtain, utilize, allocate, enter into agreements in connection with and otherwise take all steps necessary or desirable in connection with the Credits.

ARTICLE III

CAPITAL CONTRIBUTIONS

3.1     General Partners.  The Capital Contribution of the General Partners are set forth in Schedule A.  The General Partners shall not be required to make any Capital Contributions to the Partnership, except to the extent provided in Section 3.7. and Section 6.1. Notwithstanding anything contained in this Agreement or the Project Documents to the contrary, except for the initial contribution set forth on Schedule A hereto, the Managing General Partner shall not be obligated to make any capital contribution or loan to the Partnership under any circumstances.

3.2     Withdrawal of Withdrawing Limited Partner; Admission of Managing General Partner and Investor Limited Partners.  The Withdrawing Limited Partner hereby withdraws as a Partner of the Partnership.  HCA is hereby admitted to the Partnership as Managing General Partner and Limited Partner and the Special Limited Partner are hereby admitted to the Partnership as the Investor Limited Partners.  The Withdrawing Limited Partner acknowledges that it (i) has no further interest in the Partnership as of the Admission Date as a Partner, (ii) does hereby release all claims, if any, against the Partnership arising out of its participation as a Partner and (iii) shall be deemed to have withdrawn as Partner of the Partnership as of such date.

3.3     Special Limited Partner.  The Capital Contribution of the Special Limited Partner is set forth in Schedule A.  The Special Limited Partner shall be in a different class from the Limited Partner and, except as otherwise expressly stated in this Agreement, shall not participate in any rights allocable to or exercisable by the Limited Partner under this Agreement.

3.4     Limited Partner.

A.     Subject to compliance with the terms and conditions hereinafter set forth and set forth in the Contribution Agreement, the Limited Partner shall make Capital Contributions to the Partnership of $7,542,000 payable in installments as follows:

(i)     $3,771,000 (the "Initial Payment") shall be payable on the Admission Date.

(ii)     A total of $3,771,000 (the "Note Payment Amount"), which shall be payable in installments of $1,886,000 ("First Note Payment"), $377,000 (the "Second Note Payment"), $1,432,600 ("Third Note Payment"), and $75,400 (the "Fourth Note Payment" and together with the First Note Payment, Second Note Payment, Third Note Payment and the Fourth Note Payment, the "Note Payments") upon satisfaction of the First Note Payment Conditions, Second Note Payment Conditions, Third Note Payment Conditions, and Fourth Note Payment Conditions, respectively.

In the event of any inconsistency between the terms of this Agreement and the terms of the Contribution Agreement, the terms of the Contribution Agreement shall control.

B.     (i)     The amount of the Limited Partner's Capital Contributions was determined in part upon the amount of Credits that are expected to be available to the Partnership and was based upon the assumption that the Partnership would be eligible to claim an amount of Credits of not less than $9,458,960 for the period during which the Partnership is entitled to claim Credits, commencing with the calendar year 2003.  The amount of the qualified basis of the Apartment Complex will not be known until

Completion. Therefore, if the total amount of Credits which the Partnership will be entitled to claim and allocate to the Investor Limited Partners for the period during which the Partnership is entitled to claim Credits, commencing with the calendar year 2003, as certified to the Limited Partner by the Accountants upon the Second Note Payment Date, (x) is less than $9,458,010, the principal amount of the Capital Note and Second Note Payment and, if necessary, subsequent Note Payments, shall be reduced by $.7974 for each $1.00 by which $9,458,010 exceeds the Credits which the Accountants certify that the Partnership will be entitled to claim and allocate to the Investor Limited Partners; or (y) is more than $9,458,010, the principal amount of the Second Note Payment shall be increased (subject to availability of such funds at the time of notification of such increase) by $.7974 for each $1.00 by which the Credits which the Partnership will be entitled to claim and allocate to the Investor Limited Partners exceeds $9,458,010. For these purposes, any funds theretofore previously earmarked by the Limited Partner to make other investments, or to be held as reserves, shall not be considered available with respect to the determination of whether any amounts are available for payment hereunder. If the Limited Partner fails to increase its Capital Contribution pursuant to this Section 3.4.B(i), whether or not due to the unavailability of funds, the Partnership (in addition to any other rights the Partnership may have) shall have the right to admit additional Class B Limited Partners in the Partnership and accept from such Persons Capital Contributions in exchange for excess Credit available for allocation to such additional Class B Limited Partner.

(ii)     In addition to any other reduction to Capital Contributions pursuant to Section 3.4.B(i), (a) if the amounts of Credits which are allocable to the Investor Limited Partners for 2003 and/or 2004, as certified to the Limited Partner by the Accountants, is less than $866,985 for 2003 and/or less than $945,801 for 2004, the Third Note Payment shall be reduced by $0.75 for each dollar by which $866,985 exceeds the amount of Credits allocated to the Investor Limited Partners for 2003 and/or by which $945,801 exceeds the amount of credits allocated to the Investor Limited Partners for 2004.

(iii)     Notwithstanding anything to the contrary herein, in the event a downward adjustment to the principal amount of the Capital Note is required under this Section 3.4.B and such reduction is in excess of the then unpaid balance of the Capital Note or is determined after the Capital Note has been paid in full, then the Partnership shall reduce the Limited Partner's Capital Contribution by making a cash distribution to the Limited Partner in the amount by which the reduction calculated pursuant to Section 3.4.B(i) and 3.4.B(ii) above exceeds the then existing unpaid balance, if any, of the Capital Note. Upon request of the Limited Partner, the Administrative General Partner shall make a contribution to the Partnership in an amount sufficient to enable the Partnership to make the distribution to the Limited Partner required pursuant to the preceding sentence.

(iv)     The Credit Amount specified in Section 9.2.D and 11.4.A hereof shall be adjusted to the amount of Credits which the Accountants certify pursuant to Section 3.4.B(i) hereof. The $866,985 and $945,801 amounts specified in Section 3.4.B(ii) shall be adjusted in proportion to any adjustment to the $9,458,010 amount made pursuant to Section 3.4.B(i).

(v)     If the Special Limited Partner shall disagree as to the amount of Credits to which the Accountants certify pursuant to this Section 3.4.B, the Special Limited Partner shall notify the Administrative General Partner of such disagreement within 10 days after delivery of such certification to the Limited Partner,

and, notwithstanding anything to the contrary set forth in the Contribution Agreement, the Limited Partner shall pay that portion of the principal amount of the Capital Note based on that portion of Credits not in dispute. With respect to the amount of such Credits in dispute, within five days after the giving of the notice specified in this Section 3.4.B(v), the Administrative General Partner and the Special Limited Partner shall each designate a certified public accountant as an arbitrator and such two arbitrators shall designate a third arbitrator (or if the first two arbitrators cannot agree upon a third arbitrator within 20 days, such third arbitrator shall be chosen by the American Arbitration Association). The designation of arbitrators hereunder shall automatically delay the due date for payment of that portion of the Capital Note in dispute until ten days after the conclusion of such arbitration (unless prior to the expiration of such period the Administrative General Partner and the Special Limited Partner agree upon the amount of Credits which the Partnership is entitled to claim). Such arbitrators shall be directed to promptly conduct, at the expense of the Partnership, an arbitration to determine by majority vote the amount of Credits which the Partnership is entitled to claim on a basis that is prudent and defensible in light of the obligations that a general partner of a public limited partnership has to its investors. Such arbitrators shall be directed to give notice of their determination within 30 days after the giving of the notice specified in this Section 3.4.B(iv), and upon the giving of such notice of determination the amount determined by majority vote of such arbitrators shall be deemed the amount of Credits which the Partnership is entitled to claim for all purposes hereof. Upon the determination of the amount of Credits which the Partnership is entitled to claim, the principal amount, if any, remaining to be paid under the Capital Note shall be adjusted accordingly.

C.     The Limited Partner's obligation to pay each Installment after the Initial Payment is non-recourse to the Limited Partner except to the extent of the Limited Partner's Interest, which shall be pledged as security for such obligation pursuant to a Pledge Agreement in substantially the form of Exhibit A attached hereto and is subject to satisfaction of the conditions precedent thereto set forth in Section 3.4.A(ii) hereof.

D.     The Investor Limited Partners' Capital Contributions shall first be applied to the costs of the construction of the Apartment Complex, next to the payment of the fees specified in Section 6.2 hereof, and then to the payment of the Developer Fee pursuant to Section 6.1 hereof.

3.5     Delivery of Capital Note. The obligation of the Limited Partner to pay the Note Payments shall be evidenced by the delivery by the Limited Partner of the Capital Note, in substantially the form of Exhibit B attached hereto. After its Capital Contribution has been paid by the Limited Partner, its Capital Note will be returned to it, marked "paid in full."

3.6     Treatment of Other Advances. If any Partner shall advance funds to the Partnership other than the amount of its Capital Contribution, the amount of such advance shall not be considered a contribution to the capital of the Partnership, but shall be deemed either an Operating Loan or a Voluntary Loan and shall be subject to the provisions of Section 4.4 hereof.

3.7     Capital Accounts; No Interest; Withdrawal.

No Partner shall have the right to demand a return of its Capital Contribution, except as otherwise provided in this Agreement. No Partner shall have priority over any other Partner, either as to return of its Capital Contribution or as to profits, losses or distributions, except as otherwise specifically provided herein. Moreover, no General Partner shall be personally liable for the return of the Capital Contribution of any Limited Partner, or any portion thereof, it being expressly understood that any such return shall be made solely from assets of the

Partnership, nor shall any General Partner be required to pay the Partnership or any Partner any deficit in its or any other Partner's Capital Account upon dissolution or otherwise, it being understood and agreed that any deficit in any Capital Account shall not be treated as an asset of the Partnership. Further, the Limited Partner shall not be required to pay to the Partnership any deficit in its Capital Account upon dissolution or otherwise, except as provided by law, with respect to third party creditors of the Partnership. No interest shall be paid on any Capital Account or Capital Contribution. No Partner shall have the right to demand or receive property other than cash for its Interest. Each of the Partners does hereby agree to, and does hereby, waive any right such Partner may otherwise have to cause any asset of the Partnership to be partitioned or to file a complaint or institute any proceeding at law or in equity seeking to have any such asset partitioned. The acquisition of the Interest acquired by the Investor Limited Partners shall not result in a termination of the Partnership under Section 708 of the Code. Immediately following the date of this Agreement, the Capital Account of each General Partner shall be $5.00, of the Limited Partner shall be $3,771,000 and of the Special Limited Partner shall be $10.00.

> 3.8    Liability of Limited Partners. Neither the Special Limited Partner nor the Limited Partner shall be liable for any debts, liabilities, contracts or obligations of the Partnership, except as provided by law. Subject to Section 3.7, the Limited Partner and the Special Limited Partner shall be liable only to make payments of their Capital Contributions as and when due under this Agreement.

> 3.9    Provision of Other Amounts. The Partners acknowledge that, pursuant to the Contribution Agreement, the Administrative General Partner is obligated to indemnify the Partnership against any and all liability in respect of any and all transfer, gains, income, sales or other taxes and transfer fees of any kind imposed or asserted with respect to the acquisition by the Investor Limited Partners of their Interest. Such amounts shall not be treated as loans or contributions to the Partnership, and the provision of such amounts shall not affect the allocations and distributions provided for in Article IX in any way whatsoever.

> 3.10    Outside Activities of Partners. Each of the Partners may engage or possess interests in other business ventures of every kind and description for its own account, including, without limitation, the ownership or management of other real estate projects, developments or undertakings. Neither the Partnership nor any of the other Partners shall have any rights by virtue of this Agreement in such independent business ventures or to income or profits derived therefrom.

> 3.11    Construction Loan. The Investor Limited Partners hereby consent to the terms and conditions of the Construction Loan and authorize the execution of the Construction Loan Documents (as defined in the Contribution Agreement) by the General Partner on behalf of the Partnership.

> 3.12    Assignment of Capital Contributions. The Limited Partners acknowledge that the Partnership has assigned to the Construction Lender the Capital Contributions or portions thereof payable by the Limited Partner, the Partnership's rights to such Capital Contributions under the Contribution Agreement and the Capital Note, and its rights as pledgee of the Limited Partners' interests in the Partnership under the Pledge Agreement, and consents thereto. However, no such assignment or pledge by the Partnership or the General Partner shall create any liability on the part of the Investor Limited Partners to fund any Capital Contributions which are not otherwise payable by the Investor Limited Partners under the terms of the Contribution Agreement or other agreements executed by the Investor Limited Partners.

3.13     General Partner Pledge.  The Investor Limited Partners hereby consent to the grant by the General Partner to the Construction Lender of a security interest in the Interests of the General Partner pursuant to the Construction Loan.

3.14     Payment to Construction Lender.  Until the repayment in full of the Construction Loan, the Limited Partner is hereby directed by the General Partner on behalf of the Partnership to make all Capital Contributions to the Construction Lender and the Limited Partner acknowledges such direction.

3.15     Construction Lender's Restrictions on Amendment and Transfer.  The Investor Limited Partners hereby agree that without the prior consent of the Construction Lender they will not (i) amend this Agreement nor the Contribution Agreement in any manner that materially affects the rights of Construction Lender under the Construction Loan Documents (ii) transfer, contract to transfer, encumber, grant any option or permit any lien or judgment or other judicial or involuntary lien against, or otherwise convey or dispose of, any of their Interests.  The foregoing restrictions shall in no way limit the following rights of the Investor Limited Partners: (i) their rights to assign and pledge their interests pursuant to Section 10.1 hereof and (ii) their rights to remove any General Partner pursuant to Section 11.4 hereof.

3.16     Subordination of the Guaranties to the Construction Loan Guaranty.  The Investor Limited Partners hereby agree that the Guaranties are subordinate in right of payment and performance to the prior payment and performance in full of all obligations of the Guarantors to the Construction Lender under those certain guaranties, each of which is entitled Commercial Guaranty, made by each of the Guarantors in favor of Construction Lender.

ARTICLE IV

COMPLIANCE WITH AUTHORITY REQUIREMENTS;
PARTNERSHIP BORROWINGS

4.1     Authority Requirements.  During the Compliance Period, the following provisions shall apply: (i) each of the provisions of this Agreement shall be subject to, and the General Partners covenant to act in accordance with, the Credit Conditions and all applicable federal, state and local laws and regulations; (ii) the Credit Conditions and all such laws and regulations, as amended or supplemented, shall govern the rights and obligations of the Partners, their successors and assigns, and they shall control as to any terms in this Agreement which are inconsistent therewith, and any such inconsistent terms in this Agreement shall be unenforceable by or against any of the Partners; (iii) upon any dissolution of the Partnership or any transfer of the Apartment Complex, no title or right to the possession and control of the Apartment Complex and no right to collect rent therefrom shall pass to any person who is not, or does not become, bound by the Credit Conditions in a manner that, in the opinion of counsel to the Partnership, would not adversely affect the ability of the owner(s) of the Apartment Complex to utilize the Credits or avoid a recapture thereof; and (iv) any conveyance or transfer of title to all or any portion of the Apartment Complex required or permitted under this Agreement shall in all respects be subject to the Credit Conditions and all conditions, approvals or other requirements of the rules and regulations of any Authority applicable thereto.

4.2     Authorization to the General Partners.

A.     Without in any way limiting the right or authority of the General Partners under this Article IV or Article V hereof, the General Partners are specifically authorized to execute all documents required by any Authority or any Lender in connection with the

5215/60851-045 LALIB1/508627 v7                    - 20 -

acquisition, construction or financing of the Apartment Complex; provided that the terms and conditions of the related Governmental Agreement and/or Mortgage and Mortgage Note were accurately and completely disclosed to the Limited Partner pursuant to the Contribution Agreement or such requirement arises out of an amendment to such Governmental Agreement, Mortgage or Mortgage Note made with the Consent of the Special Limited Partner which shall not be unreasonably withheld or delayed; provided, however, that the Partners agree that it shall be reasonable to withhold consent if such amendment or agreement could or would have an adverse effect (other than de minimis) on the rights reserved to, the obligations of, or the distributions or income to be received by, either or both of the Investor Limited Partners.

B.      The General Partners shall, at no time, do or cause to be done any act directly or indirectly affecting the Apartment Complex in violation of the requirements of each applicable Authority and Lender without the prior written approval thereof.

4.3     Right to Mortgage.

A.      The Partnership has obtained financing for the Apartment Complex from the Construction Lender and has secured the same by the Mortgage.  Except for the Construction Loan provided by Construction Lender, each and every Mortgage provides and shall continue to provide that no Person, including, but not limited to, the Partnership, any party holding a partnership interest in the Partnership, or any of their Affiliates, shall have any personal liability for the payment of all or any part of such Mortgage.

B.      The execution by the General Partner on behalf of the Partnership of the Project Documents is hereby ratified provided that the terms and conditions thereof were accurately and completely disclosed to the Limited Partner pursuant to the Contribution Agreement.

C.      The General Partner may modify, refinance or repay the Mortgage with the approval of each Lender and each Authority, if required, including any required transfer or conveyance of Partnership assets for security or mortgage purposes; provided, however, that the terms of any such modification, refinancing or repayment must receive the Consent of the Special Limited Partner (which consent shall not be unreasonably withheld or delayed) before such transaction shall be binding on the Partnership; provided, further, that the Special Limited Partner hereby approves the terms and conditions of the Construction Loan from FMB.

4.4     Loans.  All borrowings by the Partnership shall be subject to the terms of this Agreement, the Project Documents and applicable rules, regulations and directives of any Authority.  To the extent borrowings are permitted, they may be made from any source, including any Partner or an Affiliate thereof; provided, however, that any borrowings other than Operating Loans from the Administrative General Partner or its Affiliates shall require the Consent of the Special Limited Partner.  Except as may be otherwise specifically set forth in this Agreement, if any Partner or Affiliate thereof shall lend any monies to the Partnership, such loan shall be unsecured and the amount of any such loan shall not be an increase of such Partner's Capital Contribution nor affect in any way such Partner's share of the profits and losses or distributions of the Partnership.  Any loan by a Partner or its Affiliate, other than an Operating Loan, shall be a Voluntary Loan, shall bear interest per annum at a rate equal to two percent in excess of the Prime Rate (but not in excess of the lawful maximum rate) and shall be repayable as set forth in Article IX hereof (to the extent permitted by each Authority); provided, however, that any Voluntary Loan shall be made solely for the benefit of the Partnership.  No Voluntary Loans by the General Partner or its Affiliates may be made to the Partnership during the time that the Guarantor is obligated to make Operating Loans to the Partnership.

5215/60851-045 LALIB1/508627 v7           - 21 -

28

ARTICLE V

RIGHTS, POWERS AND OBLIGATIONS OF THE GENERAL
PARTNERS AND LIMITATIONS THEREON; PARTNERS' ACTIVITIES

5.1     Exercise of Management.

A.     The overall management and control of the business, assets and affairs of
the Partnership and/or the Apartment Complex shall be vested in the Managing General Partner
and, subject to the specific limitations and restrictions set forth in this Article V and in Article IV
hereof, the Managing General Partner, in extension of and not in limitation of the powers given it
by law, shall have full, exclusive and complete charge of the management of the business of the
Partnership and/or the Apartment Complex in accordance with its purpose stated in Section 2.5
hereof. Neither the Special Limited Partner nor any other Limited Partner shall take part in the
management or control of the business of the Partnership and/or the Apartment Complex or have
authority to bind the Partnership. Notwithstanding the foregoing, the provisions of this Section
5.1.A shall not limit the exercise by the Special Limited Partner of any and all of the rights
granted to it under this Agreement.

B. The Managing General Partner (if at the time more than one Person constitutes
the Managing General Partner) shall act by vote of a majority in interest of the Persons
constituting the Managing General Partner, except where otherwise specified herein. If at any
time there is no Managing General Partner, the General Partners shall act by vote of a majority in
interest of the General Partners, except where otherwise specified herein.

C. Any General Partner, to the extent of its authorization, may from time to time,
by an instrument in writing delegate all or any of its powers or duties hereunder to another
General Partner. Such writing shall fully authorize such other General Partner to act alone
without requirement of any other act or signature of the delegating General Partner, to take any
action of any type and to do anything and everything which the delegating General Partner may
be authorized to take or do hereunder except insofar as said delegation may be limited to certain
acts or activities; provided, however, that any such delegation shall not relieve the delegating
General Partner of his obligations or liabilities under this Agreement, except to the extent that
such delegation and limitation of liability are first approved in writing by the Partners.

D. Subject to Section 5.2.A below, each obligation of the General Partners under
this Agreement which is not stated to be only an obligation of the Administrative General Partner
or the Managing General Partner shall be the joint and several obligation of each General Partner
and each such obligation shall survive any withdrawal of a General Partner pursuant to Article XI
hereof, except to the extent that the Partners expressly agree otherwise in writing.

5.2     Duties and Authority of General Partner.

A.     The General Partners shall devote to the Partnership such time as may be
necessary for the proper performance of the duties of the General Partners. The General Partners
shall at all times exercise their responsibilities as General Partners in a fiduciary manner. The
signature of a General Partner shall be required on any instrument, document or agreement to
bind the Partnership, and third parties may rely fully on any such instrument, document or
agreement signed by a General Partner. Notwithstanding the preceding sentence, the parties
agree that the Managing General Partner shall not be liable for any agreement entered into on
behalf of the Partnership, if such agreement had not been signed by the Managing General
Partner, and shall be indemnified hereunder by the Partnership to the extent provided for in

5215/60851-045 LALIB1/508627 v7              -  22  -

Section 5.8 hereof. Subject to the terms and conditions hereof, the General Partners shall be obligated, and are hereby authorized and directed, to:

(i)     Take all action that may be necessary or appropriate to carry out the purposes of the Partnership as described in this Agreement;

(ii)    Make inspections of the Apartment Complex and assure that the Apartment Complex is being properly maintained in accordance therewith and necessary repairs are being made;

(iii)   Prepare or cause to be prepared in conformity with good business practice all reports that are to be furnished to the Partners or that are required by taxing bodies, any Authority or other governmental agencies, including operations reports of the Apartment Complex or by or on behalf of the General Partners, and the financial statements and reports referred to in Section 7.3 hereof;

(iv)    Cause the property of the Partnership at all times to be insured in a manner similar to other property of like kind in the same locality and in such amounts and on such terms as will fully and adequately protect the Partnership (provided that such insurance shall be in an amount at least sufficient to satisfy the provisions of Section 5.12 hereof);

(v)     Obtain and maintain in force, or cause to be obtained and maintained in force, Workers' Compensation Insurance and such other insurance as may be required by applicable law or governmental regulation;

(vi)    Obtain and maintain in force, or cause to be obtained and maintained in force, adequate public liability insurance;

(vii)   Comply with any construction budget delivered pursuant to the Contribution Agreement, provided, however, that the General Partners shall not be in breach of this provision with respect to budgeted cost overruns if such overruns are being timely funded pursuant to the Development Deficit Guaranty Agreement or third party financing pursuant to Section 4.4 hereof;

(viii)  Enforce compliance with the Construction Contract and any other construction agreements;

(ix)    Comply with all Governmental Agreements;

(x)     Promptly report to the Investor Limited Partners any (I) material variance in the operations of the Property which would cause the Partnership to not be in continued compliance with any rules, restrictions, statutes or regulations governing the Credits or (II) failure to comply with the Governmental Agreements which would give rise to the Special Removal Right under Section 11.4.A(ii);

(xi)    Comply with all laws, rules, regulations, settlements, directives or other requirements (collectively, "Laws") imposed upon the Apartment Complex and the Partnership by any Authority and any Lender, including, without limitation, laws relating to Hazardous Substances;

(xii)   Not permit Hazardous Substances to exist, or be generated or stored on or under the Apartment Complex other than substances that are used or

consumed in the normal course of developing, operating or occupying a housing project, to the extent and degree that such substances are stored, used and disposed of in the manner and in the amounts that are consistent with normal practice and legal standards; and

(xiii)   Do all other things (subject to the restrictions contained herein) that may be necessary or desirable in order properly and efficiently to administer and carry on the affairs, assets and business of the Partnership.

B.   The Managing General Partner shall operate the Partnership and the Apartment Complex and shall cause the Management Agent to manage the Apartment Complex in such a manner that the Apartment Complex will be eligible to receive Credits with respect to the Eligible Units.  To that end, the Managing General Partner agrees, without limitation, to make all elections requested by the Special Limited Partner under Section 42 of the Code to allow the Partnership or its Partners to claim the Credits; to file Forms 8609 with respect to the Apartment Complex as required; commencing with the tax year in which Completion occurs, to file any documents necessary to obtain and retain the property tax exemption under any statute of the State which provides the Apartment Complex a real property tax exemption (so long as such statutes remain effective) for at least the duration of the Compliance Period, to operate the Apartment Complex and cause the Management Agent to manage the Apartment Complex so as to comply with the requirements of Section 42(g) and (i)(3) of the Code; and to make all certifications required by Section 42(1) of the Code.

C.   The General Partners agree that they shall prepare or cause to be prepared an annual budget in connection with the operations of the Apartment Complex for each succeeding Fiscal Year of the Partnership and shall deliver the same to the Special Limited Partner not later than November 1 of the Fiscal Year preceding the Fiscal Year to which such budget relates.  Each such budget shall contain an amount to be added to separate reserves for payment of real estate taxes (provided, however, such reserves shall not be required so long as a real property tax exemption is available to the Partnership), insurance and replacements in an amount with respect to each such reserve equal to the greater of (i) the amount required to be added to such reserve during such year by any Lender or (ii) the amount that is reasonable in the circumstances, which, in the case of the reserve for replacements, shall following Completion be not less than the Reserve Amount.  Such budget shall not be adopted without the Consent of the Special Limited Partner (not to be unreasonably withheld), provided, however, that if the Special Limited Partner shall withhold its consent to adoption of such budget, then it shall provide, in writing, the specific reasons why such budget was not approved.  The Partnership shall not make any expenditure of funds, or commit to make any such expenditure, other than in response to an Unavoidable Event, except as provided for in an annual budget so approved by the Special Limited Partner, provided, however, that the General Partner may reallocate funds within a group of line items in an annual budget which had been approved by the Special Limited Partner which line items form a major category (such as administrative expense), and make expenditures accordingly without seeking the further approval of the Special Limited Partner, provided that such reallocation may not exceed $1,000 with respect to each line item and $10,000 in the aggregate.

D.   The Administrative General Partner shall cause the Partnership to deposit into a reserve for replacements each month starting with the month following Completion, the Reserve Amount, less such amount as shall be required to be set aside for such purpose by any Lender or Authority.  If the amount required to be reserved by all Lenders and Authorities exceeds the amount required to be reserved pursuant to this Section 5.2.D, the Guarantor will, subject to the limitations contained in the Replacement Reserve Guaranty Agreement deposit such excess in a separate reserve account.  Any such deposits made by the Guarantor shall be

- 24 -

deemed to be an Operating Loan.  Any interest earned on the reserve for replacements shall become a part of that reserve.  Anything to the contrary contained in Section 7.1 hereof notwithstanding, the reserve for replacements shall be maintained in the name of the Partnership in an account with a bank acceptable to the Special Limited Partner, and withdrawals from such account or any account established for a similar purpose pursuant to the requirements of any Lender or Authority shall require the consent of the Special Limited Partner.  The Administrative General Partner shall cause the Partnership to deliver to the Special Limited Partner a copy of the monthly statements received with respect to that account.

     5.3    <u>General Partners' Authority; Tax Matters Partner</u>.

     A.    Subject to the terms and conditions hereof, the Managing General Partner is hereby fully authorized to take any action of any type and to do anything and everything which a general partner of a limited partnership organized under the Uniform Act may be authorized to take or do thereunder, and specifically, without limitation of such authority, to execute, sign, seal and deliver in the name and on behalf of the Partnership:

     (i)    any note, mortgage or other instrument or document in connection with the Mortgage, the Mortgage Note or any Governmental Agreement, and all other agreements, contracts, certificates, instruments or documents required by any Authority and/or any Lender in connection therewith or with the acquisition, development, construction, improvement, operation or leasing of the Apartment Complex or otherwise required by any Authority and/or any Lender under the Project Documents in connection with the Apartment Complex;

     (ii)    any deed, lease, mortgage, mortgage note, bill of sale, contract or any other instrument purporting to convey or encumber the real or personal Property of the Partnership;

     (iii)    any rent supplement or leasing or other contract or agreement providing for public or non-public financial assistance, directly or indirectly, to tenants of the Apartment Complex;

     (iv)    any and all agreements, contracts, documents, certificates and instruments whatsoever involving the acquisition, development, construction, improvement, management, maintenance, leasing and operation of the Apartment Complex, including the employment of such Persons as may be necessary therefor; and

     (v)    any and all instruments, agreements, contracts, certificates or documents requisite to carrying out the intention and purpose of this Agreement, including, without limitation, the filing of all business certificates, this Agreement and all amendments thereto, and documents required pursuant to the Project Documents or by any Authority and/or any Lender or deemed advisable by the Administrative General Partner in connection with any financing.

     B.    Every contract, agreement, certificate, document or other instrument executed by the Managing General Partner shall be conclusive evidence in favor of every person relying thereon or claiming thereunder that, at the time of the delivery thereof, (i) the Partnership was in existence, (ii) this Agreement had not been terminated or canceled or amended in any manner so as to restrict such authority (except as shown in any instrument duly filed in the Filing Office) and (iii) the execution and delivery thereof was duly authorized by the General Partners.  Any Person dealing with the Partnership or the Managing General Partner may, absent actual

knowledge to the contrary, rely on a certificate signed by the Managing General Partner hereunder:

      (a)    as to who are the Partners hereunder;

      (b)    as to the existence or nonexistence of any fact or facts which constitute conditions precedent to acts by any General Partner or are in any other manner germane to the affairs of the Partnership;

      (c)    as to who is authorized to execute and deliver any instrument, contract, agreement, certificate or document for the Partnership;

      (d)    as to the authenticity of any copy of this Agreement and amendments thereto; or

      (e)    as to any act or failure to act by the Partnership or as to any other matter whatsoever involving the Partnership or the Apartment Complex.

      C.    The Partners hereby consent to the exercise by the Managing General Partner of the powers conferred on it by this Agreement.

      D.    All of the Partners hereby agree that the Special Limited Partner shall have the right to designate from time to time either of the General Partners as the "Tax Matters Partner" pursuant to the Code and in connection with any audit of the Federal income tax returns of the Partnership; provided, however, that if the General Partner designated as Tax Matters Partner shall withdraw from the Partnership, become Bankrupt or be dissolved or if it shall be determined that such General Partner cannot serve as Tax Matters Partner, the Special Limited Partner shall thereafter have the right to designate itself or any other General Partner as the "Tax Matters Partner." So long as a General Partner is the Tax Matters Partner, in discharging its duties and responsibilities, it shall act as a fiduciary to the Limited Partner and shall obtain the consent of the Special Limited Partner in connection with all material decisions and determinations to be made by the Partnership with respect to income tax matters including decisions to be made in each administrative and judicial proceeding in which the Partnership is a party and all elections to be made by the Partnership in connection therewith.

      E.    So long as a General Partner is the Tax Matters Partner, the Special Limited Partner shall have the right to determine to litigate any administrative determination relating to Federal income tax matters, and shall have the right to litigate such matter in such court and to settle such matters as the Special Limited Partner shall decide in its sole discretion, provided, however, that if the settlement of any such matter would require any General Partner to make any payments or result in any reallocation of Sale or Refinancing Proceeds under Section 9.2.D, such settlement shall require the consent of each such General Partner which consent shall not be unreasonably withheld.

      5.4    <u>Lease, Conveyance or Refinancing of Assets of the Partnership</u>.

      A.    Except as may be otherwise expressly provided in Section 4.1 and Section 5.5 hereof and elsewhere in this Agreement, the Administrative General Partner, with the approval of each Authority (if required), is hereby authorized to sell, lease, exchange, refinance or otherwise transfer, convey or encumber all or substantially all of the assets of the Partnership; provided, however, that the terms of any such sale, exchange, refinancing or other transfer, conveyance or encumbrance must receive the Consent of the Special Limited Partner before such transaction shall be binding on the Partnership. Notwithstanding the foregoing, no such consent

5215/60851-045 LALIB1/508627 v7      - 26 -

shall be required for the leasing of apartments to tenants in the normal course of operations, or leases or concessions of facilities related to the operation of the Apartment Complex.

B.    (i)    Notwithstanding any provision of this Agreement to the contrary, the Administrative General Partner shall have the right to purchase the Property at the end of the Compliance Period and the Managing General Partner shall have a right of first refusal to purchase the Property, both pursuant to the Purchase Option.

(ii)    Subject to the Purchase Option described in Section 5.4(B)(i) hereof and notwithstanding any other provision of this Agreement to the contrary, the Special Limited Partner shall have the right at any time after the end of the Compliance Period to require, by written notice to the Administrative General Partner (the "Required Sale Notice"), that the Administrative General Partner promptly use its best efforts to obtain a buyer for the Apartment Complex on the most favorable terms then obtainable. The Partners agree that the Administrative General Partner shall not be obligated to expend more than an immaterial amount of Partnership funds to satisfy its obligation to use best efforts to sell the Apartment Complex as provided in the immediately preceding sentence. The Administrative General Partner shall submit the terms of any proposed sale to the Special Limited Partner for its approval as provided in Section 5.4.A hereof. If the Administrative General Partner shall fail to so obtain a buyer for the Apartment Complex within six months of the Required Sale Notice or if the Special Limited Partner in its sole discretion shall withhold its consent to any proposed sale to such buyer, then the Special Limited Partner shall have the right at any time thereafter to obtain a buyer for the Apartment Complex on terms acceptable to the Special Limited Partner (but not less favorable to the Partnership than any proposed sale previously rejected by the Special Limited Partner). In the event that the Special Limited Partner so obtains a buyer, it shall notify the Administrative General Partner in writing with respect to the terms and conditions of the proposed sale and each of the General Partners shall cause the Partnership promptly to sell the Apartment Complex to such buyer; provided that the Administrative General Partner shall have the right exercisable upon thirty days notice of receipt of the offer of such buyer, to purchase the Apartment Complex on the same terms and conditions as such offer, in which event the Administrative General Partner shall either (i) purchase the Apartment Complex within 120 days following its exercise of such right on the terms and conditions set forth in the offer or (ii) purchase the Limited Partner's and Special Limited Partner's interest in the Partnership for an amount equal to the amount the Limited Partner would have received had the Apartment Complex been sold and the Partnership was liquidated in accordance with Article XII hereof.

(iii)    A sale of the Apartment Complex prior to the end of the Compliance Period may only take place if the conditions of Section 42(j)(6) of the Code will be satisfied upon such sale either (a) by having the purchaser of the Apartment Complex post the required bond on behalf of the Partnership or (b) with the Consent of the Special Limited Partner, having the Partnership post such bond. Notwithstanding anything to the contrary contained in this Agreement, the Apartment Complex shall not be sold if such sale would cause a Tax Credit Recapture Event as such term is defined in the Recapture Guaranty Agreement attached as Exhibit I to the Contribution Agreement.

5.5    Restrictions on Authority. Notwithstanding any other provisions of this Agreement:

A.    No General Partner shall have authority to perform any act in violation of any applicable laws or regulations, the Project Documents or any agreement between the

5215/60851-045 LALIB1/508627 v7                    - 27 -

34

Partnership and any Authority or any Lender, or to take any action which under the Uniform Act or this Agreement requires the approval, ratification or consent of some or all of the Partners without first obtaining such approval, ratification or consent, as the case may be.

B.    The Managing General Partner shall not have authority to do any of the following acts, on behalf of or relative to the Partnership, except with the Consent of the Special Limited Partner and the Administrative General Partner and the approval, to the extent required, of any Authority and any Lender:

(i) acquire any real or personal property (tangible or intangible) in addition to the Apartment Complex, the aggregate value of which shall exceed $10,000 (other than easements or similar rights necessary or appropriate for the operation of the Apartment Complex);

(ii)    other than under the Construction Loan from Construction Lender, becoming personally liable on or in respect of, or guarantee, a Mortgage Note or a Mortgage or any other indebtedness of the Partnership (other than typical and customary exclusions from non-recourse provisions in real estate transactions, which exclusions would not cause such Mortgage Note to fail to qualify as non-recourse indebtedness for Federal income tax purposes);

(iii)    pay any salary, fees or other compensation to a General Partner or any Affiliate thereof, except as authorized by Section 5.7 or Articles VI, VIII or IX hereof or specifically provided for in this Agreement;

(iv)    sell all or any portion of the Apartment Complex or modify or refinance the Mortgage or incur any indebtedness for borrowed money except as specifically provided in this Agreement and subject to the provisions contained in Section 5.4 hereof;

(v)    terminate the services of the Accountants, the Architect, the Contractor or the Management Agent, or terminate, amend or modify the Construction Contract or any Project Document, or grant any material waiver or consent thereunder other than waivers or consents given in the ordinary day to day operations of a residential real estate project;

(vi)    engage a substitute Management Agent or approve the delegation by the Management Agent of all or a substantial portion of its duties to a third party;

(vii)    amend or terminate the Operating Deficit Guaranty Agreement or any of the Guaranties, or grant any waiver or consent thereunder;

(viii)    cause the Partnership to redeem or repurchase all or any portion of the Interest of a Partner;

(ix)    accept additional Capital Contributions other than those expressly provided for in this Agreement;

(x)    admit additional General Partners or Limited Partners to the Partnership except in accordance with the express terms hereof;

(xi)    cause the Partnership to convert the Apartment Complex to cooperative or condominium ownership;

(xii)    cause or permit the Partnership to be merged with any other entity;

(xiii)    cause or permit the Partnership to make loans to the General Partner or any Affiliate;

(xiv)    cause or permit the Partnership to take or omit or suffer any action that would result in a recapture of Credits previously recognized by the Partnership or a reduction (other than by reason of a reduction in the applicable percentage as defined under Section 42(b)(2)(A) of the Code) or disallowance of any Credits anticipated to be recognized by the Partnership as contemplated by Section 3.4.B hereof, other than an Unavoidable Event; or

(xv)    if reasonably requested by the Special Limited Partner, the Administrative General Partner shall cause the Partnership to make an election under Section 754 of the Code in connection with any transfer by the Limited Partner or Special Limited Partner of all or any part of its Interest.

The enumeration of the foregoing rights shall not diminish or affect the existence or exercise of other rights expressly granted to the Special Limited Partner elsewhere herein.  If the Managing General Partner wishes to take or refrain from taking any action which the Managing General Partner may only take or refrain from taking with the consent of the Administrative General Partner pursuant to this Section 5.5.B and the Managing General Partner and Administrative General Partner do not agree upon the propriety of taking or refraining from taking such action and such disagreement is not resolved within three (3) days after the Managing General Partner proposes to take or refrain from taking such action (or such shorter period of time as shall be necessary, in the reasonable opinion of the Special Limited Partner, to avoid negative consequences to the Partnership), the Special Limited Partner shall, upon notice to the Managing General Partner and the Administrative General Partner, determine whether the Partnership shall take or refrain from taking such action and the Managing General Partner and the Administrative General Partner shall be obligated to take or refrain from taking such action as determined by the Special Limited Partner.

5.6    Activities of Partners.  It is understood that the General Partners are and will be engaged in other activities and occupations unrelated to the Partnership, and the General Partners shall be required to devote such of its time as is necessary to properly conduct the affairs of the Partnership.  The General Partners shall provide to the Special Limited Partner financial statements prepared in accordance with generally accepted accounting principles within 90 days after the end of its Fiscal Year.  Any Partner may engage in and have an interest in other business ventures of every nature and description, independently or with others, including, but not limited to, the ownership, financing, leasing, operating, construction, rehabilitation, renovation, improvement, management and development of real property whether or not such real property is directly or indirectly in competition with the Apartment Complex; provided, however, that nothing herein  shall be construed to relieve a General Partner of any of its fiduciary obligations with respect to the management, financing and disposition of the Apartment Complex.  Neither the Partnership nor any other Partner shall have any rights by virtue of this Agreement in and to such independent ventures or the income or profits derived therefrom, regardless of the location of such real property and whether or not such venture was presented to such Partner as a direct or indirect result of his connection with the Partnership or the Apartment Complex.

5.7 <u>Dealing with Affiliates</u>. Subject to the restrictions contained in this Agreement, the General Partners may, for, in the name and on behalf of, the Partnership, enter into agreements or contracts for performance of services for the Partnership as an independent contractor with a General Partner or an Affiliate thereof and the General Partners may obligate the Partnership to pay compensation for and on account of any such services; provided, however, that unless the terms of such compensation and/or services are specified in this Agreement, (x) such compensation and services shall be on terms not less favorable to the Partnership than if such compensation and services were paid to and/or performed by a person who was not a General Partner or an Affiliate thereof, and (y) after full and accurate disclosure to the Special Limited Partner of the interest of the General Partner, the Consent of the Special Limited Partner to the provision of such services by such Affiliate shall have been obtained.

5.8 <u>Indemnification and Liability of the General Partners</u>.

A. To the maximum extent permitted by law and this Section 5.8, the Partnership, its receiver or its trustee (but only to the extent of the assets of the Partnership), shall indemnify, defend and hold harmless the General Partners and their respective Affiliates from and against any liability, loss, expense or damage incurred by them by reason of any act performed or omitted to be performed by them pursuant to the authority granted to them by this Agreement, including costs and reasonable attorneys' fees and any amount expended in the settlement of any claim of liability, loss, expense or damage; provided, however, that (i) if such liability, loss, expense or damage arises out of any action or inaction of any Affiliate, such action or inaction must have occurred while such party was engaged in activities which could have been engaged in by a General Partner in its capacity as such; (ii) if such liability, loss or damage arises out of any action or inaction of the General Partner or its Affiliates, (a) the General Partners or their Affiliates must have determined, in good faith, that such course of conduct was in the best interests of the Partnership and (b) such course of conduct did not constitute fraud, gross negligence or willful misconduct by the General Partners or their Affiliates or a material breach of a material provision of this Agreement; and (iii) any such indemnification shall be recoverable only from the assets of the Partnership (including the proceeds of insurance policies obtained by the Partnership) and not from the assets of any Partner. All judgments against the Partnership and the General Partners or their Affiliates, wherein the General Partners or their Affiliates are entitled to indemnification, must first be satisfied from Partnership assets before such General Partner or their Affiliates are responsible for these obligations. The Partnership shall not pay for any insurance covering liability of the General Partners or their Affiliates for actions or omissions for which indemnification is not permitted hereunder; provided, however, that nothing contained herein shall preclude the Partnership from purchasing and paying for such types of insurance, including extended coverage liability and casualty and workers' compensation, as would be customary for any person owning comparable assets and engaged in a similar business, or from naming the General Partners or their Affiliates as additional insured parties thereunder, if such addition does not add to the premiums payable by the Partnership. Nothing contained herein shall constitute a waiver by any Investor Limited Partner of any right which it may have against any party under Federal or state securities laws nor shall an Investor Limited Partner be permitted to contract away the fiduciary duty owed to it by the General Partners or their Affiliates under common law. The provision of advances from the Partnership to the General Partners or their Affiliates for legal expenses and other costs incurred as a result of a legal action is permissible if the following three conditions are satisfied: (I) the legal action relates to the performance of duties or services by the General Partners or their Affiliates on behalf of the Partnership; (II) the legal action is initiated by a third party who is not an Investor Limited Partner of the Partnership or a beneficial owner thereof; and (III) the General Partner or its Affiliates receiving such advances undertake to repay to the Partnership the funds so advanced in cases in which they would not be entitled to indemnification hereunder. Notwithstanding anything to the contrary contained herein, in no event shall any indemnity under this

Section 5.8.A be applicable to any expenditures or obligations of any General Partner or Affiliate thereof which are the subject of a separate obligation or guaranty to the Partnership or the Investor Limited Partners by such General Partner or an Affiliate thereof.

B.      Notwithstanding the provisions of Section 5.8.A hereof, the General Partners and their Affiliates shall not be indemnified or held harmless pursuant to Section 5.8.A hereof from any liability, loss or damage incurred by them in connection with, and shall indemnify, defend and hold harmless the Partnership and the other Partners from and against any liability, loss or damage incurred by them by reason of, (i) any liability for fraud, gross negligence or willful misconduct; or (ii) any claim or settlement involving allegations that federal or state securities laws associated with the offer and sale of an Interest were violated by the General Partner or its Affiliates unless: (a) the indemnitee is successful in defending such action on the merits of each count involving securities laws violations and such indemnification is specifically approved by a court of competent jurisdiction; (b) such claims have been dismissed with prejudice on the merits by a court of competent jurisdiction and the court specifically approves such indemnification; or (c) a court of competent jurisdiction approves a settlement of the claims against the entity seeking indemnification involving securities law violations and finds that indemnification of the settlement and related costs should be made. Notwithstanding the foregoing, HCA shall only be required to indemnify, defend and hold harmless the Partnership and the other Partners from and against any liability, loss or damage incurred by them by reason of HCA's fraud, gross negligence or willful misconduct.

5.9     Representations and Warranties.

A.      The Administrative General Partner hereby  represents and warrants to each of the other Partners that the following are true and accurate as of the Admission Date and will be true and accurate on the due date of any payment of Capital Contributions to the Partnership:

(i)     The execution and delivery of all instruments and the performance of all acts heretofore or hereafter made or taken pertaining to the Partnership or the Apartment Complex by the Administrative General Partner or by each Affiliate of the Administrative General Partner which is a corporation or a partnership have been or will be duly authorized by all necessary corporate or partnership actions, as the case may be, or other action and the consummation of any such transactions with or on behalf of the Partnership will not constitute a breach or violation of, or a default under, the charter or by-laws, or partnership agreement, of the Administrative General Partner or such Affiliate or any agreement by which the Administrative General Partner or such Affiliate or any of its properties is bound, nor constitute a violation of any law, administrative regulation or court decree.

(ii)    No Bankruptcy has occurred with respect to the Administrative General Partner or any Affiliates thereof which have or are presently performing services on behalf of the Partnership.

(iii)   As of the Admission Date all accounts of the Partnership required to be maintained under the terms of the Project Documents, including, without limitation, any account for replacement reserves, are currently funded to required levels, including levels required by any Authority.

(iv)    Except for the items in the budget paid for by the Administrative General Partner on behalf of the Partnership prior to closing the Construction Loan, which amounts shall be repaid to the Administrative General Partner out of the initial

funding of the Construction Loan, no Administrative General Partner has lent or otherwise advanced any funds to the Partnership other than its Capital Contribution and the Partnership has no unsatisfied obligation to make any payments of any kind to any General Partner or any Affiliate thereof outstanding as of the Admission Date.

(v)     To the best knowledge of the Administrative General Partner, no event has occurred which with the giving of notice, the passage of time, or both, would constitute a material default under any of the Project Documents.

(vi)    Each of the representations and warranties contained in the Contribution Agreement, made by the Administrative General Partner, or by the Project Partnership is true and correct on the date hereof as if made on and as of such date.

(vii)   The Partnership is acquiring the Capital Note without a view to the sale or distribution thereof and without any present intention of distributing or selling the same. The Partnership agrees that it (and any holder of any interest in the Capital Note other than the Construction Lender) will not sell, assign or otherwise transfer its interest in the Capital Note (or any fraction thereof) without the Consent of the Special Limited Partner and unless such transfer shall be in full compliance with all applicable securities laws and regulations. The Special Limited Partner consents to the assignment and pledge by the Partnership of the Capital Note and the Pledge Agreement and the Partnership's rights thereunder to the Construction Lender as collateral security for the Construction Loan given by the Construction Lender to any subsequent transfer thereof in connection with the Construction Lender's exercise of its remedies under the Project Documents.

(viii)  To the best knowledge of the Administrative General Partner, each of the representations and warranties contained in the Contribution Agreement made by the Managing General Partner is true and correct on the date hereof as if made on and as of such date.

B.      The Managing General Partner hereby represents and warrants to each of the other Partners that the following are true and accurate as of the Admission Date and will be true and accurate on the due date of any payment of Capital Contributions to the Partnership:

(i)     The execution and delivery of all instruments and the performance of all acts heretofore or hereafter made or taken pertaining to the Partnership or the Apartment Complex by the Managing General Partner or by each Affiliate of the Managing General Partner which is a corporation or a partnership have been or will be duly authorized by all necessary corporate or partnership actions, as the case may be, or other action and the consummation of any such transactions with or on behalf of the Partnership will not constitute a breach or violation of, or a default under, the charter or by-laws, or partnership agreement, of the Managing General Partner or such Affiliate or any agreement by which the Managing General Partner or such Affiliate or any of its properties is bound.

(ii)    No Bankruptcy has occurred with respect to the Managing General Partner or any Affiliates thereof which have or are presently performing services on behalf of the Partnership.

(iii)   The Managing General Partner has not lent or otherwise advanced any funds to the Partnership other than its Capital Contribution and the Partnership has no unsatisfied obligation to make any payments of any kind to the Managing General Partner or any Affiliate thereof outstanding as of the Admission Date.

(iv)   To the Managing General Partner's current actual knowledge, no event has occurred which with the giving of notice, the passage of time, or both, would constitute a material default under any of the Project Documents.

(v)   To the Managing General Partner's current actual knowledge, the Partnership is acquiring the Capital Note without a view to the sale or distribution thereof and without any present intention of distributing or selling the same.

(vi)   The Managing General Partner is a non-profit corporation which qualifies under Section 501(c)(3) of the Code. To the Managing General Partner's current actual knowledge, the Apartment Complex will upon Completion qualify for, and shall thereafter during the Compliance Period, continue to qualify for an exemption from the payment of property taxes pursuant to Section 214 of the California Revenue and Taxation Code. The General Partners and the Management Agent shall ensure that the Partnership takes all actions to obtain and retain such qualification. In furtherance thereof, the General Partners shall ensure and cause the Management Agent to ensure that twenty percent (20%) or more of the occupants of the Apartment Complex are lower income households whose rent does not exceed that prescribed by Section 50053 of the California Health and Safety Code and ensure, and provide such certifications as shall be necessary under applicable law certifying that the funds that would have been necessary to pay property taxes are used to maintain the affordability of, or reduce rents for, the units occupied by lower income households as such term is defined in Section 50079.5 of the California Health and Safety Code. Copies of all such certification shall be delivered for the Consent of the Special Limited Partner not later than twenty (20) days before such certifications are required to be delivered to the appropriate governmental authority.

5.10   Additional Covenants of General Partners. The General Partners shall permit, and shall cause the Management Agent to permit, the Special Limited Partner and its representatives to have access to the Apartment Complex and personnel employed by the Partnership and by the Management Agent who are concerned with management of the Apartment Complex at all reasonable times during normal business hours and to examine all agreements and plans and specifications and shall deliver to the Special Limited Partner such copies of such documents and such reports as may reasonably be required by the Special Limited Partner. The General Partners shall promptly upon transmission or receipt provide the Special Limited Partner with (i) copies of all material correspondence, notices and reports sent pursuant to and received under the Project Documents or any Authority with respect to the Apartment Complex, (ii) copies of all other correspondence relating to or affecting the Credits and (iii) such other correspondence, notices or reports that, in the case of (i), (ii) or (iii), a prudent investor in the position of the Investor Limited Partners might reasonably be expected to wish to examine in connection with the transaction.

5.11   Obligation to Repair and Rebuild Apartment Complex. With the approval of any Lender and any Authority, if such approval is required, any insurance proceeds received by the Partnership due to fire or other casualty affecting the Apartment Complex occurring during the Compliance Period or any condemnation proceeds received by the Partnership due to any full or partial taking pursuant to any eminent domain proceeds or inverse condemnation action during the Compliance Period will be utilized to repair and rebuild the Apartment Complex in satisfaction of the conditions contained in Section 42(j)(4) of the Code and to the extent required by any Lender and any Authority. Any such proceeds received in respect of such an event occurring after the Compliance Period shall be so utilized or, if permitted by the Project Documents and with the Consent of the Special Limited Partner, treated as Sale or Refinancing Proceeds.

## ARTICLE VI

### CERTAIN PAYMENTS

6.1     Developer Fee.  As consideration for the services of Bighorn Affordable Communities, Inc., a California corporation ("Bighorn" or the "Developer") to the Partnership in connection with the development of the Apartment Complex, the Partnership shall pay to Bighorn a developer fee of $1,129,833 (the "Developer Fee").  Such Developer Fee shall be in no event in excess of the amount permitted by CTCAC and shall be payable entirely out of the proceeds of the Limited Partner's Capital Contribution, the proceeds of the Construction Loan and Permanent Loan after payment of all costs and expenses in connection with the operation and construction of the Apartment Complex and to the extent that the Limited Partners' Contributions and the proceeds of the Construction Loan and the Permanent Loan after payment of such costs and expenses, are not sufficient to pay such fee, the unpaid amount shall bear interest at the applicable long term federal rate, compounded semi-annually (the "Deferred Developer Fee).  The Partnership shall be obligated to pay the Deferred Developer Fee from Cash Flow and Sale or Refinancing Transaction Proceeds pursuant to Article IX hereof.  If the full amount of the Deferred Developer Fee is not paid by the Partnership on or prior to the fifteenth anniversary of Completion (the "Developer Fee Maturity Date"), the Administrative General Partner shall make a capital contribution to the Partnership equal to the outstanding balance (including accrued but unpaid interest) of the Deferred Developer Fee on the Developer Fee Maturity Date, which Capital Contribution shall be applied to satisfy the outstanding balance of the Deferred Developer Fee.  Notwithstanding the foregoing, if the Apartment Complex has a qualified basis which allows the Partnership to claim the entire Credit Amount without the need for the full Developer Fee, then in the sole and absolute discretion of the Special Limited Partner, the Administrative General Partner shall have the right to reduce, waive or defer the Developer Fee payable to Bighorn in the amount not needed; provided, however, that any such reduction, waiver or deferral does not adversely affect the amount of Credits or timing available to the Partnership.

6.2     Annual Local Administrative Fee.  For its services in monitoring the operations of the Partnership, the Partnership shall pay to the Special Limited Partner an Annual Local Administrative Fee in the amount of $5,000 per annum beginning on the Admission Date, which amount shall be cumulatively increased by two percent (2%) per annum, provided that, if in any year there are not sufficient funds to pay such fee after payment of all operating expenses of the Project, then, in such event such fee shall accrue and be payable out of available Cash Flow in subsequent years or if there is no available Cash Flow, out of Sale or Refinancing Transaction Proceeds but shall be a legal obligation only if paid to the extent Cash Flow or Sale or Refinancing Transaction Proceeds are available.

6.3     MGP Fee.

A.  For its services in managing the Partnership, supervising the social services programs at the Project and overseeing the Management Agent, the Managing General Partner shall receive from the Partnership a one-time setup fee of $25,000 payable at Closing and an annual fee in the amount of $15,000 ("MGP Fee") beginning on the Completion Date, provided that if in any year there are not sufficient funds to pay such fee after payment of all operating expenses of the Project, then, in such event such fee shall accrue and be payable out of available Cash Flow pursuant to Section 9.2.A in subsequent years or if there is no available Cash Flow out of Sale or Refinancing Transaction Proceeds but shall be a legal obligation only if paid to the extent Cash Flow or Sale or Refinancing Transaction Proceeds are available. Beginning in the second year after the Property is placed in service, the MGP Fee shall be increased on an annual basis in the same proportion that the gross rents collectible from tenants at the Property have increased from the previous year, provided that such increase in the MGP Fee is included in a budget Consented to by the Special Limited Partner pursuant to Section 5.2.C hereof.

B.  No fees or reimbursements payable to the Managing General Partner pursuant to this Section 6.3 shall be made if the payment of such fees or reimbursements violate the Project Documents.

6.4     Supervisory Management Fee.  In consideration for administrative services rendered hereunder, the Administrative General Partner shall receive from the Partnership a Supervisory Management Fee for each year during which it is a General Partner hereunder in an amount equal to 80% of the Cash Flow otherwise available for distribution to the Partners pursuant to Section 9.2.A (the "Supervisory Management Fee"). In no event shall the Supervisory Management Fee exceed eight percent (8%) of Gross Effective Income per year determined on a cumulative noncompounded basis (the "Supervisory Management Fee Cap"), i.e, to the extent that the amount of such fee in any year is greater than 8% of Gross Effective Income for any year, the difference between 8% of Gross Effective Income and the amount of such fee for such year shall be carried forward to a subsequent year in determining the Supervisory Management Fee, subject to the 8% cap.  Payment of such fee shall be subject to any applicable requirements of the Construction Lender or Permanent Lender.

ARTICLE VII

ACCOUNTING, REPORTS, BOOKS,
BANK ACCOUNTS AND FISCAL YEAR

7.1     Bank Accounts.  The bank accounts of the Partnership shall be maintained in such banking institutions authorized to do business in the State or such other states as permitted by each Authority and as the General Partner shall determine with the Consent of the Special Limited Partner, and withdrawals shall be made on such signature or signatures as the General Partner shall determine.  The Partnership's funds shall not be commingled with the funds of any other Person and shall not be used except for the business of the Partnership.  All deposits (including security deposits and other funds required to be placed in escrow by any Authority or any Lender and other funds not needed in the operation of the Partnership's business) shall be deposited, to the extent permitted by each Authority, in interest-bearing accounts or invested in obligations of or guaranteed by the United States, any state thereof, or any agency, municipality or other political subdivision of any of the foregoing, commercial paper (investment grade), certificates of deposit and time deposits in commercial banks with capital in excess of $50,000,000 and in mutual (money market) funds investing in any or all of the

foregoing; provided, however, that any funds required to be placed in escrow by any Authority shall be controlled by such Authority, and the General Partner shall not be permitted to make any withdrawal from such funds without the express written consent of such Authority to the extent required.

       7.2    <u>Books of Account; Fiscal Year</u>.  Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Partnership, shall be kept or caused to be kept by the Administrative General Partner.  Subject to the requirements of the Code the books shall be kept on an accrual basis of accounting, and the Fiscal Year of the Partnership shall be the taxable year required to be used by the Limited Partner for federal income tax purposes.  All of the Partnership's books of account, together with an executed copy of this Agreement and all Project Documents and copies of such other instruments as the General Partners may execute hereunder, including amendments thereto, shall at all times be kept at the principal office of the Partnership and shall be available during normal business hours for inspection by any Partner or his duly authorized representative or, at the expense of any Partner, for audit by him or his duly authorized representative.

       7.3    <u>Reports</u>.

       A.    Within 45 days after the end of each of the first three quarters on each Fiscal Year, the Administrative General Partner shall have prepared and shall deliver to the Investor Limited Partners, commencing with the first quarterly period ending after the Admission Date, (i) a balance sheet and statements of income (or loss) and changes in financial position and Cash Flow for, or as of the end of, such quarter in customary form and substance (or in such form and substance as the Special Limited Partner shall reasonably request so as to facilitate the Limited Partner's filings with the Securities and Exchange Commission and any other filings required by law), none of which need be audited unless required by law, together with a report of other pertinent information regarding the Partnership and its activities during such quarter, including, but not limited to, a statement of the amount of all fees and other compensation paid by the Partnership during such quarter to the General Partners or any of their Affiliates, and (ii) a certificate of the Administrative General Partner that each of the Eligible Units which is then occupied qualifies as a "low income unit" under section 42 of the Code.

       B.    The Administrative General Partner shall, at the Partnership's expense, send to each Investor Limited Partner such tax information as shall be necessary for inclusion by each Partner in its Federal income tax returns and required state income tax and other tax returns. The Administrative General Partner shall send this information within 45 days after the end of each Fiscal Year.

       C.    Within 60 days after the end of each Fiscal Year of the Partnership, the Administrative General Partner shall, at the Partnership's expense send to the Investor Limited Partners (i) the balance sheet of the Partnership as of the end of such Fiscal Year and statements of income (loss), Partners' equity and cash flows for such Fiscal Year, all of which shall be prepared in accordance with generally accepted accounting principles consistently applied and shall be accompanied by a report of the audit of the Accountants for the Partnership reflecting no limitations as to the scope of the Accountant's audit of such statements, and (ii) a statement of Cash Flow for such Fiscal Year (which need not be audited), showing distributions in respect of such Fiscal Year, which statement shall identify distributions from (a) Cash Flow generated during the Fiscal Year, (b) Cash Flow generated during prior Fiscal Years, (c) proceeds from the disposition of property and investments and (d) reserves and other sources.

       D.    If the Administrative General Partner shall fail, for any reason, to deliver to the Investor Limited Partners when due any of the information or statements required by this

5215/60851-045 LALIB1/508627 v7       - 36 -

Section 7.3, the Partnership shall pay the Investor Limited Partners, as liquidated damages for such failure, an amount equal to $100 for each day that elapses after the respective due date until such information or statements have been delivered to the Investor Limited Partners; provided, however, that upon the first time the Administrative General Partner shall fail to deliver any such reports when due, the Special Limited Partner shall as a condition to requiring the payment of such amount, provide five (5) days grace period after written notice for such information or statement to be delivered to the Investor Limited Partners and if such information or statement (i) are delivered within such five (5) days period, then no such payments shall be payable and (ii) are not delivered within such five (5) day period, then such $100 per day payment shall be payable from the date originally due.  Thereafter no notice or grace period shall be required.  The Administrative General Partner hereby guarantees the payment of any amount due to the Investor Limited Partners by the Partnership under this Section 7.3.D; provided, however, that such payments shall not be deemed to be either a capital contribution or a loan from the General Partner and that neither the Partnership nor any Investor Limited Partner shall be under any obligation to repay any such amount paid by the Administrative General Partner.

7.4     Other Reports.  The Administrative General Partner shall submit an occupancy report in the form of Exhibit D annexed hereto to Related Capital Company Asset Management Group via telecopy not later than close of business on the fifth day of each month following Completion.  The General Partner shall from time to time submit to the Partners such other written reports and information regarding the operations of the Partnership (including the Budget) as may be reasonably required by the Limited Partners to satisfy their reporting requirements to their partners or governmental authorities.  During the construction of the Apartment Complex, the Administrative General Partner shall send copies of the monthly construction requisitions simultaneously with the delivery of such requisitions to the Lender to the Special Limited Partner, c/o Ronne Thielen at Related Capital Company, 18201 Von Karman Avenue, Suite 400, Irvine, California 92612 and Pond Robinson & Associates, LLC, Attn: David Othold, 7676 Hillmont, Suite 204, Houston, Texas 74040.  The Administrative General Partner shall provide to the Partners by November 30 of each Fiscal Year an estimate of each Partner's share of profits and losses for Federal and state income tax purposes for such Fiscal Year.

7.5     Tax Returns and Tax Treatment.  The Administrative General Partner shall, for each Fiscal Year, file on behalf of the Partnership a United States Partnership Return of Income within the time prescribed by law for such filing.  The Administrative General Partner shall also file on behalf of the Partnership such other tax returns and other documents from time to time as may be required by the Federal government or by any state or any subdivision thereof.  All tax returns shall be prepared by the Accountants.  The Administrative General Partner shall provide a draft copy of the Partnership's federal income tax return to the Special Limited Partner for its review and consent (which shall not be unreasonably withheld) within 45 days after the expiration of each Fiscal Year.  Within 10 days of the receipt of the Special Limited Partner's consent, the Partnership shall provide to the Investor Limited Partners all information concerning the Partnership that is necessary for the preparation of the Investor Limited Partners' federal income tax return.

7.6     Publicity.  The Administrative General Partner agrees to provide the Special Limited Partner with notice at least two (2) weeks in advance, of any groundbreaking, ribbon-cutting or other public relations ceremony or event for the Apartment Complex or the Partnership.  The Administrative General Partner shall invite the Limited Partner (which invitation may also be extended by the Limited Partner to representatives of any corporate investors in the Limited Partner) to attend such ceremony.  The Administrative General Partner shall, if requested by the Limited Partner on a timely basis, duly recognize both the Limited Partner, Related Capital Company, and any corporate investor in the Limited Partner designated for such recognition by the Limited Partner as an equity investor in the Apartment Complex and,

if applicable, the attendance of such representatives at such ceremony or event.  If requested by the Limited Partner, the Administrative General Partner shall include on any signage at the site of the Apartment Complex during the period prior to Completion which includes in such signage participants in the financing of the Apartment Complex, the Limited Partner, Related Capital Company and/or any corporate investors in the Limited Partner designated for such recognition by the Limited Partner, as equity investors in the Apartment Complex.

ARTICLE VIII

MANAGEMENT AGENT

8.1     Management Agent and Management Fee.

A.      The Managing General Partner shall have the responsibility for managing the Apartment Complex and obtaining a management agent (the "Management Agent"), the choice of which with respect to any successor to the Management Agent at the Admission Date shall be made with the Consent of the Special Limited Partner after accurate and complete disclosure to the Special Limited Partner of any affiliation between the General Partner and such successor.  The Management Agent at the Admission Date is The CBM Group, Inc. and is not an affiliate of the General Partners.

B.      The Management Agent shall receive a management fee payable by the Partnership on an annual basis in an amount not to exceed $32 per apartment unit per month for management services in accordance with the Management Agreement as approved by each Authority (if such approval is necessary) which is intended to be executed by the Partnership; provided, however, if the Management Agent is an Affiliate of either of the General Partners that 40% of such management fee with respect to any Fiscal Year of the Partnership shall not become due and payable unless the Partnership has positive Cash Flow with respect to that Fiscal Year, and any unpaid portion of such management fee may be payable from positive Cash Flow of the Partnership in future Fiscal Years of the Partnership or from Sale or Refinancing Transaction Proceeds.  The term of any Management Agreement shall not exceed one year without the Consent of the Special Limited Partner, and no payment or penalty shall be payable by the Partnership for failure to renew any such agreement.  Upon direction of the Special Limited Partner, but only with the consent of the Lenders, if required, the General Partner shall take such action as may be required under the terms of the Management Agreement to terminate the Management Agreement.

C.      The General Partners will have the duty to manage the Apartment Complex during any period when there is no Management Agent and the Partnership will pay the General Partners for such services an annual management fee equal to such amount as each Authority shall approve (but not in excess of the fee set forth in Section 8.1.B hereof) from time to time or, if no approval is required, a fee equal to the amounts set forth in Section 8.1.B hereof. If at any time the present Management Agent shall cease to act as the Management Agent, the General Partners shall be authorized, subject to the Consent of the Special Limited Partner and the approval of each Authority and Lender (if required) to retain and to enter into a Management Agreement with a different Management Agent on terms at least as favorable to the Partnership as the terms and conditions of the Management Agreement with the present Management Agent.

D.      Subject to the approval of each Authority, if required, the Special Limited Partner shall have the right, in the event a General Partner is removed as General Partner pursuant to Section 11.4 hereof, to terminate the Management Agreement and every other contract between the Partnership and Affiliates of such General Partner so removed, upon not less than 30 days' written notice to the Party contracting with the Partnership.  All existing

5215/60851-045 LALIB1/508627 v7            -  38  -

contracts between the Partnership and Affiliates of the General Partner have been amended to contain this right and the General Partner covenants not to enter any future contract with any of its Affiliates which does not contain such right.

## ARTICLE IX

### PROFITS AND LOSSES; DISTRIBUTIONS

9.1    Allocations of Profits and Losses.

For tax and accounting purposes, Profits and Losses of the Partnership for each Fiscal Year shall be allocated to the respective classes of Partners as follows:

A.    Subject to Section 9.3 hereof, Profits other than those arising from a Sale or Refinancing Transaction shall be allocated as follows:

(i)    First, 99.98% to the Limited Partner, .01% to the Special Limited Partner and .01% to the General Partner until the Limited Partner has been allocated, during the existence of the Partnership, an amount equal to the aggregate Losses previously allocated to the Limited Partner pursuant to Section 9.1.C(i) hereof (to the extent such aggregate Losses are greater than the aggregate allocations of Profits allocated to the Limited Partner pursuant to this Section 9.1.A(i), Section 9.1.A(iii), Section 9.1.B(i) and Section 9.1.B(iii)), provided, however, if at any time the Limited Partner shall have a Adjusted Capital Account Deficit, then Profits shall be allocated only to the Limited Partner pursuant to this Section 9.1.A (i) until such Adjusted Capital Account Deficit is eliminated;

(ii)    Next, to the General Partner until the General Partner has been allocated cumulative Profits under this Section 9.1.A(ii)equal to the cumulative Losses allocated to the General Partner pursuant to Section 9.1.E(ii) to the extent such Losses are attributable to but not in excess of the Operating Loans;

(iii)    Thereafter, 49.99% to the Limited Partner, 0.01% to the Special Limited Partner and 50.00% to the General Partner.

B.    Subject to Section 9.3 hereof, Profits arising from a Sale or Refinancing Transaction shall be allocated as follows:

(i)    First, 99.98% to the Limited Partner, 0.01% to the Special Limited Partner and .01% to the General Partner until the Limited Partner has been allocated an amount equal to the aggregate Losses previously allocated to the Limited Partner pursuant to Section 9.1.C hereof, to the extent such aggregate Losses are less than the aggregate allocations of Profits allocated to such Partners pursuant to Section 9.1.A(i) hereof and this Section 9.1.B(i); and

(ii)    Thereafter, 19.99% to the Limited Partner, 0.01% to the Special Limited Partner and 80% to the General Partner.

C.    (i)    Subject to Section 9.3 hereof, Losses shall be allocated 0.01% to the General Partner, 99.98% to the Limited Partner and 0.01% to the Special Limited Partner.

(ii)     The Losses allocated pursuant to this Section 9.1.C shall not exceed the maximum amount of Losses that can be so allocated without causing any Investor Limited Partner to have an Adjusted Capital Account Deficit at the end of any Fiscal Year of the Partnership. All Losses in excess of the limitations set forth in this Section 9.1.C(ii) shall be allocated to the General Partner.

D.     Intentionally Omitted.

E.     (i)     Nonrecourse Deductions for any Fiscal Year of the Partnership or other period shall be specially allocated 99.98% to the Limited Partner, 0.01% to the Special Limited Partner and .01% to the General Partner.

(ii)     Any Partner Nonrecourse Deductions for any Fiscal Year of the Partnership or other period shall be specially allocated to the Partner who bears the risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Section 1.704-2 of the Regulations. If with respect to any Fiscal Year the Guarantor (or the General Partner) shall make Operating Loans or shall otherwise be required to advance operating deficits on behalf of the Partnership, it shall be deemed that such Operating Loans or such other advances were first applied to the payment of deductible expenses with respect to such Fiscal Year up to the aggregate amount of such Operating Loans and/or such advances, and the deductions for such expenses shall be allocated to the General Partner. To the extent possible, the General Partner shall not be allocated deductions attributable to Depreciation. If such Operating Loans or other advances with respect to any Fiscal Year shall exceed the deductible expenses allocable to the General Partner pursuant to this subparagraph, the General Partner shall be allocated deductible expenses (not attributable to Depreciation) in subsequent Fiscal Years until the aggregate amount of deductions allocated to the General Partner is equal to the amount of Operating Loans or other operating deficit advances.

F.     All Credits shall be allocated in accordance with the manner in which Depreciation is allocated. In the event there occurs a recapture of Credits previously allocated among the Partners, the responsibility for the recapture of such Credits shall be allocated among the Partners in proportion to the amount of Credits originally allocated to each Partner. All deductions for charitable contributions made by the Partnership shall be allocated 99.98% to the Limited Partner, 0.01% to the Special Limited Partner and .01% to the General Partner.

G.     Notwithstanding anything to the contrary contained herein, during any Fiscal Year allocations of Profits or Losses which do not arise from a Sale or Refinancing Transaction pursuant to the provisions contained herein shall be made before allocations of Profits or Losses arising from a Sale or Refinancing Transaction.

H.     Where a distribution of an asset is made in the manner described in Section 734 of the Code, or where a transfer of an Interest permitted by this Agreement is made in the manner described in Section 743 of the Code, the Partnership shall file, upon the request of the Special Limited Partner, an election under Section 754 of the Code, in accordance with the procedures set forth in the applicable Regulations. To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) or 743(b) of the Code is required, pursuant to Section 1.704-(b)(2)(iv)(m) of the Regulations, to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be

adjusted pursuant to such Section of the Regulations.  Subject to Section 5.2 hereof, all other elections required or permitted to be made by the Partnership under the Code shall be made in such manner as, in the opinion of the Special Limited Partner with the advice of the Accountants and legal counsel for the Partnership, will be most advantageous to the Limited Partner.

I.      Except as otherwise provided herein, each Partner shall be allocated Profits and Losses in accordance with this Section 9.1 from the date on which it is admitted to the Partnership.  For purposes of determining the Profits, Losses, or any such other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the General Partner using any permissible method under Section 706 of the Code and the Regulations promulgated thereunder.

J.      Except as otherwise provided in this Agreement, all items of Partnership distributions, income, gain, loss, deduction, and any other allocations not otherwise provided for herein shall be divided among the Partners in the same proportions as they share Profits or Losses, as the case may be, for the Fiscal Year of the Partnership.  The Administrative General Partner and the Managing General Partner shall share all items of Partnership income again, loss, deduction, credit in the following proportion:  Administrative General Partner - 99%; Managing General Partner - 1%.

K.      Intentionally Omitted.

L.      If any fee or other compensation payable from the Partnership to a Partner or an Affiliate of a Partner is treated as a distribution for income tax purposes, there shall be allocated to the recipient Partner or Affiliate of a Partner an amount of gross income equal to the amount of such payment in the year in which such payment is made or in the first succeeding year in which the Partnership realizes income.

9.2     <u>Distribution and Application of Cash Flow and Proceeds From Sale or Refinancing Transactions</u>.  Except as otherwise provided by this Agreement or required by law (including all applicable rules, directives and regulations of each Authority), or the Project Documents, cash distributions shall be made to the Partners on the following bases within 60 days after the end of each Fiscal Year:

A.      Cash Flow shall be applied in the following order of priority:

(i)     To repay any loan payable to any Partner other than a General Partner;

(ii)    To the Partners, an amount or amounts equal to the unpaid balance of any Voluntary Loan made by them;

(iii)   To the Management Agent, an amount equal to any accrued management fees pursuant to the terms of Section 8.1.B hereof;

(iv)    To the Special Limited Partner, until the Special Limited Partner has received the Annual Local Administrative Fee together with an amount equal to any accrued Annual Local Administrative Fees pursuant to the terms of Section 6.2 hereof;

(v)     ~~To the Managing General Partner, to pay the MGP Fee;~~

See 1st Am LPA

(vi)   To repay interest and principal due under the Deferred Developer Fee, as and when due and payable;

(vii)   To the extent of fifty percent (50%) of the remaining Cash Flow, to the Guarantor, in repayment of any Operating Loans made by the Guarantor;

(viii)   To the Administrative General Partner, an amount equal to the Supervisory Management Fee; and

(ix)   The balance, 49.99%, to the Limited Partner, 50% to the General Partner and 0.01% to the Special Limited Partner.

B.   Subject to the provisions of Sections 9.2.D and 12.4 hereof, Sale or Refinancing Transaction Proceeds shall be applied in the following order of priority:

(i)   To the payment of all of the expenses of such Sale or Refinancing Transaction, and, with regard to damage recoveries or insurance or condemnation proceeds (other than for temporary loss of use), to the payment of all repairs, replacements or renewals resulting from damage to or partial condemnation of the affected property;

(ii)   To the payment of all debts and obligations of the Partnership due upon the occurrence of such Sale or Refinancing Transaction other than amounts owing to Partners;

(iii)   To establish such reserves as the General Partner in its reasonable discretion determines to be reasonably necessary for any contingent or foreseeable liability or obligation of the Partnership; provided, however, that the balance of any such reserve remaining at such time as the General Partner shall reasonably determine that such reserve is no longer necessary shall be distributed in accordance with subparagraphs (iv) through (ix) of this Section 9.2.B;

(iv)   To repay any loan payable to any Partner other than a General Partner;

(v)   To the Partners, an amount or amounts equal to the unpaid balance of any Voluntary Loan made by them;

(vi)   To the Managing General Partner, to pay the MGP Fee;

(vii)   To the Developer, an amount or amounts equal to the unpaid balance of the Deferred Developer Fee;

(viii)   To the Guarantor, an amount or amounts equal to the unpaid balance of any Operating Loan made by them;

(ix)   The balance, if any, 19.99% to the Limited Partner, .01% to the Special Limited Partner and 80% to the General Partner.

C.   Except as otherwise provided in this Section 9.2, each Partner shall share in distributions in accordance with this Section 9.2 from the date on which such Partner is admitted to the Partnership.

D.     In the event that the amount of the Credits finally allowed to the Partnership and allocated to the Investor Limited Partners during any calendar year during the Credit Period with respect thereto starting with 2003 is less than the Credit Amount (as adjusted pursuant to Section 3.4.B(i)) for such year multiplied by 0.9999 ("Investor Credit Amount") for any reason other than a voluntary transfer by the Investor Limited Partners of their Interests in the Partnership or a change in the Code which eliminates the availability of Credits to the Partnership or otherwise makes it practically impossible for the Partnership to be able to claim Credits, including, without limitation, the failure of the Partnership to operate the Apartment Complex so as to have 100% of the apartment units therein eligible for Credits for any such year, the "Return Amount" shall be calculated.  The "Return Amount" shall be an amount equal to the excess of (a)(I) the amount, if any, by which the appropriate Investor Credit Amount exceeds the amount of Credits finally allowed to the Partnership and allocated to the Investor Limited Partners with respect to any such calendar year plus (II) 11% per annum thereon calculated from the end of the calendar year in question until the Return Amount is paid as provided herein, over (b)(I) the amount, if any, by which the Credits finally allowed to the Partnership with respect to any other calendar year during the Credit Period exceeds the appropriate Investor Credit Amount plus (II) 11% per annum thereon calculated from the end of the calendar year in question until the Return Amount is paid as provided herein.  If the Partnership claims Credits for less than 12 calendar months with respect to any taxable year, then the calculation of the Return Amount with respect to such taxable year shall be made by proportionally prorating the appropriate Investor Credit Amount.  ~~At the time of distribution of any Sale or Refinancing Transaction Proceeds pursuant to Section 9.2.B hereof, there shall be distributed to the Limited Partner, out of any Sale or Refinancing Transaction Proceeds or other amounts that would otherwise have been~~ See 1st Am LPA ~~distributed or paid to the General Partner under such section an amount equal to the Return Amount, before the General Partner shall be distributed or paid any such proceeds pursuant to such section.~~  For purposes of this Section 9.2.D, a Credit with respect to a taxable year shall be deemed finally allowed upon the latest to occur of the following:  (I) the period for assessment of a deficiency for such taxable year shall have expired without a deficiency being assessed by the Internal Revenue Service against any Partner with respect to the Credit claimed by the Partnership for such taxable year; or (II) if such deficiency is so assessed, the determination by the Internal Revenue Service as to the amount of the Credit for such taxable year is no longer subject to petition to the United States Tax Court; or (III) if a petition with respect to such determination is filed with such court, a decision by such court as to the amount of the Credit for such taxable year becomes final and not subject to appeal; or (IV) if an appeal from such decision is filed, a decision of a court upon such appeal becomes final and not subject to further appeal.  Any Credits which are recaptured pursuant to Section 42 of the Code, other than due to an Assignment of an Interest or a disposition of the Apartment Complex that occurs with the Consent of the Special Limited Partner, shall be deemed to have been not finally allowed for purposes of this Section 9.2.D.  Notwithstanding the foregoing, the Return Amount will not include the amount of any Credits allocated to the Investor Limited Partners and subsequently recaptured by the Investor Limited Partners, so long as all amounts due the Investor Limited Partners in respect of such recaptured Credits were paid by the Guarantor under the Recapture Guaranty Agreement.

9.3     Overriding Allocations of Profits and Losses.

A.     (i)   Notwithstanding anything contained in Section 9.1 hereof or this Section 9.3 to the contrary, if there is a net decrease in Partnership Minimum Gain during any taxable year of the Partnership, except as otherwise permitted by Sections 1.704-2(f)(2), (3), (4) and (5) of the Regulations, items of Partnership income and gain for such taxable year (and subsequent years, if necessary) in the order provided in Section 1.704-2(j)(2)(i) of the Regulations shall be allocated among all Partners whose shares of Partnership Minimum Gain decreased during that year in proportion to and to the extent

of such Partner's share of the net decrease in Partnership Minimum Gain during such year. The allocation contained in this Section 9.3.A(i) is intended to be a minimum gain chargeback within the meaning of Section 1.704-(2) of the Regulations, and shall be interpreted consistently therewith. Thereafter, subject to Section 9.3.F hereof, all Profits and Losses shall be allocated as provided for in Sections 9.1, 9.3.A(ii), 9.3.B, 9.3.C, 9.3.D and 9.3.E hereof.

(ii)   Notwithstanding anything contained in Section 9.1 hereof or this Section 9.3 to the contrary, except Section 9.3.A(i) hereof, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain during a taxable year of the Partnership, then there shall be allocated to each Partner who has a share of the Partner Nonrecourse Debt Minimum Gain determined in accordance with Section 1.704-2(i)(5) of the Regulations, items of income and gain for such taxable year (and, if necessary, subsequent taxable years), in the order provided in Section 1.704-2(j)(2) of the Regulations, equal to such Partner's share of the net decrease in Partner Nonrecourse Debt Minimum Gain during such year as specified in Section 1.704-2(i)(5) of the Regulations, unless an exception specified in Section 1.704-2(i)(4) of the Regulations applies. The allocation contained in this Section 9.3.A(ii) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Regulations, and shall be interpreted consistently therewith. Thereafter, subject to Section 9.3.F hereof, all Profits and Losses shall be allocated as provided for in Sections 9.1, 9.3.B, 9.3.C, 9.3.D and 9.3.E hereof.

(iii)   The Partnership Minimum Gain and, accordingly, the minimum gain chargeback requirement amount for each partner as of the date of this Agreement, shall be zero (0).

B.   Notwithstanding any provisions of Section 9.1 hereof or this Section 9.3 to the contrary, in the event any Partner unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Partnership income and gain (including gross income) shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Partner as quickly as possible, provided that an allocation pursuant to this Section 9.3.B shall be made only if and to the extent that such Partner would have an Adjusted Capital Account Deficit. In the event that any such adjustments, allocations or distributions create an Adjusted Capital Account Deficit for more than one Partner in any taxable year of the Partnership, all such items of income and gain of the Partnership for such taxable year and all subsequent taxable years shall be allocated among all such Partners in proportion to their respective Adjusted Capital Account Deficits in such amount and manner sufficient to eliminate such Adjusted Capital Account Deficits as quickly as possible. The allocation contained in this Section 9.3.B is intended to be a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii)(d) of the Regulations, and shall be interpreted consistently therewith. Thereafter, subject to Section 9.3.F hereof, all Profits and Losses shall be allocated as provided for in Sections 9.1, 9.3.C, 9.3.D and 9.3.E hereof.

C.   Intentionally Omitted.

D.   Notwithstanding any provisions of Section 9.1 hereof or this Section 9.3 to the contrary, but subject to the provisions of Sections 9.3.A, 9.3.B and 9.3.C hereof:

(i)   (a)   in accordance with Section 704(c) of the Code and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be

5215/60851-045 LALIB1/508627 v7                    -  44  -

allocated among the Partners as provided in Section 704(c) of the Code so as to take account of any variation between the adjusted basis of such property to the Partnership for Federal income tax purposes and its initial Gross Asset Value; (b) in the event the Gross Asset Value of any Partnership asset is adjusted as provided herein, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for Federal income tax purposes and its Gross Asset Value in the same manner as under Section 704(c) of the Code and the Regulations promulgated thereunder; and (c) any elections or other decisions relating to the allocations provided in this Section 9.3.D(i) shall be made by the General Partner with the Consent of the Special Limited Partner as provided in Section 704(c) of the Code in any manner that reasonably reflects the purpose and intention of this Agreement; allocations pursuant to this Section 9.3.D(i) are solely for purposes of Federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provisions of this Agreement;

(ii)   the General Partner shall be allocated an amount of deductions equal to any interest expense allowed to the Partnership in connection with any Operating Loans;

(iii)   in the event that the General Partner is allocated more than 1% of the Losses pursuant to Section 9.1.C(ii) hereof, the General Partner shall thereafter be allocated all Profits to the extent that the aggregate Losses theretofore allocated to the General Partner pursuant to the last clause of Section 9.1.C(ii) hereof shall have exceeded the Losses that would have otherwise theretofore been allocated to the General Partner had the provisions of the last clause of Section 9.1.C(ii) hereof not been given effect;

(iv)   Intentionally Omitted.

(v)   to the extent the Partnership has taxable interest income with respect to any promissory note issued by a partner pursuant to Section 483, Sections 1271 through 1288 or Section 7872 of the Code:

(a)   such interest income shall be specially allocated to the Partner to whom such promissory note relates; and

(b)   the amount of such interest income shall be excluded from the Capital Contributions credited to such Partner's Capital Account in connection with payments of principal with respect to such promissory note; and

E.   (i)   The "Regulatory Allocations" consist of the "Basic Regulatory Allocations," as defined in Section 9.3.E(ii) hereof, the "Nonrecourse Regulatory Allocations," as defined in Section 9.3.E(iii) hereof, and the "Partner Nonrecourse Regulatory Allocations," as defined in Section 9.3.E(iv) hereof.

(ii)   The "Basic Regulatory Allocations" consist of (a) allocations pursuant to the last sentence of Section 9.1.C(ii) hereof, and (b) allocations pursuant to Sections 9.1.G, 9.3.B, and 9.3.E(iv) hereof.  Notwithstanding any other provision of this Agreement, other than the Regulatory Allocations, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of such allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that

5215/60851-045 LALIB1/508627 v7                     - 45 -

would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred. For purposes of applying the foregoing sentence, allocations pursuant to this Section 9.3.E(ii) shall only be made with respect to allocations pursuant to Section 9.1.G hereof to the extent the General Partner reasonably determines that such allocations will otherwise be inconsistent with the economic agreement among the Partners.

(iii)    The "Nonrecourse Regulatory Allocations" consist of all allocations pursuant to Sections 9.1.E(i) and 9.3.A(i) hereof. Notwithstanding any other provision of this Agreement, other than the Regulatory Allocations, the Nonrecourse Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of such allocations of other items and the Nonrecourse Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Nonrecourse Regulatory Allocations had not occurred. For purposes of applying the foregoing sentence, (a) no allocations pursuant to this Section 9.3.E(iii) shall be made prior to the taxable year of the Partnership during which there is a net decrease in Partnership Minimum Gain, and then only to the extent necessary to avoid any potential economic distortions caused by such net decrease in Partnership Minimum Gain, and (b) allocations pursuant to this Section 9.3.E(iii) shall be deferred with respect to allocations pursuant to Section 9.1.E(i) hereof to the extent the General Partners reasonably determine that such allocations are likely to be offset by subsequent allocations pursuant to Section 9.3.A(i) hereof.

(iv)    The "Partner Nonrecourse Regulatory Allocations" consist of all allocations pursuant to Sections 9.1.E(ii) and 9.3.A(ii) hereof. Notwithstanding any other provision of this Agreement, other than the Regulatory Allocations, the Partner Nonrecourse Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of such allocations of other items and the Partner Nonrecourse Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Partner Nonrecourse Regulatory Allocations had not occurred. For purposes of applying the foregoing sentence, (a) no allocations pursuant to this Section 9.3.E(iv) shall be made with respect to allocations pursuant to Section 9.1.E(ii) hereof relating to a particular Partner Nonrecourse Debt prior to the taxable year of the Partnership during which there is a net decrease in Partner Minimum Gain attributable to such Partner Nonrecourse Debt, and then only to the extent necessary to avoid any potential economic distortions caused by such net decrease in Partner Minimum Gain, and (b) allocations pursuant to this Section 9.3.E(iv) shall be deferred with respect to allocations pursuant to Section 9.1.E(ii) hereof relating to a particular Partner Nonrecourse Debt to the extent the General Partner reasonably determines that such allocations are likely to be offset by subsequent allocations pursuant to Section 9.3.A(ii) hereof.

(v)    The General Partners shall have reasonable discretion, with respect to each taxable year of the Partnership, to (a) apply the provisions of Sections 9.3.E(ii), (iii) and (iv) hereof in whatever order is likely to minimize the economic distortions that might otherwise result from the Regulatory Allocations, and (b) divide all allocations pursuant to Sections 9.3.E(ii), (iii) and (iv) hereof among the Partners in a manner that is likely to minimize such economic distortions.

(vi)    To the extent that Section 9.1 hereof in any of its subsections provides for references to the allocation of Profits or Losses pursuant to particular subsections within Section 9.1 hereof, including, without limitation, the aggregate Profits or Losses

previously allocated pursuant to a subsection, such subsection references shall be deemed to incorporate allocations of Profits or Losses pursuant to this Section 9.3 to the extent that the allocation of Profits or Losses pursuant to this Section 9.3 is of the same category of Profits or Losses.

F.     Notwithstanding anything to the contrary contained herein, Sections 9.3.A and 9.3.B hereof shall be applied in the order provided in Section 1.704-2 of the Regulations.

E.     Any allocations made pursuant to this Section 9.3 shall be taken into account in the making of subsequent allocations under other sections of this Article IX in a manner that will, to the maximum extent possible, avoid or eliminate duplicative or excessive allocations of income to any Partner.

9.4     Certain Additional Allocations.

A.     For income tax purposes, if the Partnership in any year realizes income or is allowed a deduction (including additional depreciation or amortization as a result of adding an item to its basis) as a result of the transfer of an Interest or the transfer of an interest in property to or from a Partner, the difference between the amount taken into account for tax purposes and the amount otherwise taken into account under this Agreement shall be allocated solely to such Partner.

B.     All Profits and Losses arising from the investment of Capital Contributions and loan proceeds shall be allocated to the Administrative General Partner.

C.     Solely for purposes of determining a Partner's proportionate share of the "excess nonrecourse liabilities" of the Partnership within the meaning of Section 1.752-3(a)(3) of the Regulations, the Partner's interests in Partnership Profits are as provided in Section 9.1.B(i) hereof.

D.     To the extent permitted by Sections 1.704-2(h) and 1.704-2(i)(6) of the Regulations, the General Partners shall endeavor to treat distributions of Cash Flow or Sale or Refinancing Transaction Proceeds as having been made from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for the General Partners.

E.     The Partners are aware of the income tax consequences of the allocations made by this Article IX and hereby agree to be bound by the provisions of this Article IX in reporting their shares of Partnership income and loss for income tax purposes.

## ARTICLE X

## TRANSFER OF LIMITED PARTNER INTERESTS

10.1     Assignment of Limited Partner Interests.   The Limited Partner and the Special Limited Partner shall have the right at any time after all payments due under the Capital Note have been satisfied to make an Assignment of their Interests without the consent or approval of the General Partner or any other Partner.   The General Partner shall cooperate with the Limited Partner and the Special Limited Partner in facilitating such Assignment by promptly furnishing complete and accurate financial and other relevant data regarding the Partnership, the Apartment Complex, the General Partner and the Affiliates of the General Partner and any other

5215/60851-045 LALIB1/508627 v7                    - 47 -

matters reasonably necessary in the judgment of the Special Limited Partner to facilitate and effect such Assignment. Each Assignee of an Interest transferred in accordance with this Section 10.1 shall be automatically admitted to the Partnership as a Substituted Partner without necessity of the General Partners' approval; provided, however, that each Substituted Limited Partner or Substituted Special Limited Partner shall execute such instrument or instruments as shall be required by the General Partners to signify its agreement to be bound by all the provisions of this Agreement, the Project Documents, if required, and shall pay reasonable legal fees and filing costs in connection with its substitution as a limited partner hereunder. The Limited Partner and the Special Limited Partner shall notify the General Partners as to any proposed Assignment of their Interests. Notwithstanding the foregoing, the Limited Partner and the Special Limited Partner may assign their interests to any Affiliate of Related Capital Company pursuant to documents substantially in the form of those attached hereto as Exhibit E and such Assignee shall become a Substituted Partner without the necessity of obtaining the consent of the General Partner.

Notwithstanding any language to the contrary contained herein, (i) the Investor Limited Partners may pledge their interest to Fleet National Bank, individually and as agent for other lenders ("Fleet"), to secure a loan to the Limited Partner in order to enable the Limited Partner to make its Capital Contribution to the Partnership, the Partners hereby acknowledge and consent to any such pledge to Fleet, and Fleet may have all or any rights of a secured party under the Uniform Commercial Code, as adopted and as may be amended, of the State of New York (the "NY UCC") to retain or sell the Limited Partners' Interest and (ii) within twelve (12) months from the date hereof, the Limited Partners may assign their interests to an Affiliate, each of whom shall be a Substituted Partner without the consent of the General Partner or the necessity to satisfy the provisions of Section 10.2 or 10.3 below. Notwithstanding anything to the contrary in this Agreement, if Fleet or its designee or assignee becomes an Assignee as a result of the foregoing pledge, it shall immediately, unconditionally and automatically be admitted as a Substituted Partner with all the rights and obligations of the Investor Limited Partners. With respect to the Interests of the Investor Limited Partners, for so long as such Interests are pledged to Fleet and are not released in accordance with the terms of such pledge, (i) such Interests will not be, and will not become, "investment property" and will be and will remain "general intangibles" within the meaning of Article 9 of the NY UCC, and (ii) any action by any Partner of the Partnership, to cause any such Interests to be deemed to be or to be treated as "security" or as "investment property" within the meanings of Article 8 and Article 9, respectively, of the NY UCC, shall be null and void and of no effect unless (a) Fleet (if it is the pledgee of such Interest at the time of such action) has consented to such action, (b) such Interests are certificated, and (c) any certificates evidencing Interests are delivered to Fleet together with assignments executed in blank by the holders of such Interests.

10.2    Substituted Partners; Admission.

A.    The General Partner may not admit any additional partners to the Partnership without the Consent of the Special Limited Partner.

B.    Any Assignee shall not be admitted as a Substituted Partner unless (i) the Assignee expressly agrees to be bound, to the same extent as the Assignor, by the provisions of this Agreement, the Project Documents and any other documents required in connection therewith and to assume the obligations of the Assignor hereunder and (ii) the Assignee shall have agreed to pay all reasonable expenses and legal fees relating to the Assignment and its admission as a Substituted Partner.

C.    Upon the admission of a Substituted Partner, Schedule A shall be amended to reflect the name and address of such Substituted Partner and to eliminate the name

and address of the Assignor, and an amendment to this Agreement reflecting such admission shall be filed in accordance with the Uniform Act. No consent or approval of the Limited Partner or Special Limited Partner (other than the Assignor and the Assignee) shall be required.

      10.3     <u>Assignees</u>.

      A.     Any Person who acquires in any manner whatsoever any Interest, irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefit of the acquisition thereof to have agreed to be subject to and bound by all the obligations of this Agreement that any predecessor in interest of such Person was subject to or bound by. A Person acquiring an Interest, including the personal representatives and heirs of a deceased Partner, shall have only such rights, and shall be subject to all the obligations, as are set forth in this Agreement; and, without limiting the generality of the foregoing, such Person shall not have any right to have the value of his Interest ascertained or receive the value of such Interest or, in lieu thereof, profits attributable to any right in the Partnership, except as herein set forth.

      B.     Any Assignee of an Interest pursuant to an Assignment satisfying the conditions of this Article X who does not become a Substituted Partner in accordance with this Article X shall have the right to receive the same share of the Profits and Losses and distributions of the Partnership to which its Assignor would have been entitled. If such Assignee desires to make an Assignment of its Interest, it shall be subject to all the provisions of this Article X to the same extent and in the same manner as any Partner desiring to make an Assignment.

      C.     Any Partner who shall Assign all of its Interest shall cease to be a Partner and shall no longer have any rights or privileges of a Partner except that, unless and until its Assignee is admitted to the Partnership as a Substituted Partner in accordance with this Article X, such Assignor shall retain all rights and be subject to all obligations under the Uniform Act and this Agreement.

      D.     In the event of an Assignment, the obligation of the Assignor to make Capital Contributions hereunder shall be extinguished only by and to the extent of Capital Contributions made by its Assignee.

      E.     In the event that an Assignment shall be made, there shall be filed with the Partnership a duly executed and acknowledged counterpart of the instrument making such Assignment. Such instrument must evidence the written acceptance of the Assignee to all the terms and provisions of this Agreement. If such an instrument is not so filed, the Partnership need not recognize any such purported Assignment for any purpose. The General Partner acknowledges receipt of the pledges of the Interests to Fleet referred to in Section 10.1 above.

      F.     Upon any Assignment, the assignor or assignee shall, upon request of the General Partner, provide to the Partnership an opinion of counsel reasonably satisfactory to the General Partners stating that the Assignment does not violate the registration provisions of any applicable federal or state securities laws.

## ARTICLE XI

### WITHDRAWAL OF A GENERAL PARTNER; NEW GENERAL PARTNER

11.1    Withdrawal.

A.    A General Partner may not Withdraw (other than an Involuntary Withdrawal) from the Partnership or Assign, pledge or encumber all or any part of its General Partner Interest without the Consent of the Special Limited Partner, and, to the extent required, of each Authority and each Lender. The consent of the Limited Partner shall not be required. For purposes of this Agreement, the sale, transfer, or other conveyance, or the pledge or encumbering, of any share of capital stock of a General Partner which constitutes a change in the Persons controlling a General Partner shall be deemed an Assignment by that General Partner of its General Partner Interest; provided, however, that the General Partner may pledge its General Partner Interest to any Lender as provided in the Loan Documents with such Lender approved by the Special Limited Partner.

B.    A General Partner shall indemnify and hold harmless the Partnership and all Partners from any Withdrawal of such General Partner or Assignment in violation of Section 11.1.A hereof or in violation of any of the Project Documents. In the event of a Withdrawal of a General Partner (other than an Involuntary Withdrawal) or the Assignment, pledge or encumbrance of any part of its General Partner Interest in violation of Section 11.1.A hereof, the Interest of the General Partner who so Withdrew, Assigned, pledged or encumbered any part of its Interest shall immediately and automatically terminate on the effective date of such Withdrawal (or the effective date of such Assignment, pledge or encumbrance) and such General Partner shall have no further right to participate in the management or operation of the Partnership or to receive any future allocations of Profits and Losses, any distributions from the Partnership or any other funds or assets of the Partnership nor shall it be entitled to receive or to be paid by the Partnership any further payment of fees (including fees which have been earned but are unpaid) or to be repaid any outstanding advances or loans made by it to the Partnership. From and after the effective date of such Withdrawal, Assignment, pledge or encumbrance, the rights of the Withdrawing General Partner to receive or to be paid such allocations, distributions, funds, assets, fees or repayments shall be reallocated to the other General Partner or General Partners, or if the Special Limited Partner becomes a general partner of the Partnership at that time, to the Special Limited Partner. Notwithstanding such Withdrawal, Assignment, pledge or encumbrance, and loss of any right to receive such allocations, distributions, funds, assets, fees and repayments, the Withdrawing General Partner shall remain liable to the Partnership and the other Partners for all obligations theretofore incurred by it under this Agreement, which may arise upon such Withdrawal, Assignment, pledge or encumbrance. Notwithstanding anything herein to the contrary, any remaining Partner shall have all other rights and remedies against the Withdrawing General Partner as provided by law.

C.    Upon the Involuntary Withdrawal of a General Partner, its General Partner Interest shall automatically become an Interest of a Class B Limited Partner. Until the purchase of such Class B Limited Partner Interest shall occur pursuant to the provisions of Section 11.3.B hereof, the Class B Limited Partner shall be entitled to be repaid any outstanding advances or loans made by the Withdrawing General Partner to the Partnership and to share in the Profits and Losses and distributions at the same times and in the same manner as the Withdrawing General Partner would have otherwise received as a General Partner, but shall not be entitled to participate in the management of the Partnership's business or to participate in any allocation of profits and losses and distributions payable to the Limited Partner or the Special Limited Partner.

11.2    Effect of Withdrawal; Election to Continue Business.  Upon the occurrence of an event giving rise to a Withdrawal of a General Partner, (A) any remaining General Partner, if any, or, if there be no remaining General Partner, the Withdrawing General Partner or its legal representative shall promptly notify the Investor Limited Partners of such Withdrawal (the "Withdrawal Notice") and (B) the Special Limited Partner shall have the right to become an additional General Partner and to become the Managing General Partner if the Withdrawing General Partner was previously the Managing General Partner and (C) the Partnership shall be dissolved and its assets liquidated unless the then General Partner or all of the then General Partners elect to continue the business of the Partnership; provided, however, such election may not be made upon the occurrence of the events described in Section 12.1.E. The Withdrawal of a General Partner shall not be deemed to be effective until the expiration of 90 days from the day on which the Withdrawal Notice has been mailed to the Investor Limited Partners, unless the Special Limited Partner shall have elected to become an additional General Partner as provided herein, whereupon the withdrawal of that General Partner shall be deemed effective upon the notification of all the other Partners by the Special Limited Partner of such election.  A Withdrawn General Partner shall remain liable for obligations incurred by it under this Agreement through the effective date of its Withdrawal, even if such Withdrawal shall be an Involuntary Withdrawal and in compliance with or in violation of this Agreement, but shall not be liable for any obligations of the Partnership arising or accruing after the date of such Withdrawal.

11.3    Formation of New Partnership.

A.      Subject to the provisions of Section 11.1.A hereof, upon the occurrence of an event giving rise to the Withdrawal of a General Partner, if there is then no other General Partner, or, if there is then one or more other General Partners, but the remaining General Partner or General Partners or but the Special Limited Partner do not elect to continue the business of the Partnership pursuant to Section 11.2 hereof, the Investor Limited Partners may elect within 120 days thereafter to form a new partnership on substantially identical terms to those of this Agreement to carry on the business of the Partnership. In so doing, the Investor Limited Partners shall designate a successor general partner to serve in place of the Withdrawing General Partner with the approval of each Authority and each Lender, if such approval is required; provided, however, that no Person shall be designated or admitted as a successor general partner if he is an individual and he is below the age of majority in the State or has theretofore been adjudged insane or incompetent, and unless, in the opinion of the Partnership's counsel, such Person has a financial net worth to satisfy the financial net worth requirements of the Internal Revenue Service for the Partnership to continue to be treated as a partnership for Federal income tax purposes.

B. (i) If the Investor Limited Partners shall designate a successor general partner and obtain all necessary approvals therefor, the Class B Limited Partner Interest of the Withdrawing General Partner where the Withdrawal was Involuntary hereof shall be transferred to the successor general partner upon its written assumption of the obligations of the Withdrawing General Partner under this Agreement (except for any obligations of the Withdrawing General Partner under this Agreement specifically excepted by the Special Limited Partner).  In such event, the successor general partner shall pay to the Withdrawing General Partner or its legal representative as the purchase price for its Class B Limited Partner Interest an amount to be agreed upon between them.

(ii)    If a General Partner is removed pursuant to Section 11.4.C hereof, the Partnership shall purchase the Interest of such General Partner for an amount to be agreed upon between the Withdrawing General Partner and the Special Limited Partner.  If such Withdrawing General Partner and the Special Limited Partner cannot agree upon the consideration for the transfer of such Interest within 60 days after such removal,

consideration therefor shall be the fair market value of such Interest as determined by a committee of three qualified real estate appraisers, one selected by the Withdrawing General Partner, one selected by the Special Limited Partner and a third selected by the other two real estate appraisers (or, if the first two real estate appraisers cannot agree upon the third real estate appraiser within 30 days, such third appraiser shall be selected by the American Arbitration Association), less the value of any Interest given to induce a substitute general partner to take over the obligations of the removed general partner and the damages payable by the removed general partner (to the extent not paid by such removed general partner). The purchase of the Withdrawing General Partner's Interest under this Section 11.3.B(ii) shall take place within ten days after the purchase price is determined (whether by agreement or appraisal), and the closing shall take place at the office of the Special Limited Partner. The purchase price for such Interest shall be payable in full by delivery of a promissory note bearing interest at a rate equal to the Prime Rate and payable solely out of Sale or Refinancing Transaction Proceeds, shall be secured by the Interest being purchased and shall otherwise be without recourse to the Partners.

(iii)     Unless any other General Partner shall agree to continue the Partnership pursuant to Section 11.2 hereof, the Interest of such other General Partner other than the Withdrawing General Partner shall be converted into and shall be deemed to be that of a Class B Limited Partner with the same interest in the Partnership as such General Partner had as a general partner prior to the Withdrawal (as reduced in the manner set forth in Section 11.3.B(iv) hereof).

(iv)     If no agreement can be reached as to the amount of the purchase price for the Class B Limited Partner Interest of the Withdrawing General Partner under Section 11.3(B)(i) hereof and if the successor general partner does not own a 1% interest in all material items of profits and losses and distributions of the Partnership, each limited partner of the Partnership (including the Person succeeding to the Interest of the Withdrawing General Partner as a Class B Limited Partner and any other Class B Limited Partner) shall transfer a pro rata portion of his Interest to the successor general partner in an amount sufficient to give the successor general partner such 1% interest and the successor general partner shall pay to each limited partner of the Partnership (including the Person succeeding to the Interest of the Withdrawing General Partner as a Class B Limited Partner and any other Class B Limited Partner) as the purchase price for his Interest, an amount determined by the Special Limited Partner.

C.     In exercising the election permitted under Section 11.3.A hereof, the successor general partner and all the limited partners of the Partnership agree to be bound by the provisions of this Agreement; provided, however, that if this Agreement is amended by them, no amendment shall be made without the Consent of the Special Limited Partner and unless counsel to the Partnership shall issue an opinion that the Partnership shall continue to be treated as a partnership for Federal income tax purposes; provided, further, however, that the amended agreement shall be as similar in form and substance to this Agreement as practicable and the successor partnership shall engage in the same business as the Partnership employing the assets and name of the Partnership to the extent possible.

D.     Any new limited partnership formed pursuant to this Section 11.3 shall succeed to all rights and assets of the Partnership subject to all liabilities of the Partnership. Each limited partner of the Partnership shall be a limited partner of any limited partnership formed pursuant to this Section 11.3 and agrees to execute all documents and take such further action as may be necessary in connection therewith. Until such time as the new limited partnership agreement is executed by all of the Partners, this Agreement shall continue to be binding on all of

the partners of the Partnership.  Upon execution of a declaration to be bound by the terms of this Agreement and delivery of such declaration to any Partner of the Partnership, the general partner of such hew limited partnership shall succeed to all the rights and liabilities of the then general partners of the Partnership under this Agreement.

11.4    Special Removal Rights.

A.    Notwithstanding any other provision of this Agreement to the contrary, in the event that

(i)    any General Partner shall:

(a)    materially violate its fiduciary responsibilities as a General Partner of the Partnership;

(b)    be in material breach of this Agreement or the Contribution Agreement or any of the Guaranties for ten days after notice thereof has been given by the Special Limited Partner; provided, however, that if such breach is of the type that cannot reasonably be cured within ten days, the Special Limited Partner shall not have the right to remove a General Partner under this Section 11.4.A(i)(b) with respect to such breach for a 60-day period after such notice is given so long as the General Partner is diligently pursuing a cure of such breach at all times during such 60-day period following delivery of notice and the expiration of any applicable cure period set forth herein or therein;

(c)    willfully and intentionally violate any law, regulation or order applicable to the Partnership which has a material adverse financial impact on the Partnership or the Apartment Complex; or

(d)    become Bankrupt;

(ii)    either:

(a)    the Partnership shall be in material breach of or have suffered a material event of default to occur under any Project Document (other than the Contribution Agreement) or any other material agreement or document affecting the Partnership or the Investor Limited Partners to which it is a party beyond the expiration of any applicable grace, cure or notice period; or

(b)    (I) at any time (v) prior to the commencement of the Guaranty Period, if the Guarantor is at such time in default of its obligations under the Development Deficit Guaranty Agreement, or (w) during the Guaranty Period if the Guarantor is at such time in default of its obligations under the Operating Deficit Guaranty Agreement, or (x) after termination of the Guaranty Period, the Partnership has realized a deficit in Cash Flow in each calendar month for a period of six consecutive months and such deficit has not been funded by a Voluntary Loan of the Administrative General Partner, (II) at any time after the Third Note Payment is due, the Apartment Complex shall have less than 95% of the Eligible Units eligible to receive the Credit in any month, (III) at any time the Partnership shall have had the qualified basis (as defined in Section 42 of the Code) of the Apartment Complex at the end of any taxable year prior to the taxable year starting January 1, 2014 be less than ninety-five percent (95%) of the amount of such basis at the close of the preceding tax year, or (IV) at any time the

Partnership shall otherwise be in any situation where the amount of the Credits which the Partnership is entitled to claim under Section 42 of the Code be less than ninety-five percent (95%) of the Credit Amount (as such number is adjusted pursuant to Section 3.4.B(ii) hereof) in any year during the Credit Period of the Partnership (other than any year therein in which Credits may not be claimed for 12 months because the first day of the Compliance Period was other than the first day of a calendar year);

(iii)    With respect to completion of the construction, if Completion shall not have occurred by June 1, 2003 (provided, however, that if Completion is delayed due to Unavoidable Events, such date may be extended for the period of time that such Unavoidable Events cause a delay in Completion to occur, but in no event longer than three months) unless the Interest of the Limited Partner is purchased by the Guarantor under the Development Deficit Guaranty Agreement; or

(iv)    (a)    a material uncured default exists under any material agreement or commitment entered into by the Partnership or binding thereon, or any such agreement or commitment shall have expired or shall have been terminated by any of the parties thereto and shall not have been extended after expiration of applicable grace, notice or cure periods, or (b) any Lender shall have commenced foreclosure proceedings against the Apartment Complex (whether judicial or otherwise), and such proceedings shall not have been stayed or dismissed within 90 days if such proceeding is commenced after the payment of the Third Note Payment or 30 days if such proceeding is commence prior to the payment of the Third Note Payment unless the Interest of the Limited Partner is purchased by the General Partner under the Development Deficit Guaranty Agreement;

then, in any such event (a "Major Default") the Special Limited Partner shall have the right, but not the obligation, in its sole discretion, (y) upon ten days' prior written notice to such General Partner, in the case of the occurrence of an event specified in Section 11.4.A(i)(a) and (c) or 11.4.A(ii), to remove such General Partner as General Partner of the Partnership and to appoint itself or any of its Affiliates to succeed such General Partner as a General Partner of the Partnership in accordance with the provisions of Section 11.2 hereof, and (z) upon written notice to the General Partner, in the case of the occurrence of an event specified in 11.4.A(i)(b), 11.4.A(iii), or 11.4.A(iv), to remove the General Partner as General Partner of the Partnership and to appoint itself or any of its Affiliates to succeed such General Partner as a General Partner of the Partnership in accordance with the provisions of Section 11.2 hereof. Upon the occurrence of a Major Default, each Partner hereby irrevocably constitutes and appoints the Special Limited Partner as its true and lawful attorney-in-fact and agent with full power and authority to act in its name, place and stead to execute, acknowledge, swear to, deliver, file, record and publish any documents which the Special Limited Partner reasonably deems necessary or appropriate to confirm and/or effect (x) the removal of the General Partner as General Partner of the Partnership and (y) the appointment of the Special Limited Partner or its designee as a General Partner of the Partnership including, without limitation:

(i)    To qualify or continue the Partnership as a limited partnership;

(ii)    To reflect a modification of the Partnership or an amendment to this Agreement or the Certificate in accordance with the terms hereof; and

(iii)    To effect transfers, admissions, withdrawals and substitutions of Partners as provided under the terms of this Agreement.

In lieu of exercising the right to remove the General Partner, the Special Limited Partner may elect to appoint itself or any of its Affiliates as an additional General Partner, in which event such

additional General Partner shall have the sole and exclusive right to take all actions to be taken by the General Partner hereunder until the events constituting a Major Event shall have been cured. If the right to admit an additional General Partner is exercised, each General Partner shall have the right to withdraw as a general partner of the Partnership upon obtaining consents to such withdrawal which may be required under the Project Documents.

B.     Each General Partner agrees to indemnify and hold the Investor Limited Partners harmless from and against all losses, costs and expenses incurred in connection with a Major Default by such General Partner pursuant to Section 11.4.A.(i)(a) and (c) and a willful and intentional breach pursuant to Section 11.4.A(i)(b) including, without limitation, all legal fees and other expenses of the Investor Limited Partners in connection with the removal of such General Partner (collectively, the "Removal Costs").

C.     The removal of a General Partner pursuant to Section 11.4.A hereof (other than Section 11.4.A(i)(d) hereof) shall be treated for purposes of this Agreement as a voluntary Withdrawal of such General Partner from the Partnership. The removal of a General Partner pursuant to Sections 11.4.A(i)(d) hereof shall be treated for purposes of this Agreement as an Involuntary Withdrawal of such General Partner from the Partnership, provided, however, that in all such cases, the Administrative General Partner shall still be entitled to any remaining unpaid payments due under the Deferred Developer Fee, as and when such payments become due, less the Removal Costs.

D.     If the General Partner which becomes subject to removal pursuant to Section 11.4.A(i) hereof is the Administrative General Partner, then the Special Limited Partner will also have the right to concurrently remove the Managing General Partner. If the General Partner which becomes subject to removal pursuant to Section 11.4.A(i) hereof is the Managing General Partner, subject to the Special Limited Partner's other rights pursuant to Section 11.4.A hereof, only the Managing General Partner may be removed. If the General Partners become subject to removal pursuant to Section 11.4.A(ii), (iii) or (iv) hereof, both General Partners will be subject to removal.

11.5    Additional General Partners. At any time, the General Partner, with the Consent of the Special Limited Partner and subject to any applicable approvals of each Authority and each Lender, may admit an additional general partner to the Partnership with such share of the aggregate General Partner Interest as shall be agreed upon between the General Partner and the additional general partner. Any additional general partner, as a condition of receiving any Interest, shall agree to be bound by the Project Documents and any other document required in connection therewith and by the provisions of this Agreement to the same extent and on the same terms as the General Partner.

11.6    Amendment of Schedule and Agreement. Upon the admission of a successor or additional general partner or the Withdrawal of a General Partner in accordance with the terms and conditions hereof, Schedule A attached hereto shall be amended to reflect such admission or Withdrawal and such amendment shall be filed as required by the Uniform Act.

11.7    Survival of Liabilities. It is expressly understood that no Withdrawal, Assignment, pledge or encumbrance of a General Partner's Interest, even if it results in the substitution of the Assignee as a Partner, shall release the Withdrawing General Partner from any liability to the Partnership resulting from events occurring prior to such withdrawal which shall survive such Withdrawal, Assignment, pledge or encumbrance, including those set forth in the Uniform Act.

11.8    Removal and Replacement of Managing General Partner. Notwithstanding anything to the contrary set forth above in this Article XI, so long as PDDC is

the Administrative General Partner, the Administrative General Partner shall have the right upon sixty (60) days prior written notice to the Managing General Partner and the Special Limited Partner to cause the removal of the Managing General Partner; provided, that concurrently with the Administrative General Partner's notice of removal, a non-profit corporation meeting the qualifications of Section 214 of the California Revenue and Taxation Code must be nominated by the Administrative General Partner as a successor Managing General Partner and (i) such successor Managing General Partner must be approved by the Special Limited Partner in writing, such approval not to be unreasonably withheld or delayed (such successor being hereinafter referred to as a "Qualified Successor"), (ii) such successor Managing General Partner must assume the duties and responsibilities of the removed Managing General Partner concurrently with such removal and (iii) the Managing General Partner shall be paid any accrued but unpaid MGP Fees, including a pro rata portion of the MGP Fee for the year of such removal, subject to Section 14.17, and if the Partnership does not then have sufficient Cash Flow to pay such accrued MGP Fee, the Administrative General Partner shall make a Voluntary Loan to the Partnership in an amount sufficient to pay such MGP Fee. Notwithstanding the foregoing, if each of the above qualifications are not met, the Administrative General Partner shall still have the right to remove the Managing General Partner upon sixty (60) days written notice to the Special Limited Partner and the Managing General Partner if (to the extent that prior to the removal of the Managing General Partner, the Partnership qualified for the welfare tax exemption because of the Managing General Partner being a qualifying non-profit corporation), concurrently with the delivery of the removal notice, the Administrative General Partner delivers in escrow to Proskauer Rose LLP or such other escrow holder designated by the Special Limited Partner ("Tax Escrow Holder") an amount the Special Limited Partner reasonably estimates to be equal to the real property taxes payable with respect to the Apartment Complex, assuming no exemption from the payment of such taxes is available pursuant to Section 214 of the California Revenue and Taxation Code for the immediately succeeding tax year. Thereafter on or before the first day of each subsequent tax year (i.e. July 1), until a Qualified Successor is admitted to the Partnership as the Managing General Partner, the Administrative General Partner shall deposit with the Tax Escrow Holder the amount that the Special Limited Partner reasonably estimates to be equal to the real property taxes payable with respect to the Apartment Complex for that tax year, each such deposit being referred to herein as a "Tax Payment." The Tax Escrow Holder shall deposit all Tax Payments in an interest bearing account, such interest being payable to the Administrative General Partner and shall pay such Tax Payments when directed by the Special Limited Partner to the County of Riverside Tax Collector in payment of the real property taxes assessed against the Apartment Complex. All Tax Payments shall be repaid to the Administrative General Partner, to the extent provided in Article IX herein as Operating Loans. Notwithstanding the foregoing, if the Administrative General Partner is obligated to make any Tax Payments hereunder, and the Special Limited Partner's estimate of the taxes to become due is less than the taxes eventually assessed against the Apartment Complex during the period that an exemption under Section 214 is not available, the Administrative General Partner shall immediately upon demand deposit with the Tax Escrow Holder the amount of such additional assessed taxes. In the event that the Managing General Partner is removed pursuant to this Section 11. or is otherwise a Withdrawing General Partner, until and unless a substitute Managing General Partner is admitted, the Administrative General Partner shall assume the duties and responsibilities and enjoy the rights of the Managing General Partner hereunder; provided that the Administrative General Partner shall not receive the MGP Fee and shall have no obligations to provide the social and community services that theretofore were provided by the Managing General Partner, except to the extent required by the CTCAC Regulatory Agreement.

        11.9    <u>Assignment of HCA's Interest</u>. Notwithstanding any language to the contrary herein, HCA may freely assign its Interest as Managing General Partner to an affiliate of HCA provided that such assignee is a non-profit corporation meeting the qualifications of Section 214 of the California Revenue and Taxation Code and such assignee assumes all of the duties and responsibilities of the Managing General Partner.

ARTICLE XII

DISSOLUTION AND TERMINATION OF THE PARTNERSHIP

12.1   Events Which Cause a Dissolution.  The Partnership shall continue in full force and effect until December 31, 2060, except that the Partnership shall be dissolved prior thereto upon the happening of any of the following events:

A.   An election to dissolve the Partnership made in writing by the General Partner, with the Consent of the Special Limited Partner;

B.   The Withdrawal of a General Partner if the Partnership is not continued in accordance with Section 11.2 hereof;

C.   Any event which shall make it unlawful for the existence of the Partnership to be continued; or

D.   The sale or other disposition of all or substantially all of the assets of the Partnership.

12.2   Actions of Liquidating Agent Upon Dissolution.  Upon the dissolution of the Partnership, the Partnership shall be liquidated in accordance with this Article XII and the Uniform Act.  The liquidation shall be conducted and supervised by the General Partner or, if there is no remaining general partner, by a person who shall be designated for such purpose by the Special Limited Partner (the General Partner, or such person so designated, being hereinafter referred to as the "Liquidating Agent").  The Liquidating Agent shall have all of the rights in connection with the liquidation and termination of the Partnership that a general partner would have with respect to the assets and liabilities of the Partnership during the term of the Partnership, and the Liquidating Agent is hereby expressly authorized and empowered to effectuate the liquidation and termination of the Partnership and the transfer of any assets and liabilities of the Partnership.  The Liquidating Agent shall have the right from time to time, by revocable powers of attorney, to delegate to one or more persons any or all of such rights and powers and the authority and power to execute documents in connection therewith, and to fix the reasonable compensation of each such person, which compensation shall be charged as an expense of liquidation.  The Liquidating Agent is also expressly authorized to distribute the Partnership's property to the Partners subject to liens.

12.3   Statements on Termination.  Each Partner shall be furnished with a statement prepared by the Liquidating Agent which shall set forth the assets and liabilities of the Partnership as at the date of complete liquidation, and each Partner's share thereof.  Upon compliance with the distribution plan set forth in Section 12.4 hereof, the Limited Partner and the Special Limited Partner shall each cease to be a partner of the Partnership, and the Liquidating Agent shall execute, acknowledge and cause to be filed a certificate of termination of the Partnership.

12.4   Priority on Liquidation; Distribution of Non-Liquid Assets.

A.   The Liquidating Agent shall, to the extent feasible, liquidate the assets of the Partnership as promptly as shall be practicable.  To the extent the proceeds are sufficient therefor, as the Liquidating Agent shall deem appropriate, the proceeds of such liquidation shall be applied in accordance with the provisions of Section 9.2.B(i) through (viii) hereof, and the balance of such proceeds shall be distributed by the Liquidating Agent to the Partners pro rata in accordance with their respective Capital Accounts, as such accounts are determined after all

adjustments are made as required herein to such accounts for the taxable year of the Partnership during which the liquidation occurs.

       B.     If the Liquidating Agent shall determine with the Consent of the Special Limited Partner that it is not feasible to liquidate all or part of the assets of the Partnership or that an immediate sale of all or part of such assets would cause an undue loss to the Partners, the Liquidating Agent shall cause the fair market value of the assets not so liquidated to be determined by independent appraisal. Such assets, as so appraised, shall be retained or distributed by the Liquidating Agent as follows (it being understood that the allocation of specific assets pursuant to this Section 12.4 shall require the Consent of the Special Limited Partner):

            (i) The Liquidating Agent shall retain assets having a value (which value shall be equal to the fair market value of such assets less the amount of any liability related thereto) equal to the amount by which the net proceeds of the liquidated assets are insufficient to satisfy the requirements of subparagraphs (i) through (viii) of Section 9.2.B hereof; and

            (ii)    Thereafter to the Partners pro rata in accordance with their respective Capital Accounts, as such accounts are determined after all adjustments are made as required herein to such accounts for the taxable year of the Partnership during which the liquidation occurs.

Any distribution of assets in kind shall be distributed on the basis of the fair market value thereof and any Partner entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Partners so entitled. If the Liquidating Agent, with the Consent of the Special Limited Partner, deems it not feasible to distribute to each Partner an aliquot share of each asset, the Liquidating Agent may allocate and distribute specific assets to one or more Partners as tenants-in-common as the Liquidating Agent shall determine with the Consent of the Special Limited Partner, taking into consideration, inter alia, the basis for tax purposes of each asset distributed and the effect of crediting or charging the Capital Accounts for any unrealized appreciation or unrealized depreciation.

       C.     Notwithstanding any other provision of this Article XII, in the event the Partnership is liquidated within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations but no Event specified in Section 12.1 hereof has occurred, the property of the Partnership shall not be liquidated, the Partnership's liabilities shall not be paid or discharged, and the Partnership's affairs shall not be wound up. Instead, the Partnership shall be deemed to have distributed its property in kind to the Partners, who shall be deemed to have assumed and taken subject to all Partnership liabilities, all in accordance with their respective Capital Accounts. Immediately thereafter, the Partners shall be deemed to have recontributed such property in kind to the Partnership, which shall be deemed to have assumed and taken subject to all such liabilities.

       12.5    Orderly Liquidation. A reasonable time shall be allowed for the orderly liquidation of the assets of the Partnership and the discharge of liabilities so as to minimize the losses normally attendant upon a liquidation.

       12.6    No Goodwill Value. At no time during continuation of the Partnership shall any value ever be placed on the Partnership name, or the right to its use, or to the goodwill appertaining to the Partnership or its business, either as among the Partners or for the purpose of determining the value of any Interest, nor shall the legal representatives of any Partner have any right to claim any such value. In the event of a termination and dissolution of the Partnership as provided in this Agreement, neither the Partnership name, nor the right to its use, nor the same goodwill, if any, shall be considered as an asset of the Partnership, and no valuation shall be put

thereon for the purpose of liquidation or distribution, or for any other purpose whatsoever; nor shall any value ever be placed thereon as between the remaining or surviving Partners and the legal representatives of the estate of any deceased, insane, incompetent, dissolved, liquidated or Bankrupt Partner.

## ARTICLE XIII

## FOREIGN PARTNERS

13.1    <u>Certification of Non-Foreign Status.</u>

A.      Each Partner shall upon acquiring a Partnership Interest certify that he is not a Foreign Person on forms to be provided by the General Partner at the time of subscription. At any time that an Interest is transferred or assigned, the transferee shall certify to non-foreign status prior to the transfer or assignment of such Interest.  Such certifications shall be made on a form to be provided by the General Partner.

B.      Each Partner shall notify the General Partner if he becomes a Foreign Person within 30 days of such change.

C.      Prior to a disposition of a United States Real Property Interest, a distribution attributable to a disposition of a United States Real Property Interest or any other distribution by the Partnership, each Partner may be required to certify to non-foreign status.

13.2    <u>Withholding of Certain Amounts Attributable to Interests of Foreign Partners.</u>

A.      In the event that either (y) the Partnership's actual or deemed amount realized upon disposition of any United States Real Property Interest is attributed to a Foreign Partner or (z) the Partnership has effectively connected taxable income for any taxable year:

(i) any tax required to be withheld under Sections 1445 or 1446 of the Code shall be charged to that Foreign Partner's Capital Account as if the amount of such tax had been distributed to such Partner;

(ii)    the General Partner shall have the right to make a loan to the Partnership in an amount equal to the amount of tax required to be withheld pursuant to Sections 1445 or 1446 of the Code to the extent that cash is needed to make the Sections 1445 or 1446 withholding payment attributable to that Foreign Partner; and

(iii)    the General Partner may retain appropriate portions of a Foreign Partner's distributions until any withholding obligations relating to that Foreign Partner are satisfied and may apply such distributions to repay any loan made pursuant to Section 13.2.A(ii) hereof.

B.      For purposes of this Section 13.2, any person who fails to provide a certification of a non-foreign status when requested to do so by the General Partner shall be treated as a Foreign Person.

ARTICLE XIV

MISCELLANEOUS

14.1     Law Governing.  This Agreement shall be governed by and construed in accordance with the laws of the State applicable to contracts made and to be performed entirely therein.

14.2     Power of Attorney.  [Intentionally Omitted]

14.3     Counterparts.  This Agreement may be signed in any number of counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one agreement.  The production of any executed counterpart of this Agreement shall be sufficient for all purposes without producing or accounting for any other counterpart thereof.

14.4     Partners Independently Bound.  The General Partner, the Special Limited Partner and the Limited Partner shall become bound by this Agreement immediately upon its execution thereof and independently of the execution hereof by any other Partner.

14.5     Separability of Provisions.  Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein (A) are determined to be invalid or contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid or (B) would cause any of the Investor Limited Partners to be bound by the obligations of the Partnership (other than under the rules, directives and regulations of any Authority) under the laws of the State as the same may now or hereafter exist, such provision or provisions shall be deemed void and of no effect.

14.6     Address and Notice.  All notices, demands, solicitations of consent or approval, and other communications hereunder required or permitted shall be in writing and shall be deemed to have been given when personally delivered or five days after the date when deposited in the United States mail and sent postage prepaid by registered or certified mail, return receipt requested, addressed as follows:  if intended for (A) the Partnership, to its principal place of business or (B) the Partners, to their respective addresses set forth on Schedule A, or to such other address which any Partner shall have given to the Partnership for such purpose by notice hereunder; provided, however, that copies of all such items (which shall not constitute notice hereunder) shall (i), if sent to the Limited Partner or Special Limited Partner, also be sent to Proskauer Rose LLP, 2049 Century Park East, Suite 3200, Los Angeles, California  90067, Attention:  Kenneth Krug, Esq; (ii) if sent to the Administrative General Partner, also be sent to Goldfarb & Lipman, 1300 Clay Street, Ninth Floor, Oakland, CA 94612, Attention:  John Haygood, Esq.; and (iii) if sent to the Managing General Partner, also be sent to Mark F. Nelson, Esq., 31423 South Coast Highway, Suite 7100, Laguna Beach, CA 92651-6997.

14.7     Computation Of Time.  In computing any period of time pursuant to this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included.

14.8     Titles and Captions.  All article and section titles or captions contained in this Agreement are for convenience only and shall not be deemed part of the text of this Agreement.

14.9     Entire Agreement.  This Agreement contains the entire understanding between and among the parties and supersedes any prior understandings and agreements between and among them respecting the subject matter of this Agreement.

5215/60851-045 LALIB1/508627 v7                   -  60  -

14.10    Agreement Binding.  This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives and permitted successors and assigns of the parties hereto.

14.11    Parties in Interest.  Nothing herein shall be construed to be to the benefit of or enforceable by any third party including, but not limited to, any creditor of the Partnership.

14.12    Amendments; Other Actions.

A.    This Agreement may not be amended or modified except by the General Partner with the Consent of the Special Limited Partner and the approval, if required, of each Authority; provided, however, that the prior written consent of all Partners is required to any amendment which would (i) extend the term of the Partnership as set forth in Section 12.1 hereof, (ii) amend this Section 14.12, (iii) increase or extend the liability or obligation of the Limited Partner or any limited partner, (iv) increase the amount of Capital Contributions payable by the Limited Partner or any limited partner, (v) accelerate the date of payment of any installment or (vi) alter the distribution or allocation to the Partners of any profits and losses and distributions of the Partnership.

B.    Notwithstanding any other provision of this Agreement, no action may be taken under this Agreement unless such action is taken in compliance with the provisions of the Uniform Act.

C.    The General Partners acknowledge and agree that upon receipt of written notice from the Investor Limited Partner that it desires to exercise the right of the Special Limited Partner to Consent to the actions specified in Sections 5.5.B(i), (iv), (x), (xi), (xii) or the rights exercisable under Section 11.4, including the right to appoint a successor General Partner upon the removal of a General Partner, such rights shall be exercisable exclusively by the Investor Limited Partner and this Agreement shall be deemed to have been so amended to reflect that such rights are to be exercised exclusively by the Investor Limited Partner.

14.13    Survival of Representations, Warranties and Agreements.  All representations, warranties and agreements shall survive until the dissolution and termination of the Partnership, except to the extent that a representation, warranty or agreement expressly provides otherwise.

14.14    Further Assurances.  The Partners will execute and deliver such further instruments and do such further acts and things as may be required to carry out the intent and purposes of this Agreement.

14.15    Remedies Cumulative.  No remedy conferred upon or reserved to the Partnership or any Partner by this Agreement is intended to be exclusive of any other remedy. Each and every such remedy shall be cumulative and shall be in addition to any other remedy given to the Partnership or any Partner hereunder or now or hereafter existing at law or in equity or by statute.

14.16    Meetings.  Meetings of the Partnership may be called by the General Partner or by the Special Limited Partner for any matters for which the Partners may vote as set forth in this Agreement or to obtain information concerning the Partnership.  A list of names and addresses of all Partners shall be maintained as part of the books and records of the Partnership and shall be made available upon request to any Partner or its representative at cost.  Upon receipt of a request either in person or by registered mail stating the purposes of the meeting, the General Partner shall provide the Partners, within ten days after receipt of such request, written notice of a meeting and the purpose of such meeting to be held on a date not less than 15 nor

more than 30 days after receipt of such request, at a time and place within or without the State convenient to the Partners.

   14.17 <u>HCA Obligations Nonrecourse</u>.  Notwithstanding anything to the contrary contained in the Project Documents, absent the wilful misconduct or gross negligence of HCA or its officers, directors or agents, HCA and its officers, directors, employees and agents shall have no personal, deficiency or recourse liability for any obligations, representations, warranties or indemnities contained in the Project Documents, it being understood that the sole remedy of the Partnership or the Partners against HCA and its officers, directors, employees and agents pursuant to the Project Documents shall be to set-off any claims against HCA against any amounts due HCA pursuant to this Agreement and/or removal of HCA as Managing General Partner pursuant to Article 11 hereof.  Notwithstanding anything in the Project Documents to the contrary, (a) to the extent that a covenant or representation under the Project Documents is specifically made by a particular General Partner, no other General Partner shall have any obligation or liability in connection with that covenant or representation unless such other General Partner affirmatively undertakes responsibility with respect to such covenant or representation; and (b) the obligation of the Managing General Partner to indemnify the Partnership and the other Partners from and against any liability, loss or damage shall be limited to instances where the acts or omissions of the Managing General Partner caused such liability, loss or damage.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, this Agreement has been duly executed on the day and year first above written.

ADMINISTRATIVE GENERAL PARTNER:

PALM DESERT DEVELOPMENT COMPANY,
a California corporation

By:_____

Name:_____

Title:_____

MANAGING GENERAL PARTNER:

HOUSING CORPORATION OF AMERICA,
a Utah non-profit corporation

By:_____

Name:_____

Title:_____

WITHDRAWING LIMITED PARTNER:

_____
Danavon L. Horn

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

5215/60851-045 LALIB1/508627

70

IN WITNESS WHEREOF, this Agreement has been duly executed on the day and year first above written.

ADMINISTRATIVE GENERAL PARTNER:

PALM DESERT DEVELOPMENT COMPANY,
a California corporation

By:_____
   Name:_____
   Title:_____

MANAGING GENERAL PARTNER:

HOUSING CORPORATION OF AMERICA,
a Utah non-profit corporation

By: _Ronald H Olson_____
   Name: _Ronald H Olson_____
   Title: _Pres._____

WITHDRAWING LIMITED PARTNER:

_____
Danavon L. Horn

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

5215/60851-045 LALIB1/508627

71

LIMITED PARTNER:

RCC CREDIT FACILITY, L.L.C., a Delaware
limited liability company

By: _____

Ronne Thielen
Vice President

SPECIAL LIMITED PARTNER:

RELATED DIRECT SLP LLC
a Delaware limited liability company

By:   RCC Credit Facility L.L.C.,
      a Delaware limited liability company

      By: _____

      Ronne Thielen
      Vice President

SCHEDULE A TO

THE AMENDED AND RESTATED

AGREEMENT OF LIMITED PARTNERSHIP

OF FREDERICK AND 52 II LIMITED PARTNERSHIP,
A CALIFORNIA LIMITED PARTNERSHIP

dated as of March 1, 2002

| General Partners: | Capital Contribution | |
|---|---|---|
| PALM DESERT DEVELOPMENT COMPANY<br>73-061 El Paseo<br>Suite 214<br>Palm Desert, California 92261<br>Attention: Danavon L. Horn | $ | 5.00 |
| HOUSING CORPORATION OF AMERICA<br>150 South 600 East, Suite 1A<br>Salt Lake City, Utah 84102<br>Attention: Ronald H. Olsen | $ | 5.00 |
| **Special Limited Partner:** | | |
| RELATED DIRECT SLP LLC<br>625 Madison Avenue<br>New York, New York 10022 | $ | 10.00 |
| **Limited Partner:** | | |
| RCC CREDIT FACILITY, L.L.C.<br>625 Madison Avenue<br>New York, New York 10022 | $ | 7,542,000 |

FREDERICK AND 52 II LIMITED PARTNERSHIP,

FIRST AMENDMENT TO AMENDED AND RESTATED
AGREEMENT OF LIMITED PARTNERSHIP

FIRST AMENDMENT TO AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP ("Amendment"), dated as of May 𝟥𝟢, 2002, by and among PALM DESERT DEVELOPMENT COMPANY, a California corporation ("PDDC"), as Administrative General Partner, HOUSING CORPORATION OF AMERICA, a Utah non-profit corporation ("HCA"), as Managing General Partner, RELATED DIRECT SLP LLC, a Delaware limited liability company, as Withdrawing Special Limited Partner, RCC CREDIT FACILITY, L.L.C., a Delaware limited liability company, as Withdrawing Limited Partner, RELATED CAPITAL HOUSING PARTNERSHIP I L.P.- SERIES 2, a Delaware limited partnership, as Limited Partner, and RCHP SLP I L.P.- SERIES 2, a Delaware limited partnership, as Special Limited Partner.

## W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲:

WHEREAS, the Partnership was formed as a limited partnership under the laws of the State pursuant to an Agreement of Limited Partnership dated as of August 6, 2001, and was continued pursuant to that certain Amended and Restated Agreement of Limited Partnership dated as of March 1, 2002 (the "Partnership Agreement"); and

WHEREAS, the Withdrawing Limited Partner has assigned its Interest to the Limited Partner, the Withdrawing Limited Partner desires to withdraw from the Partnership, and the Limited Partner desires to be admitted into the Partnership; and

WHEREAS, the Withdrawing Special Limited Partner has assigned its Interest to the Special Limited Partner, the Withdrawing Special Limited Partner desires to withdraw from the Partnership, and the Special Limited Partner desires to be admitted into the Partnership;

WHEREAS, the Partners desire to further clarify the provisions in the Partnership Agreement regarding allocations of Profits and Losses to the Partners for tax and accounting purposes; and

WHEREAS, the Partners desire to make certain amendments to the Partnership Agreement to reflect such assignments, withdrawals, admissions and clarifications.

NOW, THEREFORE, in consideration of the agreements hereinafter set forth, the parties hereto agree that the Partnership Agreement is hereby amended as follows:

1.    The Withdrawing Limited Partner and the Withdrawing Special Limited Partner hereby withdraw as limited partners of the Partnership.  The Limited Partner and the

Special Limited Partner are hereby admitted to the Partnership as limited partners. The Limited Partner has signed and delivered a new Capital Note, dated of even date herewith (the "New Capital Note"), evidencing its obligation to make capital contributions to the Partnership. The Withdrawing Limited Partner and the Withdrawing Special Limited Partner acknowledge that they have no further interest in the Partnership as limited partners as of the date hereof, have released all claims, if any, against the Partnership arising out of their participation as limited partners, and shall be deemed to have withdrawn as limited partners of the Partnership as of such date. The General Partner, the Limited Partner and the Special Limited Partner agree that the Withdrawing Limited Partner and the Withdrawing Special Limited Partner shall have no further liabilities or obligations to the Partnership as of such date. Without limiting the foregoing, the Withdrawing Limited Partner shall have no further liability under its Capital Note, which shall become null and void upon the execution and delivery of this First Amendment, the New Capital Note and the Pledge Agreement executed and delivered by the Limited Partner, the Special Limited Partner and the Partnership. The Pledge Agreement previously executed by the Withdrawing Limited Partner and the Withdrawing Special Limited Partner shall also be null and void at such time.

2. Any reference in the Partnership Agreement to the Limited Partner shall henceforth be deemed a reference to Related Capital Housing Partnership I L.P.- Series 2, and any reference in the Partnership Agreement to the Special Limited Partner shall henceforth be deemed a reference to RCHP SLP I L.P.- Series 2.

3. Schedule A to the Partnership Agreement is hereby amended by replacing the schedule attached to the Partnership Agreement with Schedule A attached to this Amendment.

4. Section 9.2A(v) of the Partnership Agreement is hereby replaced in its entirety with the following:

(v) To the Managing General Partner, 90% of then available Cash Flow to pay the MGP Fee and 10% of then available Cash Flow to the Limited Partner until the Managing General Partner has received an amount equal to the MGP Fee then due to the Managing General Partner pursuant to Section 6.3 of the Partnership Agreement (for example, assuming the MGP Fee is $15,000, the first 16,667 available would be allocated $15,000 to the Managing General Partner and $1,667 to the Limited Partner).

5. The fourth sentence of Section 9.2.D of the Partnership Agreement is hereby replaced in its entirety with the following: "At the time of distribution of any Cash Flow and/or Sale or Refinancing Transaction Proceeds pursuant to Section 9.2.A or 9.2.B hereof, there shall be distributed to the Limited Partner, out of any Cash Flow and/or Sale or Refinancing Transaction Proceeds or other amounts that would otherwise have been distributed or paid to the General Partner and/or the Developer under such section an amount equal to the Return Amount, before the General Partner and/or the Developer, as applicable, shall be distributed or paid any such proceeds pursuant to such section."

6.      Except as modified hereby, the Partnership Agreement remains in full force and effect.

7.      This Agreement may be signed in any number of counterparts, all of which taken together shall constitute one and the same instrument.

8.      Capitalized terms not defined herein shall have the meaning provided in the Partnership Agreement.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, this Amendment has been duly executed as of the day and year first above written.

<u>ADMINISTRATIVE GENERAL PARTNER</u>:

PALM DESERT DEVELOPMENT COMPANY,
a California corporation


By:_____

Name:_____

Title:_____


<u>MANAGING GENERAL PARTNER</u>:

HOUSING CORPORATION OF AMERICA,
a Utah non-profit corporation


By:_____

Name:_____

Title:_____


[SIGNATURES CONTINUE ON FOLLOWING PAGES]

IN WITNESS WHEREOF, this Amendment has been duly executed as of the day and year first above written.

ADMINISTRATIVE GENERAL PARTNER:

PALM DESERT DEVELOPMENT COMPANY,
a California corporation

By:_____
    Name:_____
    Title:_____

MANAGING GENERAL PARTNER:

HOUSING CORPORATION OF AMERICA,
a Utah non-profit corporation

By:_____
    Name:_____Ronald H Olson_____
    Title:_____Pres_____

[SIGNATURES CONTINUE ON FOLLOWING PAGES]

WITHDRAWING LIMITED PARTNER

RCC CREDIT FACILITY, L.L.C.,
a Delaware limited liability company

By: _____
     Name: _____
     Title: _____

LIMITED PARTNER

RELATED CAPITAL HOUSING PARTNERSHIP I L.P.-
SERIES 2,  a Delaware limited partnership

By:   RCHP GENERAL I L.L.C.- SERIES 2,
      a Delaware limited liability company
      Its General Partner

      By: _____
         Name: _____
         Title: _____

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

<u>WITHDRAWING SPECIAL LIMITED PARTNER</u>

RELATED DIRECT SLP LLC,
a Delaware limited liability company

By:    RCC Credit Facility, L.L.C.,
       a Delaware limited liability company
       Its Manager

       By:   _____
             Name: _____
             Title: _____


<u>SPECIAL LIMITED PARTNER</u>

RCHP SLP I L.P. - SERIES 2,
a Delaware limited partnership

By:    RCHP GENERAL  L.L.C. 1- SERIES 2,
       a Delaware limited liability company,
       Its General Partner,

       By:   _____
             Name: _____
             Title: _____

5556/60851-045  LALIB1/522814 v1

SCHEDULE A TO
FIRST AMENDMENT TO
AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP
OF
FREDERICK AND 52 II LIMITED PARTNERSHIP,
a California limited partnership

dated as of May *30* , 2002

| General Partners | Capital Contribution |
|---|---|
| PALM DESERT DEVELOPMENT COMPANY<br>73-061 El Paseo<br>Suite 214<br>Palm Desert, California  92261<br>Attention: Danavon L. Horn | $     5.00 |
| HOUSING CORPORATION OF AMERICA<br>150 South 600 East, Suite 1A<br>Salt Lake City, Utah 84102<br>Attention: Ronald H. Olsen | $     5.00 |

Special Limited Partner:

| | |
|---|---|
| RCHP SLP I L.P.- Series 2<br>625 Madison Avenue<br>New York, New York  10022 | $    10.00 |

Limited Partner:

| | |
|---|---|
| RELATED CAPITAL HOUSING PARTNERSHIP<br> I L.P.- Series 2<br>625 Madison Avenue<br>New York, New York  10022 | $   7,542,000 |